# EXHIBIT F

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NEW YORK

3    ------------------------------------------------

4    **ALAN WALTER,**

            Plaintiff,

5

6    -vs-                          19-CV-01583-WMS-JJM

7

8    **CSX TRANSPORTATION INC.,**

            Defendant.

9    ------------------------------------------------

10             Examination Before Trial of

11   **RICHARD RYDZA,** held before Jennifer A.

12   Drakulich, Notary Public, at DePaolo Crosby

13   Reporting Services, 135 Delaware Avenue, Suite

14   301, Buffalo, New York, on Wednesday, October

15   21st, 2020 at 12:50 p.m., pursuant to notice.

16

17

18

19

20

21

22

23

1          **A P P E A R A N C E S**

2          APPEARING FOR THE PLAINTIFF:

3                    **LOTEMPIO P.C. LAW GROUP**
                     **BY:   HEATHER BAUMEISTER, ESQ.,**
4                    181 Franklin Street
                     Buffalo, New York 14202
5                    (716) 855-3761

6          APPEARING FOR THE DEFENDANT:

7                    **NASH CONNORS, P.C.**
                     **BY:   PHILIP M. GULISANO, ESQ.,**
8                    344 Delaware Avenue
                     Suite 400
9                    Buffalo, New York 14202
                     (716) 842-4121

10

11

12

13

14

15

16

17

18

19

20

21

22

23

```
1                  W I T N E S S E S
     WITNESS               EXAMINATION              PAGE
2
     RICHARD RYDZA
3
                   By Ms. Baumeister              4, 30
4                  By Mr. Gulisano                   19

5
                   E X H I B I T S
6    EXHIBIT             DESCRIPTION               PAGE

7    (No exhibits marked)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

RICHARD RYDZA

```
 1        R I C H A R D      R Y D Z A
 2        110 Labelle Avenue, Blasdell, New York 14219
 3        having been first duly sworn, was examined and
 4        testified as follows:
 5
 6        EXAMINATION BY MS. BAUMEISTER:
 7     Q. Mr. Rydza, my name is Heather Baumeister.  I
 8        represent Alan Walter with respect to the
 9        injuries he sustained from the accident on
10        July 21st, 2017.  I'm just going to ask you a
11        couple questions today to find out what
12        happened.  Have you ever given a deposition
13        before?
14     A. Yes.
15     Q. I'll just go over the ground rules just so
16        we're all on the same page.  The court
17        reporter here is going to take down everything
18        that's said.  She can only take down one
19        person at a time.  If you let me finish my
20        question before you answer, that's the best
21        way to go.  She can't take down head nods
22        or --
23     A. Correct.
```

RICHARD RYDZA

1    Q. -- shoulder shrugs or anything like that, so

2       verbal responses.  If I ask a question that

3       you don't understand, just let me know and

4       I'll rephrase it so we're all on the same

5       page.  Okay?

6    A. Yes.

7    Q. What's your date of birth?

8    A. June 7th, 1961.

9    Q. Can you give me a little bit of your education

10      history?

11    A. I have a two-year degree in criminal justice,

12      two-year degree in occupational health and

13      safety and industrial hygiene, four-year

14      degree, dual degree, in environmental

15      engineering technology and safety in

16      engineering technology.  I'm also a New York

17      State certified building and fire inspector

18      with all these sorts of certifications you

19      need to run a business.

20    Q. Where are you currently employed?

21    A. Thermo Fisher, Grand Island.

22    Q. All right.  So at Thermo Fisher, when did you

23      start there?

RICHARD RYDZA

```
 1      A. March 23rd, this year, 2020.

 2      Q. Okay.  What position do you have?

 3      A. Environmental health and safety specialist.

 4      Q. And where did you work before that?

 5      A. Aurubis.

 6      Q. Okay.  When did you start there?

 7      A. Asking me for a date.  I was there three

 8         years, so sometime in 20 -- when I left

 9         Clark's.  2016 it was sometime.  I went from

10         Clark to there.

11      Q. Okay.  So you were at Clark Rigging.  When did

12         you start there?  If you can approximate.

13      A. Don't recall exactly.  Maybe 2015, 2014.  I'm

14         not going to remember.

15      Q. So either 2014 or --

16      A. That could even be wrong.

17      Q. Okay.  Do you remember what positions you had

18         when you were there?

19      A. At which one?

20      Q. Sorry.  Clark.

21      A. Yes.  Environmental health and safety.  They

22         call me a director.

23      Q. Okay.
```

RICHARD RYDZA

1    A.  I think the exact title was risk and safety

2        manager.

3    Q.  Okay.  And did you hold that position

4        throughout your entire time at Clark?

5    A.  Yes.

6    Q.  Okay.  And you said you left there around

7        2016?

8    A.  Yes.  Could be.

9    Q.  All right.  On July 21st, 2017, do you

10       remember what project was being done on that

11       day?

12            MR. GULISANO:  Can we just clarify?

13       First of all, he said he left in 2016.

14            THE WITNESS:  End of 2016 sometime.

15            MR. GULISANO:  And now you're

16       questioning him on something that has happened

17       in 2017 --

18            MS. BAUMEISTER:  Oh.  I see.

19            MR. GULISANO:  So technically, by his

20       testimony, he wasn't employed by Clark at that

21       time, so maybe he was, but maybe he wasn't.

22   Q.  Were you employed by Clark on July 21st, 2017?

23   A.  I probably was.  I may have been, but I don't

RICHARD RYDZA

1          remember the exact dates.

2     Q.   Okay.  Were you employed by Clark Rigging on

3          the day that Alan Walter was injured?

4     A.   Yes.

5     Q.   Okay.  And you were on the job site that day?

6     A.   No, I was not.

7     Q.   Do you remember where you were?

8     A.   I was at another job site, then came to the

9          Clark main office and was requested to respond

10         to an incident that just happened at a job

11         site -- CSX job site.

12    Q.   Okay.  Do you know what the project was on the

13         job site for CSX?

14    A.   Clark had the contract to remove all the

15         towers -- the old existing towers for CSX, so

16         I believe that was one of the locations they

17         were setting up and stationing the crane to

18         remove one of the towers.

19    Q.   And do you know if that was CSX's property

20         they were on?

21    A.   I have no idea whose property.  It was -- may

22         I continue?

23    Q.   Oh.  Yes.

RICHARD RYDZA

1   A. I know there's a roadway and a sign that says

2      CSX, but it doesn't indicate whether it's the

3      property or not being so far from the tracks.

4   Q. But the job that the project that was being

5      done was for tracks that are on the property

6      -- strike that.  You don't have to answer

7      that.  Okay.  Do you know what equipment was

8      being used on on that day?

9   A. There was a crane, I can recall.  There's

10     other equipment than a crane being offloaded

11     on the flatbed trailer, so there was a

12     semitrailer and a tractor.  And then there was

13     other ancillary equipment used to lift items

14     up and place them into position.

15  Q. Okay.  So you said you were not on the job

16     site at the time Mr. Walter was injured; is

17     that correct?

18  A. Correct.

19  Q. Okay.  But you had said that you were called

20     to the job site after he was injured?

21  A. Correct, and I did get there and he was still

22     there.  He was still waiting for an emergency

23     vehicle to respond, I guess.

RICHARD RYDZA

1    Q.  Do you remember about what time that was?

2    A.  Later in the afternoon.  I can't pinpoint a

3        time.

4    Q.  Okay.  So when you got there, could you just

5        recount what you remember happened?

6    A.  Drove up a roadway, access to the rail yard or

7        the rail tracks.  I remember seeing a flatbed

8        with a semitrailer there.  Al was sitting on

9        the edge of the back of the trailer.  I don't

10       remember where the crane was positioned at

11       all.  That's kind of what I observed as I was

12       approaching.

13   Q.  Okay.  Did you see the trailer at all when you

14       got there?

15   A.  Yes.

16   Q.  Okay.  I'm going to show you what's marked as

17       Exhibit B.  Can you identify what's in that

18       picture?

19   A.  It is a semitrailer.

20   Q.  Okay.

21   A.  A flat semitrailer bed.

22   Q.  Is that an accurate representation of the

23       trailer that was on the job site that day?

RICHARD RYDZA

1    A. Refreshing, yes.

2    Q. Okay.  I'll show you what's marked as Exhibit

3       C.  Could you tell me what's in that picture?

4    A. Appears to be the same semitrailer flatbed.

5    Q. Is that a true and accurate representation of

6       what it would have looked like when you

7       arrived there?

8    A. Yes.  Refreshed me as to where the crane was,

9       too.

10   Q. Okay.  So when you got there, Mr. Walter was

11      sitting on the side of the trailer.  Did he

12      indicate to you that he was injured?

13   A. Yes.

14   Q. He did.  Do you remember what he said?

15   A. Says his back hurts really bad, had difficulty

16      moving and ambulating, so I said wait for an

17      emergency vehicle.

18   Q. And he went in the emergency vehicle.  Do you

19      know if he returned?

20   A. I don't remember.  I don't recall what

21      happened after that.  I'm sorry.

22   Q. Three years ago, too.  It's a long time to

23      remember.  So when you got to the job site,

RICHARD RYDZA

```
 1        you said the plank was -- the plank was
 2        missing in the trailer bed at the time when
 3        you got there?
 4     A. Yes, it was.  He identified that as the area
 5        where he fell through the vehicle or the
 6        trailer.
 7     Q. Okay.  And when you got there, was there
 8        anything on the trailer?
 9     A. No.  Nothing.
10     Q. No.  Okay.  Do you know if anyone replaced the
11        board after?  The missing plank in the
12        trailer?
13     A. I have no idea, but I put out a warning a
14        couple weeks ago that those flatbed trucks and
15        trailers needed to be complete throughout and
16        throughout, that all the decking needed to be
17        finished to give no opportunities for any
18        pebbles, rocks, debris, or for people to fall
19        through, because I think we did have a near
20        miss on one where someone almost fell through
21        but didn't get injured.  That's why I put that
22        out.
23     Q. And when you say a couple weeks before, do you
```

RICHARD RYDZA

1       mean a couple weeks before the July 21st, 2017
2       date of the accident?
3    A. Yeah.  It could have been a month or two
4       before that.  The incidents with stones --
5       it's a requirement that those flatbeds are
6       finished and there's no opportunity for stones
7       to fly out of them, hit other vehicles -- any
8       other objects to come out of them.  Everything
9       needs to be secure on them.
10              I think it's Section 393 that also
11      states that -- it's not that section.  It's
12      the OSHA standard that openings greater than
13      one inch, they have to be -- because that's
14      considered a working surface, so there can be
15      no openings on there where somebody can fall
16      through that's greater than one inch in
17      diameter.
18   Q. Whose job is it to make sure that the trailers
19      are up to code?
20   A. It's everybody's responsibility --
21              MR. GULISANO:  Objection.
22              THE WITNESS:  Did you say something?
23              MR. GULISANO:  I just objected.  You can

RICHARD RYDZA

1          answer.

2      A.  It's everybody's responsibility technically.

3          So the driver -- this came from the Syracuse

4          warehouse, and I think I put out a memo there,

5          maybe an e-mail, demanding that I didn't want

6          to see any more of these flatbeds coming into

7          our area without being properly repaired

8          because then they're going to get a citation

9          and possibly damage other people's property

10         and equipment if things fall through those

11         penetrations.

12             So that was a Syracuse trailer.  So the

13         driver's responsible not to drive his truck

14         when it's out of compliance.  It's my

15         responsibility to go around and audit

16         facilities to make sure that I look for

17         non-compliance issues, and when I find them, I

18         usually put out an e-mail or hazard alert, and

19         it's also the owner's responsibility.

20             And when you're on a construction site,

21         it's also -- whoever you're working for, it's

22         their responsibility or their safety person to

23         make sure the equipment is coming onto their

RICHARD RYDZA

1          property in a safe manner also, so there's

2          multiple people responsible.

3     Q.   You said this trailer came from the Syracuse

4          warehouse?

5     A.   Yes.  It was driven by a Syracuse driver.  I

6          forget his name exactly.

7     Q.   Would there have been anything on it at that

8          point in time?

9     A.   There could have been -- the crane could have

10         been on it, most likely.  I'm guessing they

11         drove the crane on it possibly.

12    Q.   Okay.  Do you know if any sort of accident

13         report was filled out?

14    A.   Yes.  I generated an accident report.

15    Q.   Do you know what typically goes in an accident

16         report or what you put in it?

17    A.   It can be quite lengthy depending on the

18         person.  The name of the person, the date of

19         the injury, the time of the injury.  I'll take

20         pictures and put the pictures in with the

21         accident report I would take about what

22         happened.

23              The supervisor will also fill out their

RICHARD RYDZA

1      version of what happened if they were on site
2      at the time.  I'll take statements, so I think
3      I took a statement, a signed statement from
4      Alan as far as what happened, and one of the
5      other truck operators there.
6   Q. Okay.  Do you know who the supervisor was on
7      that day?
8   A. I do not recall.
9   Q. I'm sorry if I asked you this before, but do
10     you know if the trailer was repaired after?  I
11     did ask you this.
12  A. I don't recall if it was, but it better have
13     been.
14  Q. Okay.  Okay.  So your role at Clark Rigging is
15     as a director, or was as a director, at that
16     point in time?
17  A. Correct.  Manager, whatever you want to call
18     me.
19  Q. So you do a little bit of everything, then?
20  A. When you're hired in that position, you do the
21     environmental safety, the health.  You do all
22     their fit testing, so it's hands-on.  It's a
23     combination.

RICHARD RYDZA

1    Q.  Okay.  And then with respect to trailers that

2        are used, those come from various warehouses

3        or various locations?

4    A.  Yes.  Depending on where the need is.  There

5        might be not enough trailers in the Western

6        New York area, and depending on what they need

7        to transport to and from each location on the

8        job site, those trailers might -- they might

9        stay in Buffalo.  They might move to

10       Rochester.  They might go to Syracuse.  They

11       might stay on the job site for a period of

12       time.

13   Q.  And then you had said that there's a

14       possibility that the piece of equipment could

15       have been on the trailer that was coming from

16       the Syracuse warehouse?

17   A.  Correct.  And again, I don't recall if they

18       were unloading it or loading it.

19   Q.  Okay.  That being said, is it fair to say that

20       no one at the Buffalo site would have been a

21       part of that loading within the Syracuse

22       office?

23   A.  Explain that.

RICHARD RYDZA

1    Q. So would it have been someone in Syracuse not

2        associated with the Buffalo, I guess, office

3        or sector, you could say?  Would it be someone

4        in Syracuse that would have potentially loaded

5        the piece of equipment on this trailer?

6    A. Correct.  And each location has their own

7        mechanic working on those trailers.

8    Q. Is it all Clark --

9    A. It's all Clark.

10   Q. -- Rigging?

11   A. Correct.

12   Q. And then do you know if the trailer that I

13       showed you in the pictures, if that was

14       brought directly to the job site at CSX?

15   A. Yes.

16   Q. It was.  Okay.

17   A. From Syracuse directly to the site, correct.

18   Q. Okay.

19       MS. BAUMEISTER:  I think that's all I

20     have.

21       MR. GULISANO:  You're not out of the

22     woods yet.

23       THE WITNESS:  I know.  I don't want to

RICHARD RYDZA

1      miss this appointment.

2          MR. GULISANO:  So I'll do my best to get

3      through it.

4

5      **EXAMINATION BY MR. GULISANO:**

6   Q. Just so I understand, you had no involvement

7      in the work being performed on the day of the

8      incident, correct?

9   A. Correct.

10  Q. Not to minimize your knowledge, but probably

11     at the time of the incident you had no idea

12     really what was taking place until the

13     accident was brought to your attention and you

14     went to investigate it.  Is that fair?

15  A. Correct.  Correct.

16  Q. With respect to the trailer, it's been

17     referred to as a lowboy trailer.  Do you

18     understand that term?

19  A. Yes.

20  Q. Okay.  How did you learn that that lowboy

21     trailer was brought from Syracuse?

22  A. Because a Syracuse driver -- it was advised

23     that's where it came from.

RICHARD RYDZA

1    Q. What do you mean "it was advised"?

2    A. It was advised from our central terminal that

3       dispatches that that came from that location.

4       It was a Syracuse driver that drove it to that

5       location.

6    Q. So what did you do to determine that?

7    A. I asked our dispatch guy.  I asked everybody.

8    Q. After the accident you asked the dispatch

9       where the trailer came from and was told it

10      came from Syracuse, correct?

11   A. Correct.

12   Q. As you sit here right now, do you know when it

13      came from Syracuse what was on the lowboy

14      trailer?

15   A. I do not.

16   Q. Okay.

17   A. I don't recall.

18   Q. You don't know if it was loaded with something

19      or nothing.  Is that fair?

20   A. Yes.

21   Q. And do you know who the driver was that drove

22      from Syracuse to the Buffalo area?

23   A. Yeah, but I don't remember his name.

RICHARD RYDZA

1    Q. Was it Mr. Walter, the individual who was

2       injured?

3            MS. BAUMEISTER:  Objection.

4    A. That's who I assume was driving it.

5    Q. You assume that or learned that through your

6       investigation?

7    A. I was told that.

8    Q. So your recollection is -- and you understand

9       the person who claims he was injured in this

10      lawsuit was Mr. Walter, correct?  Do you

11      understand that?

12   A. Yes.  Now you're telling me that.

13   Q. And it's your understanding he drove it from

14      Syracuse to Buffalo?

15   A. Told.  Advised.

16   Q. Do you have any other information that leads

17      you to believe that's not true?

18   A. No.  I don't recall.

19   Q. Do you have any -- did your investigation

20      yield any prior complaints or problems with

21      this particular trailer?

22   A. Not the particular trailer, but other trailers

23      had similar issues.

RICHARD RYDZA

1    Q. Okay.  When you say similar issues, did your

2       investigation reveal that there were other

3       trailers that may have had some missing planks

4       on them?

5    A. Yes.  There was one where some product came

6       onto the highway and I got a complaint from a

7       driver requesting payment for damage to his

8       vehicle because the stones came off our truck.

9    Q. Any other instances?

10   A. Not that I recall.

11   Q. When you responded to the scene of this

12      incident at CSX, you talked to Mr. Walter and

13      he told you that he stepped in the area where

14      the plank was missing, correct?

15   A. Yes.

16   Q. All right.  Do you, as you sit here, have any

17      knowledge as to how that plank came off?

18   A. No, I do not.

19   Q. Do you, as you sit here, have any acknowledge

20      as to how long the plank was missing?

21   A. No, I do not.

22   Q. So you don't know if it came off in

23      transportation a long time ago or not.  Is

RICHARD RYDZA

1          that fair?

2     A.   That's fair, yes.

3     Q.   You indicated that you may have sent some

4          e-mails or memos.  Did you do that before this

5          particular incident of July 21st, 2017?

6     A.   Yes.

7     Q.   And what was the -- what was the substance of

8          those communications?

9     A.   From that incident, I took a picture of that

10         vehicle, a flatbed lowboy, that had a missing

11         plank and sent out a hazard alert, the DOT

12         standard, the New York State standard

13         requiring -- and the OSHA standard requiring

14         that there be no holes in the decking and they

15         shouldn't be transported until they're

16         repaired.

17    Q.   So do you believe that that notice went out at

18         some point before Mr. Walter's accident?

19    A.   Yes.  Definitely.

20    Q.   Did you send the notice out as a result of Mr.

21         Walter's accident?

22    A.   On top of that, I do send another hazard ID

23         alert out because I let everybody know about

RICHARD RYDZA

1      the injury and what happened and how it
2      happened.
3   Q. Do you recall doing it in this occasion?
4   A. Yes.
5   Q. Are drivers responsible to conduct an
6      inspection of their tractor and trailer before
7      operating it?
8   A. Yes.
9   Q. Would you have expected Mr. Walter to conduct
10     an inspection of his tractor and trailer prior
11     to operating it?
12  A. Yes.
13  Q. Would that include carefully examining the
14     trailer to make sure there are no known
15     problems or defects with it?
16  A. Yes.  Sometimes that can be difficult with
17     lowboys, the beds, because if there's a crane
18     on it, you're not going to see what's on the
19     decking under it sometimes.
20  Q. All right.  But you don't know what was on it
21     when he first got the trailer, correct?
22  A. Correct.
23  Q. Have you ever put out a hazard bulletin

RICHARD RYDZA

1       stating "do not use trailer decks as walking
2       surfaces"?
3  A.  I don't recall.
4  Q.  Do you agree with that statement, that you
5       should not use trailer decks as walking
6       surfaces?
7  A.  No.
8  Q.  You don't agree with that?
9  A.  They are considered a walking-working surface.
10      You cannot physically do the work without
11      walking onto the deck to unbolt some of the
12      equipment when it's chained down, so then it
13      becomes a walking-working surface.
14  Q.  So then the people should use them as
15      walking-working surfaces.  Is that what you're
16      saying?
17  A.  They can be used as walking-working surface.
18  Q.  Would you agree that in this particular case a
19      root cause was the driver's failure to inspect
20      the trailer using the pre-trip form?
21  A.  I would say yes.
22  Q.  Would you agree that a root cause or secondary
23      cause of this incident was the failure of Mr.

RICHARD RYDZA

1      Walter to watch where he was walking?
2           MS. BAUMEISTER:  Objection.
3   A.  Secondary causes -- or the first one, if I may
4       elaborate on that first one.  As far as a root
5       cause, it would go down to the actual
6       procedure or the policy of the manager or the
7       owner who initiates a policy that from that --
8       that root cause is the procedure that that
9       individual is the secondary.
10          He should be doing the inspection, so
11      the inspection would be the secondary cause,
12      not the root cause.  The root cause of the
13      procedure is the maintenance mechanic did not
14      repair the item.
15  Q.  That's fine.
16  A.  I don't know if that matters.
17  Q.  I'm not sure it matters or not, but let's just
18      answer my questions, if you can.  And if you
19      can't, just tell me you can't.  Question:  Do
20      you agree that a root cause was the driver's
21      failure to inspect the trailer using a
22      pre-trip form?
23  A.  No.

RICHARD RYDZA

1    Q.  You don't agree with that?

2    A.  Not as the root cause.

3    Q.  Do you believe that it's any cause?

4    A.  It's a secondary.

5    Q.  You believe that's the secondary cause?

6    A.  Yes.

7    Q.  What about the driver's failure to watch where

8        he is walking?  Do you believe that's any

9        cause in this accident?

10   A.  Yes.

11   Q.  What kind of cause do you believe that is?

12   A.  Secondary.

13   Q.  Do you believe this is a true statement:  The

14       best prevention to getting hurt is yourself?

15   A.  It's a common statement, yes.

16   Q.  Do you agree with that?

17   A.  Yes.

18   Q.  Do you agree that workers should plan their

19       steps?

20   A.  Yes.

21   Q.  Okay.  And they should look ahead and plan

22       their steps by watching for hazards such as

23       protruding screws, nails, stones, or anything

RICHARD RYDZA

1       that could create a slip, trip, or fall?

2   A.  Yes.

3   Q.  Do you agree with that?  And that includes Mr.

4       Walter in this particular incident, correct?

5   A.  As being a what?

6   Q.  That would apply to him as being an employee.

7   A.  Yes.

8   Q.  That he should do those things.

9   A.  Yes.

10  Q.  Do you know why Mr. Walter was walking on the

11      surface of the lowboy trailer?

12  A.  Yes.

13  Q.  Why is that?

14  A.  He said that he was actually not only

15      performing his duties as a driver, but they

16      wanted him to perform duties as a rigger,

17      which he's not certified to do, but the cause

18      -- they will ask drivers to do rigging work,

19      so what he was doing was actually holding onto

20      a tagline as a piece of equipment was in the

21      air and walking backwards on the lowboy, and

22      that's when he fell.

23  Q.  So that's what he told you?

RICHARD RYDZA

1    A. That's how he said it happened.

2    Q. He told you he was walking backwards and then

3       he said he was not watching in the direction

4       he was traveling?

5    A. No.  He was focusing on the piece of equipment

6       because it had to be guided properly.

7    Q. Let me just ask the question, because it

8       wasn't responsive.  Did he tell you that he

9       was walking backwards and he was not looking

10      in the direction he was moving?

11   A. I don't recall exactly what he said.

12   Q. You don't?

13   A. No.

14   Q. Well, if he was looking up at the load, was he

15      also watching where he was walking behind him?

16         MS. BAUMEISTER:  Objection.

17   A. No.

18   Q. All right.  So he wasn't watching where was

19      going.  Is that a fair statement?

20         MS. BAUMEISTER:  Objection.

21   A. Yes.

22         MR. GULISANO:  That's all the questions

23      I have.

RICHARD RYDZA

1          MS. BAUMEISTER:  Quick followup.

2

3     **BY MS. BAUMEISTER:**

4     Q. Do you know how the planks are affixed to a

5        trailer?

6     A. They're bolted down.

7     Q. They're bolted down.  Okay.  How do they come

8        off?  How do you find yourself in a situation

9        where a trailer is missing a plank?

10          MR. GULISANO:  Objection.

11    A. That would ask for assumption, so I don't

12       know.  Are you asking me why this one was

13       removed?

14    Q. Not this one.  You said in the past trailers

15       have had similar issues with missing planks.

16    A. It may have had a bad plank and they just

17       didn't finish repairing it.

18    Q. If it is a bad plank, how does that affect

19       the --

20    A. It could affect -- I know where you're going.

21       It could affect the stability of the load.  It

22       could cause somebody to actually go through

23       it.

RICHARD RYDZA

1  Q. Is it fair to say if there is a -- I'm sorry.

2     I forget the term you used for it.  The

3     plate -- the plank.  If it's not properly on,

4     it's --

5  A. Plank.

6  Q. Yes.  Is it fair to say that if a piece of

7     equipment was placed on this area, the plank

8     could come off and no one would know if it's

9     not fully, like, on?

10 A. So you're asking if it could?

11 Q. If it could.

12 A. It possibly could, but I can't assume, you

13    know?  There's been trailers I've seen that

14    have damaged floorboards and they've never

15    come off.

16 Q. But it's possible, if there was a damaged

17    floorboard and upon inspection everything

18    looks up to code --

19 A. Mm-hm.

20 Q. -- and then a piece of equipment's put on,

21    that floorboard could go and no one would

22    know?

23 A. That's a possibility.  Yes.

RICHARD RYDZA

 1   Q. Possibility.  Okay.  And do you know if it's

 2      standard procedure for employees to do

 3      multiple tasks on a job site?  For example,

 4      would it be standard procedure for a driver to

 5      help unload equipment off of the trailer?

 6   A. I think our policy dictated no, and they're

 7      also not supposed to do rigger jobs, so he was

 8      doing a job of not only a driver, but of the

 9      rigger, and that's something I was all over

10      Clark about, too, that they had un-certified

11      riggers doing rigging work.  It was a concern.

12           MS. BAUMEISTER:  That's all I have.

13           MR. GULISANO:  Okay.  Thank you.

14           THE WITNESS:  Thank you very much.

15

16      (Deposition concluded at 1:24 p.m.)

17              * * * * * *

18

19

20

21

22

23

```
 1          STATE OF NEW YORK)

 2                   )  ss.

 3          COUNTY OF ERIE   )

 4

 5          I, Jennifer A. Drakulich, Notary Public, in
 6      and for the County of Erie, State of New York,
        do hereby certify:
 7

 8          That the witness whose testimony appears
        hereinbefore was, before the commencement of
 9      their testimony, duly sworn to testify the
        truth, the whole truth and nothing but the
10      truth; that said testimony was taken pursuant
        to notice at the time and place as herein set
11      forth; that said testimony was taken down by
        me and thereafter transcribed into
12      typewriting, and I hereby certify the
        foregoing testimony is a full, true and
13      correct transcription of my shorthand notes so
        taken.
14

15          I further certify that I am neither counsel
        for nor related to any party to said action,
16      nor in anyway interested in the outcome
        thereof.
17

18          IN WITNESS WHEREOF, I have hereunto
        subscribed my name and affixed my seal this
19      30th day of October, 2020.

20                      Drakulich

                   _____
22                 Jennifer A. Drakulich

23
```

## 1

**110** [1] - 4:2
**12:50** [1] - 1:15
**135** [1] - 1:13
**14202** [2] - 2:4, 2:9
**14219** [1] - 4:2
**181** [1] - 2:4
**19** [1] - 3:4
**19-CV-01583-WMS-JJM** [1] - 1:6
**1961** [1] - 5:8
**1:24** [1] - 32:16

## 2

**20** [1] - 6:8
**2014** [2] - 6:13, 6:15
**2015** [1] - 6:13
**2016** [4] - 6:9, 7:7, 7:13, 7:14
**2017** [6] - 4:10, 7:9, 7:17, 7:22, 13:1, 23:5
**2020** [3] - 1:15, 6:1, 33:19
**21st** [6] - 1:15, 4:10, 7:9, 7:22, 13:1, 23:5
**23rd** [1] - 6:1

## 3

**30** [1] - 3:3
**301** [1] - 1:14
**30th** [1] - 33:19
**344** [1] - 2:8
**393** [1] - 13:10

## 4

**4** [1] - 3:3
**400** [1] - 2:8

## 7

**716** [2] - 2:5, 2:9
**7th** [1] - 5:8

## 8

**842-4121** [1] - 2:9
**855-3761** [1] - 2:5

## A

**access** [1] - 10:6
**accident** [11] - 4:9, 13:2, 15:12, 15:14, 15:15, 15:21, 19:13, 20:8, 23:18, 23:21,
27:9
**accurate** [2] - 10:22, 11:5
**acknowledge** [1] - 22:19
**action** [1] - 33:15
**actual** [1] - 26:5
**advised** [4] - 19:22, 20:1, 20:2, 21:15
**affect** [3] - 30:18, 30:20, 30:21
**affixed** [2] - 30:4, 33:18
**afternoon** [1] - 10:2
**ago** [3] - 11:22, 12:14, 22:23
**agree** [9] - 25:4, 25:8, 25:18, 25:22, 26:20, 27:1, 27:16, 27:18, 28:3
**ahead** [1] - 27:21
**air** [1] - 28:21
**AI** [1] - 10:8
**ALAN** [1] - 1:4
**Alan** [3] - 4:8, 8:3, 16:4
**alert** [3] - 14:18, 23:11, 23:23
**almost** [1] - 12:20
**ambulating** [1] - 11:16
**ancillary** [1] - 9:13
**answer** [4] - 4:20, 9:6, 14:1, 26:18
**anyway** [1] - 33:16
**APPEARING** [2] - 2:2, 2:6
**apply** [1] - 28:6
**appointment** [1] - 19:1
**approaching** [1] - 10:12
**approximate** [1] - 6:12
**area** [6] - 12:4, 14:7, 17:6, 20:22, 22:13, 31:7
**arrived** [1] - 11:7
**associated** [1] - 18:2
**assume** [3] - 21:4, 21:5, 31:12
**assumption** [1] - 30:11
**attention** [1] - 19:13
**audit** [1] - 14:15
**Aurubis** [1] - 6:5
**Avenue** [3] - 1:13, 2:8, 4:2

## B

**backwards** [3] -
28:21, 29:2, 29:9
**bad** [3] - 11:15, 30:16, 30:18
**BAUMEISTER** [11] - 2:3, 4:6, 7:18, 18:19, 21:3, 26:2, 29:16, 29:20, 30:1, 30:3, 32:12
**Baumeister** [2] - 3:3, 4:7
**becomes** [1] - 25:13
**bed** [2] - 10:21, 12:2
**beds** [1] - 24:17
**behind** [1] - 29:15
**best** [3] - 4:20, 19:2, 27:14
**better** [1] - 16:12
**birth** [1] - 5:7
**bit** [2] - 5:9, 16:19
**Blasdell** [1] - 4:2
**board** [1] - 12:11
**bolted** [2] - 30:6, 30:7
**brought** [3] - 18:14, 19:13, 19:21
**Buffalo** [8] - 1:14, 2:4, 2:9, 17:9, 17:20, 18:2, 20:22, 21:14
**building** [1] - 5:17
**bulletin** [1] - 24:23
**business** [1] - 5:19
**BY** [5] - 2:3, 2:7, 4:6, 19:5, 30:3

## C

**cannot** [1] - 25:10
**carefully** [1] - 24:13
**case** [1] - 25:18
**causes** [1] - 26:3
**central** [1] - 20:2
**certifications** [1] - 5:18
**certified** [3] - 5:17, 28:17, 32:10
**certify** [3] - 33:6, 33:12, 33:15
**chained** [1] - 25:12
**citation** [1] - 14:8
**claims** [1] - 21:9
**clarify** [1] - 7:12
**Clark** [13] - 6:10, 6:11, 6:20, 7:4, 7:20, 7:22, 8:2, 8:9, 8:14, 16:14, 18:8, 18:9, 32:10
**Clark's** [1] - 6:9
**code** [2] - 13:19, 31:18
**combination** [1] - 16:23
**coming** [3] - 14:6, 14:23, 17:15

**commencement** [1] - 33:8
**common** [1] - 27:15
**communications** [1] - 23:8
**complaint** [1] - 22:6
**complaints** [1] - 21:20
**complete** [1] - 12:15
**compliance** [2] - 14:14, 14:17
**concern** [1] - 32:11
**concluded** [1] - 32:16
**conduct** [2] - 24:5, 24:9
**CONNORS** [1] - 2:7
**considered** [2] - 13:14, 25:9
**construction** [1] - 14:20
**continue** [1] - 8:22
**contract** [1] - 8:14
**Correct** [10] - 4:23, 9:18, 9:21, 17:17, 18:6, 18:11, 19:9, 19:15, 20:11, 24:22
**correct** [11] - 9:17, 16:17, 18:17, 19:8, 19:15, 20:10, 21:10, 22:14, 24:21, 28:4, 33:13
**counsel** [1] - 33:15
**COUNTY** [1] - 33:3
**County** [1] - 33:6
**couple** [4] - 4:11, 12:14, 12:23, 13:1
**COURT** [1] - 1:1
**court** [1] - 4:16
**crane** [6] - 8:17, 9:9, 9:10, 10:10, 11:8, 15:9, 15:11, 24:17
**create** [1] - 28:1
**criminal** [1] - 5:11
**Crosby** [1] - 1:12
**CSX** [7] - 1:7, 8:11, 8:13, 8:15, 9:2, 18:14, 22:12
**CSX's** [1] - 8:19

## D

**damage** [2] - 14:9, 22:7
**damaged** [2] - 31:14, 31:16
**date** [4] - 5:7, 6:7, 13:2, 15:18
**dates** [1] - 8:1
**debris** [1] - 12:18
**deck** [1] - 25:11
**decking** [1] - 12:16

**23:14, 24:19
decks** [2] - 25:1, 25:5
**defects** [1] - 24:15
**DEFENDANT** [1] - 2:6
**Defendant** [1] - 1:8
**definitely** [1] - 23:19
**degree** [4] - 5:11, 5:12, 5:14
**Delaware** [2] - 1:13, 2:8
**demanding** [1] - 14:5
**DePaolo** [1] - 1:12
**Deposition** [1] - 32:16
**deposition** [1] - 4:12
**DESCRIPTION** [1] - 3:6
**determine** [1] - 20:6
**diameter** [1] - 13:17
**dictated** [1] - 32:6
**difficult** [1] - 24:16
**difficulty** [1] - 11:15
**direction** [2] - 29:3, 29:10
**directly** [2] - 18:14, 18:17
**director** [3] - 6:22, 16:15
**dispatch** [2] - 20:7, 20:8
**dispatches** [1] - 20:3
**DISTRICT** [2] - 1:1, 1:2
**done** [2] - 7:10, 9:5
**DOT** [1] - 23:11
**down** [6] - 4:17, 4:18, 4:21, 25:12, 26:5, 30:6, 30:7, 33:11
**Drakulich** [3] - 1:12, 33:5, 33:22
**drive** [1] - 14:13
**driven** [1] - 15:5
**driver** [9] - 14:3, 15:5, 19:22, 20:4, 20:21, 22:7, 28:15, 32:4, 32:8
**driver's** [1] - 14:13, 25:19, 26:20, 27:7
**drivers** [2] - 24:5, 28:18
**driving** [1] - 21:4
**drove** [5] - 10:6, 15:11, 20:4, 20:21, 21:13
**dual** [1] - 5:14
**duly** [2] - 4:3, 33:9
**duties** [2] - 28:15, 28:16

## E

**e-mail** [2] - 14:5, 14:18

e-mails [1] - 23:4
edge [1] - 10:9
education [1] - 5:9
either [1] - 6:15
elaborate [1] - 26:4
emergency [3] - 9:22, 11:17, 11:18
employed [4] - 5:20, 7:20, 7:22, 8:2
employee [1] - 28:6
employees [1] - 32:2
end [1] - 7:14
engineering [2] - 5:15, 5:16
entire [1] - 7:4
environmental [4] - 5:14, 6:3, 6:21, 16:21
equipment [12] - 9:7, 9:10, 9:13, 14:10, 14:23, 17:14, 18:5, 25:12, 28:20, 29:5, 31:7, 32:5
equipment's [1] - 31:20
ERIE [1] - 33:3
Erie [1] - 33:6
ESQ [2] - 2:3, 2:7
exact [2] - 7:1, 8:1
exactly [3] - 6:13, 15:6, 29:11
Examination [1] - 1:10
EXAMINATION [3] - 3:1, 4:6, 19:5
examined [1] - 4:3
examining [1] - 24:13
example [1] - 32:3
Exhibit [2] - 10:17, 11:2
EXHIBIT [1] - 3:6
exhibits [1] - 3:7
existing [1] - 8:15
expected [1] - 24:9
explain [1] - 17:23

**F**

facilities [1] - 14:16
failure [4] - 25:19, 25:23, 26:21, 27:7
fair [6] - 17:19, 19:14, 20:19, 23:1, 23:2, 29:19, 31:1, 31:6
fall [4] - 12:18, 13:15, 14:10, 28:1
far [3] - 9:3, 16:4, 26:4
fell [3] - 12:5, 12:20, 28:22
fill [1] - 15:23
filled [1] - 15:13

fine [1] - 26:15
finish [2] - 4:19, 30:17
finished [2] - 12:17, 13:6
fire [1] - 5:17
first [5] - 4:3, 7:13, 24:21, 26:3, 26:4
Fisher [2] - 5:21, 5:22
fit [1] - 16:22
flat [1] - 10:21
flatbed [5] - 9:11, 10:7, 11:4, 12:14, 23:10
flatbeds [2] - 13:5, 13:6
floorboard [2] - 31:17, 31:21
floorboards [1] - 31:14
fly [1] - 13:7
focusing [1] - 29:5
follows [1] - 4:4
followup [1] - 30:1
FOR [2] - 2:2, 2:6
foregoing [1] - 33:12
forget [2] - 15:6, 31:2
form [2] - 25:20, 26:22
forth [1] - 33:11
four [1] - 5:13
four-year [1] - 5:13
Franklin [1] - 2:4
full [1] - 33:12
fully [1] - 31:9

**G**

generated [1] - 15:14
given [1] - 4:12
Grand [1] - 5:21
greater [2] - 13:12, 13:16
ground [2] - 4:15
GROUP [2] - 2:3
guess [1] - 9:23, 18:2
guessing [1] - 15:10
guided [1] - 29:6
GULISANO [12] - 2:7, 7:12, 7:15, 7:19, 13:21, 13:23, 18:21, 19:2, 19:5, 29:22, 30:10, 32:13
Gulisano [1] - 3:4
guy [1] - 20:7

**H**

hands [1] - 16:22
hands-on [1] - 16:22
hazard [4] - 14:18, 23:11, 23:22, 24:23

hazards [1] - 27:22
head [1] - 4:21
health [4] - 5:12, 6:3, 6:21, 16:21
Heather [1] - 4:7
HEATHER [1] - 2:3
held [1] - 1:11
help [1] - 32:5
hereby [2] - 33:6, 33:12
herein [1] - 33:10
hereinbefore [1] - 33:8
hereunto [1] - 33:18
highway [1] - 22:6
hired [1] - 16:20
history [1] - 5:10
hit [1] - 13:7
hm [1] - 31:19
hold [1] - 7:3
holding [1] - 28:19
holes [1] - 23:14
hurt [1] - 27:14
hurts [1] - 11:15
hygiene [1] - 5:13

**I**

ID [1] - 23:22
idea [3] - 8:21, 12:13, 19:11
identified [1] - 12:4
identify [1] - 10:17
IN [1] - 33:18
INC [1] - 1:7
inch [2] - 13:13, 13:16
incident [8] - 8:10, 19:8, 19:11, 22:12, 23:5, 23:9, 25:23, 28:4
incidents [1] - 13:4
include [1] - 24:13
includes [1] - 28:3
indicate [2] - 9:2, 11:12
indicated [1] - 23:3
individual [2] - 21:1, 26:9
industrial [1] - 5:13
information [1] - 21:16
initiates [1] - 26:7
injured [3] - 8:9, 9:16, 9:20, 11:12, 12:21, 21:2, 21:9
injuries [1] - 4:9
injury [3] - 15:19, 24:1
inspect [2] - 25:19, 26:21

inspection [5] - 24:6, 24:10, 26:10, 26:11, 31:17
inspector [1] - 5:17
instances [1] - 22:9
interested [1] - 33:16
investigate [1] - 19:14
investigation [3] - 21:6, 21:19, 22:2
involvement [1] - 19:6
island [1] - 5:21
issues [4] - 14:17, 21:23, 22:1, 30:15
item [1] - 26:14
items [1] - 9:13

**J**

Jennifer [3] - 1:11, 33:5, 33:22
job [16] - 8:5, 8:8, 8:10, 8:11, 8:13, 9:4, 9:15, 9:20, 10:23, 11:23, 13:18, 17:8, 17:11, 18:14, 32:3, 32:8
jobs [1] - 32:7
July [5] - 4:10, 7:9, 7:22, 13:1, 23:5
June [1] - 5:8
justice [1] - 5:11

**K**

kind [2] - 10:11, 27:11
knowledge [2] - 19:10, 22:17
known [1] - 24:14

**L**

Labelle [1] - 4:2
LAW [1] - 2:3
lawsuit [1] - 21:10
leads [1] - 21:16
learn [1] - 19:20
learned [1] - 21:5
left [3] - 6:8, 7:6, 7:13
lengthy [1] - 15:17
lift [1] - 9:13
likely [1] - 15:10
load [2] - 29:14, 30:21
loaded [2] - 18:4, 20:18
loading [2] - 17:18, 17:21
location [4] - 17:7, 18:6, 20:3, 20:5
locations [2] - 8:16, 17:3

look [2] - 14:16, 27:21
looked [1] - 11:6
looking [2] - 29:9, 29:14
looks [1] - 31:18
LOTEMPIO [1] - 2:3
lowboy [6] - 19:17, 19:20, 20:13, 23:10, 28:11, 28:21
lowboys [2] - 24:17

**M**

mail [2] - 14:5, 14:18
mails [1] - 23:4
main [1] - 8:9
maintenance [1] - 26:13
manager [2] - 7:2, 26:6
Manager [1] - 16:17
manner [1] - 15:1
March [1] - 6:1
marked [3] - 3:7, 10:16, 11:2
matters [2] - 26:16, 26:17
mean [2] - 13:1, 20:1
mechanic [2] - 18:7, 26:13
memo [1] - 14:4
memos [1] - 23:4
might [6] - 17:5, 17:8, 17:9, 17:10, 17:11
minimize [1] - 19:10
miss [2] - 12:20, 19:1
missing [8] - 12:2, 12:11, 22:3, 22:14, 22:20, 23:10, 30:9, 30:15
mm-hm [1] - 31:19
month [1] - 13:3
most [1] - 15:10
move [1] - 17:9
moving [2] - 11:16, 29:10
MR [11] - 7:12, 7:15, 7:19, 13:21, 13:23, 18:21, 19:2, 19:5, 29:22, 30:10, 32:13
MS [10] - 4:6, 7:18, 18:19, 21:3, 26:2, 29:16, 29:20, 30:1, 30:3, 32:12
multiple [2] - 15:2, 32:3

**N**

nails [1] - 27:23

**name** [5] - 4:7, 15:6, 15:18, 20:23, 33:18
**NASH** [1] - 2:7
**near** [1] - 12:19
**need** [3] - 5:19, 17:4, 17:6
**needed** [2] - 12:15, 12:16
**needs** [1] - 13:9
**never** [1] - 31:14
**NEW** [2] - 1:2, 33:1
**New** [8] - 1:14, 2:4, 2:9, 4:2, 5:16, 17:6, 23:12, 33:6
**non** [1] - 14:17
**non-compliance** [1] - 14:17
**Notary** [2] - 1:12, 33:5
**notes** [1] - 33:13
**nothing** [3] - 12:9, 20:19, 33:9
**notice** [4] - 1:15, 23:17, 23:20, 33:10

**O**

**objected** [1] - 13:23
**objection** [6] - 13:21, 21:3, 26:2, 29:16, 29:20, 30:10
**objects** [1] - 13:8
**observed** [1] - 10:11
**occasion** [1] - 24:3
**occupational** [1] - 5:12
**October** [2] - 1:14, 33:19
**OF** [3] - 1:2, 33:1, 33:3
**office** [3] - 8:9, 17:22, 18:2
**offloaded** [1] - 9:10
**old** [1] - 8:15
**one** [16] - 4:18, 6:19, 8:16, 8:18, 12:20, 13:13, 13:16, 16:4, 17:20, 22:5, 26:3, 26:4, 30:12, 30:14, 31:8, 31:21
**openings** [2] - 13:12, 13:15
**operating** [2] - 24:7, 24:11
**operators** [1] - 16:5
**opportunities** [1] - 12:17
**opportunity** [1] - 13:6
**OSHA** [2] - 13:12, 23:13
**outcome** [1] - 33:16
**own** [1] - 18:6

**owner** [1] - 26:7
**owner's** [1] - 14:19

**P**

**P.C** [2] - 2:3, 2:7
**p.m** [2] - 1:15, 32:16
**PAGE** [2] - 3:1, 3:6
**page** [2] - 4:16, 5:5
**part** [1] - 17:21
**particular** [6] - 21:21, 21:22, 23:5, 25:18, 28:4
**party** [1] - 33:15
**past** [1] - 30:14
**payment** [1] - 22:7
**pebbles** [1] - 12:18
**penetrations** [1] - 14:11
**people** [3] - 12:18, 15:2, 25:14
**people's** [1] - 14:9
**perform** [1] - 28:16
**performed** [1] - 19:7
**performing** [1] - 28:15
**period** [1] - 17:11
**person** [4] - 4:19, 14:22, 15:18, 21:9
**PHILIP** [1] - 2:7
**physically** [1] - 25:10
**picture** [3] - 10:18, 11:3, 23:9
**pictures** [3] - 15:20, 18:13
**piece** [6] - 17:14, 18:5, 28:20, 29:5, 31:6, 31:20
**pinpoint** [1] - 10:2
**place** [3] - 9:14, 19:12, 33:10
**placed** [1] - 31:7
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 2:2
**plan** [2] - 27:18, 27:21
**plank** [13] - 12:1, 12:11, 22:14, 22:17, 22:20, 23:11, 30:9, 30:16, 30:18, 31:3, 31:5, 31:7
**planks** [3] - 22:3, 30:4, 30:15
**plate** [1] - 31:3
**point** [3] - 15:8, 16:16, 23:18
**policy** [3] - 26:6, 26:7, 32:6
**position** [4] - 6:2, 7:3, 9:14, 16:20
**positioned** [1] - 10:10
**positions** [1] - 6:17

**possibility** [3] - 17:14, 31:23, 32:1
**possible** [1] - 31:16
**possibly** [3] - 14:9, 15:11, 31:12
**potentially** [1] - 18:4
**pre** [2] - 25:20, 26:22
**pre-trip** [2] - 25:20, 26:22
**prevention** [1] - 27:14
**problems** [2] - 21:20, 24:15
**procedure** [5] - 26:6, 26:8, 26:13, 32:2, 32:4
**product** [1] - 22:5
**project** [3] - 7:10, 8:12, 9:4
**properly** [3] - 14:7, 29:6, 31:3
**property** [6] - 8:19, 8:21, 9:3, 9:5, 14:9, 15:1
**protruding** [1] - 27:23
**Public** [2] - 1:12, 33:5
**pursuant** [2] - 1:15, 33:10
**put** [8] - 12:13, 12:21, 14:4, 14:18, 15:16, 15:20, 24:23, 31:20

**Q**

**questioning** [1] - 7:16
**questions** [3] - 4:11, 26:18, 29:22
**Quick** [1] - 30:1
**quite** [1] - 15:17

**R**

**rail** [2] - 10:6, 10:7
**really** [2] - 11:15, 19:12
**recollection** [1] - 21:8
**recount** [1] - 10:5
**referred** [1] - 19:17
**refreshed** [1] - 11:8
**refreshing** [1] - 11:1
**related** [1] - 33:15
**remember** [13] - 6:14, 6:17, 7:10, 8:1, 8:7, 10:1, 10:5, 10:7, 10:10, 11:14, 11:20, 11:23, 20:23
**remove** [2] - 8:14, 8:18
**removed** [1] - 30:13
**repair** [1] - 26:14
**repaired** [3] - 14:7,

16:10, 23:16
**repairing** [1] - 30:17
**rephrase** [1] - 5:4
**replaced** [1] - 12:10
**report** [4] - 15:13, 15:14, 15:16, 15:21
**reporter** [1] - 4:17
**Reporting** [1] - 1:13
**represent** [1] - 4:8
**representation** [2] - 10:22, 11:5
**requested** [1] - 8:9
**requesting** [1] - 22:7
**requirement** [1] - 13:5
**requiring** [2] - 23:13
**respect** [3] - 4:8, 17:1, 19:16
**respond** [2] - 8:9, 9:23
**responded** [1] - 22:11
**responses** [1] - 5:2
**responsibility** [5] - 13:20, 14:2, 14:15, 14:19, 14:22
**responsible** [3] - 14:13, 15:2, 24:5
**responsive** [1] - 29:8
**result** [1] - 23:20
**returned** [1] - 11:19
**reveal** [1] - 22:2
**RICHARD** [2] - 1:11, 3:2
**rigger** [3] - 28:16, 32:7, 32:9
**riggers** [1] - 32:11
**Rigging** [4] - 6:11, 8:2, 16:14, 18:10
**rigging** [2] - 28:18, 32:11
**risk** [1] - 7:1
**roadway** [2] - 9:1, 10:6
**Rochester** [1] - 17:10
**rocks** [1] - 12:18
**role** [1] - 16:14
**root** [6] - 25:19, 25:22, 26:4, 26:8, 26:12, 26:20, 27:2
**rules** [1] - 4:15
**run** [1] - 5:19
**RYDZA** [2] - 1:11, 3:2
**Rydza** [1] - 4:7

**S**

**safe** [1] - 15:1
**safety** [7] - 5:13, 5:15, 6:3, 6:21, 7:1, 14:22, 16:21
**scene** [1] - 22:11
**screws** [1] - 27:23

**seal** [1] - 33:18
**secondary** [7] - 25:22, 26:3, 26:9, 26:11, 27:4, 27:5, 27:12
**Section** [1] - 13:10
**section** [1] - 13:11
**sector** [1] - 18:3
**secure** [1] - 3:9
**see** [4] - 7:18, 10:13, 14:6, 24:18
**seeing** [1] - 10:7
**semitrailer** [5] - 9:12, 10:8, 10:19, 10:21, 11:4
**send** [2] - 23:20, 23:22
**sent** [2] - 23:3, 23:11
**Services** [1] - 1:13
**set** [1] - 33:10
**setting** [1] - 8:17
**shorthand** [1] - 33:13
**shoulder** [1] - 5:1
**show** [2] - 10:16, 11:2
**showed** [1] - 18:13
**shrugs** [1] - 5:1
**side** [1] - 11:11
**sign** [1] - 9:1
**signed** [1] - 16:3
**similar** [3] - 21:23, 22:1, 30:15
**sit** [3] - 20:12, 22:16, 22:19
**site** [17] - 8:5, 8:8, 8:11, 8:13, 9:16, 9:20, 10:23, 11:23, 14:20, 16:1, 17:8, 17:11, 17:20, 18:14, 18:17, 32:3
**sitting** [2] - 10:8, 11:11
**situation** [1] - 30:8
**slip** [1] - 28:1
**someone** [3] - 12:20, 18:1, 18:3
**sometime** [2] - 6:8, 6:9, 7:14
**sometimes** [2] - 24:16, 24:19
**sorry** [4] - 6:20, 11:21, 16:9, 31:1
**sort** [1] - 15:12
**sorts** [1] - 5:18
**specialist** [1] - 6:3
**ss** [1] - 33:2
**stability** [1] - 30:21
**standard** [6] - 13:12, 23:12, 23:13, 32:2, 32:4
**start** [3] - 5:23, 6:6, 6:12
**STATE** [1] - 33:1

**State** [3] - 5:17, 23:12, 33:6
**statement** [6] - 16:3, 25:4, 27:13, 27:15, 29:19
**statements** [1] - 16:2
**states** [1] - 13:11
**STATES** [1] - 1:1
**stating** [1] - 25:1
**stationing** [1] - 8:17
**stay** [2] - 17:9, 17:11
**stepped** [1] - 22:13
**steps** [2] - 27:19, 27:22
**still** [2] - 9:21, 9:22
**stones** [4] - 13:4, 13:6, 22:8, 27:23
**Street** [1] - 2:4
**strike** [1] - 9:6
**subscribed** [1] - 33:18
**substance** [1] - 23:7
**Suite** [2] - 1:13, 2:8
**supervisor** [2] - 15:23, 16:6
**supposed** [1] - 32:7
**surface** [5] - 13:14, 25:9, 25:13, 25:17, 28:11
**surfaces** [3] - 25:2, 25:6, 25:15
**sustained** [1] - 4:9
**sworn** [2] - 4:3, 33:9
**Syracuse** [17] - 14:3, 14:12, 15:3, 15:5, 17:10, 17:16, 17:21, 18:1, 18:4, 18:17, 19:21, 19:22, 20:4, 20:10, 20:13, 20:22, 21:14

**T**

**tagline** [1] - 28:20
**tasks** [1] - 32:3
**technically** [2] - 7:19, 14:2
**technology** [2] - 5:15, 5:16
**term** [2] - 19:18, 31:2
**terminal** [1] - 20:2
**testified** [1] - 4:4
**testify** [1] - 33:9
**testimony** [6] - 7:20, 33:8, 33:9, 33:10, 33:11, 33:12
**testing** [1] - 16:22
**THE** [6] - 2:2, 2:6, 7:14, 13:22, 18:23, 32:14
**thereafter** [1] - 33:11

**thereof** [1] - 33:16
**Thermo** [2] - 5:21, 5:22
**they've** [1] - 31:14
**three** [2] - 6:7, 11:22
**throughout** [3] - 7:4, 12:15, 12:16
**title** [1] - 7:1
**today** [1] - 4:11
**took** [2] - 16:3, 23:9
**top** [1] - 23:22
**towers** [3] - 8:15, 8:18
**tracks** [3] - 9:3, 9:5, 10:7
**tractor** [3] - 9:12, 24:6, 24:10
**trailer** [34] - 9:11, 10:9, 10:13, 10:23, 11:11, 12:2, 12:6, 12:8, 12:12, 14:12, 15:3, 16:10, 17:15, 18:5, 18:12, 19:16, 19:17, 19:21, 20:9, 20:14, 21:21, 21:22, 24:6, 24:10, 24:14, 24:21, 25:1, 25:5, 25:20, 26:21, 28:11, 30:5, 30:9, 32:5
**trailers** [10] - 12:15, 13:18, 17:1, 17:5, 17:8, 18:7, 21:22, 22:3, 30:14, 31:13
**transcribed** [1] - 33:11
**transcription** [1] - 33:13
**transport** [1] - 17:7
**TRANSPORTATION** [1] - 1:7
**transportation** [1] - 22:23
**transported** [1] - 23:15
**traveling** [1] - 29:4
**Trial** [1] - 1:10
**trip** [3] - 25:20, 26:22, 28:1
**truck** [3] - 14:13, 16:5, 22:8
**trucks** [1] - 12:14
**true** [4] - 11:5, 21:17, 27:13, 33:12
**truth** [1] - 33:9, 33:10
**two** [3] - 5:11, 5:12, 13:3
**two-year** [2] - 5:11, 5:12
**typewriting** [1] - 33:12
**typically** [1] - 15:15

**U**

**un-certified** [1] - 32:10
**unbolt** [1] - 25:11
**under** [1] - 24:19
**UNITED** [1] - 1:1
**unload** [1] - 32:5
**unloading** [1] - 17:18
**up** [6] - 8:17, 9:14, 10:6, 13:19, 29:14, 31:18

**V**

**various** [2] - 17:2, 17:3
**vehicle** [6] - 9:23, 11:17, 11:18, 12:5, 22:8, 23:10
**vehicles** [1] - 13:7
**verbal** [1] - 5:2
**version** [1] - 16:1
**vs** [1] - 1:6

**W**

**wait** [1] - 11:16
**waiting** [1] - 9:22
**walking** [14] - 25:1, 25:5, 25:9, 25:11, 25:13, 25:15, 25:17, 26:1, 27:8, 28:10, 28:21, 29:2, 29:9, 29:15
**walking-working** [4] - 25:9, 25:13, 25:15, 25:17
**WALTER** [1] - 1:4
**Walter** [11] - 4:8, 8:3, 9:16, 11:10, 21:1, 21:10, 22:12, 24:9, 26:1, 28:4, 28:10
**Walter's** [2] - 23:18, 23:21
**warehouse** [3] - 14:4, 15:4, 17:16
**warehouses** [1] - 17:2
**warning** [1] - 12:13
**watch** [2] - 26:1, 27:7
**watching** [4] - 27:22, 29:3, 29:15, 29:18
**Wednesday** [1] - 1:14
**weeks** [3] - 12:14, 12:23, 13:1
**WESTERN** [1] - 1:2
**Western** [1] - 17:5
**WHEREOF** [1] - 33:18
**whole** [1] - 33:9
**witness** [1] - 33:8

**WITNESS** [6] - 3:1, 7:14, 13:22, 18:23, 32:14, 33:18
**woods** [1] - 18:22
**workers** [1] - 27:18

**Y**

**yard** [1] - 10:6
**year** [4] - 5:11, 5:12, 5:13, 6:1
**years** [2] - 6:8, 11:22
**yield** [1] - 21:20
**YORK** [2] - 1:2, 33:1
**York** [8] - 1:14, 2:4, 2:9, 4:2, 5:16, 17:6, 23:12, 33:6
**yourself** [2] - 27:14, 30:8