# EXHIBIT H

*ALAN WALTER vs.*
*CSX TRANSPORTATION, INC.*

---

*DAVID PIRRO*
*February 10, 2021*

---



METSCHL

AND ASSOCIATES

COURT REPORTERS • LEGAL VIDEO SERVICES

**Buffalo, NY:** 716 856-1906
**Rochester, NY:** 585 697-0969
**Toll Free:** 800 397-1796



*Min-U-Script® with Word Index*

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

---

**Page 1**

1  UNITED STATES DISTRICT COURT

2  WESTERN DISTRICT OF NEW YORK

3  _____

4  ALAN WALTER,

5          Plaintiff,

6      vs

7                          Civ. No. 1:19-CV-01583(WMS)

8  CSX TRANSPORTATION, INC.,

9          Defendant.

10  _____

11  Examination Before Trial of DAVID PIRRO, held pursuant to

12  the Federal Rules of Civil Procedure, in the offices of

13  METSCHL & ASSOCIATES, 295 Main Street, Suite 1098,

14  Buffalo, New York, on Wednesday, February 10, 2021 at

15  12:04 p.m. before Molly Fenske, Notary Public (via

16  webcam).

17

18

19

20

21

22

23

24

25

---

**Page 2**

1  APPEARANCES:

2

3  LOTEMPIO LAW GROUP
   BY:  BOYD EARL, ESQ. (via webcam)

4  One Franklin Court
   181 Franklin Street

5  Buffalo, New York  14202
   boydearl@gmail.com

6      Appearing for the Plaintiff.

7  NASH CONNORS, PC
   BY:  PHILIP M. GULISANO, ESQ.

8  344 Delaware Avenue, Suite 400
   Buffalo, New York  14202

9  Gulisano@nashconnors.com
   Appearing for the Defendant.

10

11

12  PRESENT:

13  David Meyme, CSX representative (via webcam)

14

15

16

17

18

19

20

21

22

23

24

25

---

**Page 3**

1

2

3                  INDEX TO WITNESS

4  DAVID PIRRO                                      PAGE

5  Examination by Mr. Earl............................6

6

7

8

9                  INDEX TO EXHIBITS
                      (attached)

10

11  EXHIBIT                                          PAGE

12  Exhibit J, construction contract between

13          CSX Transportation, Inc. and

14          Niagara Erecting, Inc.....................4

15  Exhibit K, Buffalo Terminal phase 3.............4

16  Exhibit L, PowerPoint presentation..............4

17

18

19                  INDEX TO DOCUMENTS REQUESTED

20  DOCUMENT                                         PAGE

21  CSX Safeway booklet.............................57

22

23

24

25

---

**Page 4**

1          (Whereupon, Exhibit J, construction

2  contract between CSX Transportation, Inc. and

3  Niagara Erecting, Inc; Exhibit K, Buffalo Terminal

4  phase 3; and Exhibit L, PowerPoint presentation,

5  were marked for identification.)

6          THE REPORTER: Mr. Earl, you'll supply

7  Mr. Gulisano?

8          MR. EARL: Sure.

9          THE REPORTER: Will the witness be

10  reading and signing?

11          MR. GULISANO: No, no read and sign.

12          (Whereupon, the following stipulations

13  were entered into by the respective parties:

14          It is hereby stipulated by and between

15  counsel for the respective parties that the oath of

16  the referee is waived, that signing, filing and

17  certification of the transcript are waived, and all

18  objections, except as to the form of the question,

19  are reserved until the time of trial.)

20          THE REPORTER: Mr. Earl, is there anyone

21  in the room with you?

22          MR. EARL: Nope.

23          THE REPORTER: Mr. Gulisano, is there

24  anyone in the room with you besides the witness?

25          MR. GULISANO: No, just the two of us.

---

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 5

1       THE REPORTER: Before we proceed, I will
2  ask counsel to agree on the record that, under the
3  current National Emergency, pursuant to Section 319
4  of the Public Health Service Act, there is no
5  objection to this deposition officer administering a
6  binding oath to the witness remotely.  Please state
7  your agreement on the record.
8       MR. EARL: Yes, agreed.
9       MR. GULISANO: I agree.
10      DAVID NICHOLAS PIRRO, 3026 Cameronodale
11  Road, Baldwinsville, New York 13027, having been
12  duly called and sworn, was examined and testified as
13  follows:
14      MR. EARL: Good morning, or I guess
15  afternoon there, Mr. Pirro.  My name is Boyd Earl.
16  I represent the plaintiff in this case that's been
17  brought against CSX.  I'll be asking you some
18  questions about your knowledge of the case and the
19  circumstances surrounding it.  If you don't
20  understand my question, please just let me know and
21  I'll rephrase it.  Sometimes I get a little
22  complicated in my questions because I'm trying to
23  get it perfect or something.
24      Also, if you could do me a favor and wait
25  until my question is done before you answer, it'll

Page 6

1  make it easier for the court reporter to get the
2  question and answer down properly.  Everyone kind of
3  breaks that rule, so if you do I'll mention it to
4  you occasionally.  And your answers do have to be
5  verbal.  Nods of the head or saying uh-huh doesn't
6  really show up that well on a transcript of course.
7  EXAMINATION BY MR. EARL:
8  Q.  So, first of all, sir, are you currently
9  employed?
10  A.  Yes.
11  Q.  With whom?
12  A.  CSX Transportation.
13  Q.  And how long have you worked for?
14  A.  Since September of '08, so twelve and a half
15  years or, yeah, twelve and a half years.
16  Q.  By the way, if I just say CSX in the future
17  you'll understand that to be CSX Transportation, Inc.?
18  A.  Yes, sir.
19  Q.  Just wanted to make sure there's no other
20  related corporation.  That might be confusing here.
21  What's your educational background?
22  A.  Two-year degree in electrical engineering from
23  Onondaga Community College.
24  Q.  When was that?
25  A.  Let's see, '08, '07, probably around 2005,

Page 7

1  2006 time period.  I went through electrical
2  apprenticeship program at my last -- at Chrysler, and
3  as part of that I went to the college and got my
4  degree.
5  Q.  Have you had any additional training since
6  that time, education, training classes, continuing ed,
7  anything like that?
8  A.  There's been plenty of training classes.  Like
9  I said, I'm a journeyman electrician so I went through
10  the journeyman program and, you know, CSX there's, you
11  know, we've had numerous courses that I've taken, you
12  know, taken through them about signal craft, plus all
13  the safety training that we do every year.
14  Q.  That would be more on-the-job training I'm
15  gathering, as opposed to sending you off to a school
16  somewhere?
17  A.  Well, there's a training center in Georgia.
18  It's called the Ready Center, so I've been down there
19  numerous times to take week-long classes.
20  Q.  Now, going back to CSX, when you first hired
21  in September of '08, what was your position?
22  A.  Assistant signal worker or assistant signal
23  maintainer, I guess would be the...
24  Q.  Okay.  What does an assistant signal
25  maintainer do for CSX?

Page 8

1  A.  Basically works, learns the trade, works with
2  a signal maintainer and, you know, learns the trade,
3  and then, when a position becomes available, you know,
4  you bid on a position.  When you get bid on a position
5  as the signal maintainer, you're moved up to that
6  class.
7       MR. GULISANO: Can we take -- just go off
8  the record for a second?
9       (A discussion was held off the record.)
10  BY MR. EARL:
11  Q.  When you talk about signals, why don't we
12  figure out what that's talking about in terms of what
13  CSX signal maintainers do.  Are we talking about the
14  lights that direct where trains go, or what is it?
15  A.  There's different aspects of it.  A local
16  signal maintainer basically has a section of track, you
17  know, maybe 20 miles of track, and he does all the FRA
18  testing on it, which is, you know, there's different
19  monthly, quarterly, yearly tests.  There's different
20  tests that are required by the FRA, so he does that.
21  If there's trouble calls, he goes out and fixes the
22  trouble, and then there's the signal construction side
23  of it which I've been for most of my career.
24      What we do is we build the new signals so that
25  they'll put new signals, you know, the colored lights like

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

---

Page 9

1  you talk about.  Switch machines that direct trains from
2  one track to the other, crossings, you know; when you pull
3  up to crossings and you've got the gates and the flashing
4  lights and all that.  We do all that, plus all cabling.
5      So, basically, signal craft is, basically, it's
6  the way to control the trains on the track, you know.
7  When a train sees the signal it knows by the color of that
8  signal, it knows whether there's a train ahead of them or
9  if it's clear ahead of them, depending on the color, and
10  then by, dependent on what color and which position it is,
11  tells him how fast he can go, and then, like I said,
12  there's switch machines on the track that divert trains
13  from one track on the other.  The switch trains are part
14  of the signal craft also.
15      Q.  So the lights that are used to indicate to the
16  trains if there's a train ahead, that type of thing,
17  are they always in the form of a bridge that goes over
18  the railroad track or are there some that are standards
19  that just come up out of the ground?  Are there
20  different types?
21      A.  Yes, there's lots of types.  There's bridges,
22  cantilevers, which only have -- instead of having the
23  uprights on both sides, have it on one side and it
24  hangs over the track.  There are the single units, like
25  you said, wayside signals, that basically just go on a

---

Page 10

1  foundation.  They just go straight up and then they
2  have different, you know, different configurations of
3  lights hanging from them.
4      There's also called dwarf signals which are real
5  low to the ground.  So depending on the application they
6  could be, you know, any one of those.
7      Q.  Okay.  I'm gathering from what you said --
8  well, actually, let me back up just a little bit, just
9  so I have your employment correct, and then we'll talk
10  about that a little bit more.  So you were an assistant
11  signal maintainer for some period of time when you
12  started in '08.  What was your next position?
13      A.  Signal maintainer.
14      Q.  I'm assuming that would be the same general
15  job duties except now you have a more supervisory role,
16  or is it some other distinction?
17      A.  It's just, as I said, the assistant basically;
18  you know, like a training part, and then, when you
19  become a maintainer, again, if you're in the
20  maintenance side of things you have a section of track
21  you're responsible for doing all the testing, answering
22  all the trouble calls.  If you're on the construction
23  side, you know, you're building new locations, building
24  new crossings, you're working on there, you're working
25  on a five man team.  You have a foreman and four

---

Page 11

1  maintainers, so depending on which side of the -- if
2  you're on the maintenance side or the construction
3  side.
4      Q.  When did you become a signal maintainer then,
5  approximately?
6      A.  Two weeks after I started.  I was only an
7  assistant for two weeks.
8      Q.  How long did you continue as a signal
9  maintainer then?
10      A.  I think I went into management, became an
11  engineer of signal construction in 2012, I believe it
12  was.
13      Q.  How did your job duties change when you became
14  an engineer of signal construction?
15      A.  Instead of being, you know, on a team
16  constructing it, I was overseeing various teams that
17  constructed the locations to make sure they had, you
18  know, the proper material, make sure they had the
19  proper equipment to do the job safely, you know, do
20  safety audits.
21      Q.  Is there a geographic area that you were
22  responsible for as the engineer of signal construction?
23      A.  Well, basically we go from Newport, New
24  Virginia to Montreal, and from Boston to Erie, PA, but
25  for the most part I was up in the northeast, you know,

---

Page 12

1  anywhere from Massachusetts, New Jersey, New York, that
2  was mostly -- I stayed up, I stayed up higher and I
3  didn't go down lower very much.
4      Q.  All right.  Where you are based, do you have
5  an office that you use generally?
6      A.  I have a small office in Syracuse.
7      Q.  Is that generally where you work as a signal
8  maintainer -- or, I'm sorry, as engineer of signal
9  construction?
10      A.  All depends where the work is.  Like I said,
11  we did jobs in Massachusetts, you know, Albany,
12  Syracuse, Buffalo.
13      Q.  Now --
14      A.  Around Erie, PA.
15      Q.  Okay.
16      A.  Wherever work is at the time, that's where I
17  have to go.
18      Q.  How long did you remain an engineer of signal
19  construction?  Did you get a new job after that?
20      A.  Yeah.  I became a general engineer of signal
21  construction so it's basically like, an engineer is
22  basically a manager, so I was a manager.  Then I became
23  a general manager.
24      Q.  So would you be responsible for supervising
25  some of the engineers of signal construction?

---

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 13

1    A.  Correct.
2    Q.  And is that the position you have currently?
3    A.  No.  I'm currently the director of signal
4  construction.
5    Q.  Does that put you in charge of all the signal
6  construction within that geographic area that you
7  talked about?
8    A.  Yes, east region signal construction.  There's
9  three regions, west region, southern region and eastern
10  region.  I'm the director of east regional signal
11  construction.
12    Q.  And I think I probably know, but what are your
13  job duties as the director of the east regional signal
14  construction?
15    A.  Pretty much overseeing everything, you know,
16  all the -- making sure that my managers are doing what
17  they're supposed to be doing, planning the projects
18  ahead of time, making sure we've got, you know, work
19  going forward.  I still go out and travel around, still
20  visit the locations, check on the work, you know, check
21  on the making sure things are being done to my
22  standards and, like I said, basically just overseeing
23  everything that's signal construction.
24    Q.  Okay.  Do you have anything to do with the
25  signal maintenance then in your current position or is

Page 14

1  it just new construction?
2    A.  Not really.  I interact with them sometimes if
3  they have an issue and they need -- if they need help
4  they'll call me.  If we have somebody available or a
5  team available, we, you know, we'll give them a hand,
6  but per se the everyday working of signal maintenance,
7  no.
8        MR. EARL:  By the way, I guess we should
9  probably mention, it looks like someone from CSX has
10  joined us.  I think they should be on the record at
11  some point, just so we know who's here.
12        MR. GULISANO:  My understanding is that's
13  David Meyme.  Am I pronouncing it correctly?
14        MR. MEYME:  It's Meyme, but either way.
15        THE REPORTER:  Can you spell that for me,
16  please?
17        MR. MEYME:  It's M-E-Y-M-E.
18        THE REPORTER:  Thank you.  Is there
19  anyone in the room with you?
20        MR. MEYME:  No.
21        THE REPORTER:  Thank you.
22        MR. EARL:  Just, for the record, he's a
23  representative of CSX as well?
24        MR. GULISANO:  Correct.
25  BY MR. EARL:

Page 15

1    Q.  Mr. Pirro, do you have any responsibility for
2  determining when a new signal or when signals will be
3  replaced with new construction, or is that someone
4  else's responsibility?
5    A.  That usually gets done by the project
6  engineers down in Jacksonville, depending on this part
7  or this incident where this incident supposedly
8  happened here or whatever was part of the PTC
9  initiative, the positive train control initiative.
10    Q.  That was a federal directive that there should
11  be ways to stop trains if there are problems, you know,
12  a runaway train, for example, that type of thing?
13    A.  Correct.
14    Q.  I meant to ask, what is the FRA?  You
15  mentioned FRA before.
16    A.  Federal Railroad Administration, the governing
17  body over all railroads.
18    Q.  Thank you.  Now, why don't we talk about this
19  case specifically, just so we can put things in context
20  here.  Now, you indicated that this is part of the PTC
21  work that was being done throughout the country;
22  correct?
23    A.  Correct.
24    Q.  So who made the decision, if you know, that
25  the bridge being replaced in this situation -- I mean,

Page 16

1  how did it come about that it was determined that that
2  was going to be replaced, if you can tell me?
3    A.  Back when this whole thing started, I guess
4  they made a decision up in this section of the railroad
5  to greenfield everything, so that means put all new
6  houses, all new cable and all new signals in because of
7  the age of the stuff that was there.  So a
8  determination was made to go through and put new
9  everything in.
10    Q.  Was this a rolling project then?  In other
11  words, you would do one set of bridges and then, once
12  that was done, you move on to another set as part of
13  this project?
14    A.  That's correct.
15    Q.  Is there any overall name for this project
16  within the company?
17    A.  This section?
18    Q.  Well, overall.  First of all the entire
19  replacement you were talking about, was there any name?
20    A.  Just PTC.
21    Q.  What about this job involving this bridge?
22  Did it have a specific name?
23    A.  It was called Baltimore -- not Baltimore.  I'm
24  sorry, Buffalo Terminal, phase three.
25    Q.  So I'm gathering, obviously, there were at

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 17

1  least two phases before this one?
2    A.  Correct.
3    Q.  And were those prior phases also involved in
4  the replacement of the signal bridges or was it also
5  other work that had to be done as part of this PTC
6  program?
7    A.  It was similar, you know, just different
8  locations.  There were bridges that, you know, new
9  stuff that went up and old stuff that came out.
10    Q.  As part of, let's say phase three, did that
11  involve more work than simply the replacement of those
12  the bridges involved?
13    A.  Yes.  They're like, I say, you would -- there
14  were new signal houses, which housed all the
15  electronics.  So, depending on the location, you know,
16  some locations had, you know, one house, some of them
17  had, like, five houses, and then, depending on where
18  they were in the control point, which a control point
19  is where the switch, you know, the switch machines in
20  there that divert trains from one track to another.
21      Depending on how big of a control point, it is
22  determined how many houses were in the location, so you
23  had, you know, to install new houses, install new cables
24  out to the, all the switch machines.  You would put a new
25  junction box in and run new cables into the new junction

Page 18

1  box.  Again, it would be the signals.  You would put new
2  signals up, whether it's a wayside, a cantilever or a
3  bridge.  You would wire them all up and then you would pre
4  test it, making sure it's going to work the way it's
5  supposed to work, and then you would have what we call a
6  cut over, which we would take, shut off all the old stuff
7  and turn on all the new stuff.
8    Q.  As part of this phase three project, were
9  certain bridges being removed and then replaced with
10  new bridges?
11    A.  Yes.
12    Q.  Was there a reason for that as opposed to just
13  putting new signals on the existing bridges and was
14  that not possible, I'm gathering?
15    A.  No, them bridges were probably fifty, sixty
16  years old.  They were all steel.  They were all rusted
17  and so...
18    Q.  Okay.  So it was just time to replace them,
19  I'm gathering?
20    A.  Correct.
21    Q.  Now, are you familiar with the location where
22  this accident occurred and which bridge was involved?
23    A.  Yes.
24    Q.  How would they designate the bridge that was
25  involved in that work?  Did it have a name or...

Page 19

1    A.  CP436, 436.
2    Q.  And you said EP, as in --
3    A.  CP, like control point.
4    Q.  Okay, 436.
5    A.  That one actually was, there were two tracks
6  that were made into a control point, and then the other
7  two tracks were just an automatic, but still the same
8  thing.  There were four tracks there that had signals
9  on them.
10    Q.  All right.  And so, when we talk about control
11  point or CP436, that is the specific bridge that was
12  being worked on at the time that this accident
13  occurred; is that correct?
14    A.  Yes.
15      MR. GULISANO: Object, only because I
16  don't think there was any work being done on a
17  bridge at the time the accident occurred, but that's
18  my objection.
19      MR. EARL: Fair enough.
20  BY MR. EARL:
21    Q.  I just want to make sure when you say CP436,
22  that would only involve the one bridge that we're
23  talking about?  It doesn't include several bridges or
24  other signals?
25    A.  As part of the project or just as part of

Page 20

1  CP436?
2    Q.  Part of CP436.  I'm just trying to figure out
3  if CP436 was limited to this one bridge that was about
4  to be replaced or if it included other work in that
5  area?
6    A.  This particular location there was just that
7  one.
8    Q.  So what was your first involvement with
9  respect to the work that was going to be done at CP436?
10    A.  We did a survey probably a few years before
11  with the people in Jacksonville and the designer to
12  look it over.
13    Q.  Did you have anything to do with the actual
14  bidding of the contract or the contract for the track
15  at CP436?
16    A.  Which work are you referring to?
17    Q.  The work we're talking about, taking down the
18  existing bridge and replaced it with a new one.  Did
19  you have anything to do with the contract provisions or
20  bidding out that contract for the work?
21    A.  Not the contract, but I was the one that
22  brought the -- I don't know what his official word is
23  manager or whoever he was.  I was the one that brought
24  him and out and showed him the locations so that he
25  could determine what kind of equipment he needed to do

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 21

1   what he had to do.
2        MR. GULISANO: Manager of whom?
3        THE WITNESS: What's that?
4        MR. GULISANO: Manager of whom?
5        THE WITNESS: Clark Rigging.
6   BY MR. EARL:
7   Q.  Now, did that take place, I'm presuming,
8   before July 21, 2017 that you went out with the
9   representative of Clark?
10  A.  Yes, probably, I would guess, three, four or
11  five months before.  I don't have an exact date, but it
12  was pretty well in advance.
13  Q.  And how was Niagara Erecting involved in this
14  project, involved in CP436?
15  A.  I believe they're just another subsidiary of
16  Clark Rigging.
17  Q.  Do you know that for a fact or is that just
18  your understanding?
19  A.  That's just my understanding.
20  Q.  Who is it that came out to that location with
21  you from Clark?
22  A.  Gunther Minguez.  I don't know if I'm
23  pronouncing that right or not.
24  Q.  And the purpose of that was just to show him
25  that the work that needed to be done?

Page 22

1   A.  Correct.  I would show him the location and
2   then I would tell him where we needed to put -- where
3   we needed to put the old bridge to get it out of the
4   way, and then he would measure the width of the
5   right-of-ways and stuff and find a spot where he could
6   safely set up his crane, and then he would measure to
7   the center of the bridge and how wide the bridge was
8   and by that he would determine how big of a train he
9   would need to safely do the job.
10  Q.  Now, prior to the work being done at CP436,
11  had you had Clark also do other work as part of this
12  PTC program?
13  A.  Yes.
14  Q.  So you were familiar with the company and the
15  work that they had done?
16  A.  Yes.
17  Q.  Had you ever had any complaints about the work
18  they had done in the past?
19  A.  No.
20  Q.  Now, was the -- would it be your understanding
21  that the contract had already been approved and signed
22  before you went out to that location to show Mr.
23  Minguez the area?
24  A.  Yes.
25       MR. EARL: Phil, do you have the copy of

Page 23

1   the contract with Niagara, Electric, Inc.?
2        MR. GULISANO: This one?
3        MR. EARL: Yeah, it says on the upper
4   right SR-2133299.
5        MR. GULISANO: Yes, I do.
6        MR. EARL: Why don't we mark that as the
7   next?  What are we up to, J?
8        MR. GULISANO: I believe J.  Let me
9   confirm.  The last marking was the Social Security
10  so that was I.  So this is J.  I'll mark it Exhibit
11  J.
12       MR. EARL: Great, thank you.
13       MR. GULISANO: It's a construction
14  contract between CSX Transportation and Niagara
15  Erecting.
16  BY MR. EARL:
17  Q.  Mr. Pirro, could you take a look at that
18  document just briefly and tell me if you recognize it,
19  first of all?
20  A.  I was aware of it, but I hadn't seen it until
21  this happened, because this was before my time as
22  getting involved with these projects.
23  Q.  All right.  Do you know whether this is the
24  contract that would have covered the work for CP436?
25  A.  Yes.

Page 24

1   Q.  It would have covered that?
2   A.  Yes.
3   Q.  So after you met with Mr. Minguez and showed
4   him the area, what was your next involvement in this
5   specific part of the project with that bridge?
6   A.  With CSX or with Clark Rigging?
7   Q.  Either way.  Did you have -- what was your
8   next involvement with respect to that location?  Did
9   you have to do -- what was the next thing you had to
10  do, if anything?
11  A.  Our teams built the locations.  Like we talked
12  about earlier, they put -- at this location, they put
13  one new house in.  They had to dig in concrete
14  foundations and they put the uprights on both sides of
15  the tracks.  Like I said, there were four tracks there
16  so they had to dig in a concrete foundation on both
17  sides of the four tracks and then they put the uprights
18  in.
19       There's boxes on the junction boxes, on the
20  masts, which we ran the new cables up into that went from
21  the new house to the new signal.  All them wires were
22  landed in the junction box, and then the horizontal had to
23  be put together.  It came in pieces because it was so
24  long.  So it had to be bolted together off to the side and
25  then all the signals were mounted on them and wired and

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

**Page 25**

1  because this location the new signal was, you know, close
2  to the old signal, it would block -- it would block the
3  old signal a little bit so we couldn't put it up ahead of
4  time like we normally did, so we made arrangements the day
5  before, which would have been the Saturday, to have Clark
6  Rigging put the new one up, and then the next day, Sunday,
7  would be when we took the old one down.  Of course, we ran
8  all the new, all the track leads, you know, out to all the
9  tracks you had to dig, and run wires out to each track.
10  That was part of that location also.
11    Q.  So, essentially, if I understand it correctly,
12  you have to have the new one up and ready to go before
13  you take the old one down; correct?
14    A.  Correct.
15    Q.  So who was it that did the work with respect
16  to this prep work -- strike that for a second.  I'm
17  assuming from your answer that at some point Clark
18  Rigging was involved with putting the mast up of the
19  bridge over the tracks itself with the crane; correct?
20    A.  That's correct.
21    Q.  But the other work with respect to putting the
22  side supports up, I'm not sure what you call those, and
23  the foundation and the cables and those, the houses,
24  who did all that work for the new?
25    A.  One of my construction teams.

**Page 26**

1    Q.  So they would be CSX employees?
2    A.  Correct.
3    Q.  So the first involvement with respect to CP436
4  with respect to Clark would have been when they came in
5  on Saturday the 20th of July, 2017, in order to lift up
6  the new mast in order to have it locked into place; is
7  that right?
8        MR. GULISANO: Objection.  Let's get our
9    timing set up.  July 21st was the day of the
10    accident, which was a Friday.  He's talking about
11    Saturday, the 22nd, I believe.  You could ask him.
12    And then Sunday is the 23rd.
13        MR. EARL: Okay.  Sorry about that.  Now
14    that makes more sense to me.
15  BY MR. EARL:
16    Q.  Let me rephrase my question then.  So the plan
17  was to have Clark, on Saturday the 22nd of July, raise
18  up the new -- it's called a mast; is that correct?
19    A.  The horizontal part of the bridge.
20    Q.  Okay.  So they were -- on the 22nd were
21  supposed to raise the horizontal portion of that mast
22  for it to be installed; correct?
23    A.  Correct.
24    Q.  And who was actually going to be -- to do the
25  installation itself?  Would the installation or the

**Page 27**

1  mounting of that horizontal piece been done by Clark
2  employees or someone else?
3    A.  Clark.
4    Q.  Okay.  And then the plan was the following day
5  that Clark would, on the 23rd of July, actually do the
6  work to remove the old signal bridge?
7    A.  Correct.
8    Q.  Did you have any knowledge or conversation,
9  say, with anyone regarding the date that Clark would
10  first set up in that location, whether it be the day
11  before, the day of or some other time?
12    A.  They just asked me, there was an open lot down
13  the street or whatever, and Gunther had asked me if
14  they could start bringing all their equipment to build
15  a bridge if they could park it in there, you know,
16  while they were building the bridge.
17        MR. GULISANO: Building the crane or the
18    bridge?
19        THE WITNESS: The crane, I'm sorry.
20    While they assembled the crane, so...
21  BY MR. EARL:
22    Q.  Do you know what kind of crane was going to be
23  used as part of this work?
24    A.  The actual crane, no.
25    Q.  All right.  Is that something you had any

**Page 28**

1  involvement with selecting the type of crane?
2    A.  No.
3    Q.  So that's something that Clark would take care
4  of to determine what type of crane they needed?
5    A.  Correct.
6    Q.  Now, you said there was an open lot that they
7  asked to use which you approved?
8    A.  Correct.
9    Q.  Was that more of a staging area for the trucks
10  to come in with the parts and then the individual parts
11  be transported to the work location?
12    A.  I believe so, yes.
13    Q.  Were you aware that Clark was going to be at
14  that location on July 21, 2017 setting up the crane?
15    A.  I believe they were there all week.
16    Q.  And you knew that ahead of time, I assume?
17    A.  Yes.
18    Q.  Now, the open lot area that you were talking
19  about, is that a piece of property that, to your
20  knowledge, is owned by CSX?
21    A.  I believe so.
22    Q.  And the area where the old bridge was located,
23  was that also property owned by CSX, to your
24  understanding?
25    A.  I'm not sure exactly where the borderline is,

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 29

1 you know, near the tracks, of course, was ours, but how
2 far out and that whole open lot that's there, I do not
3 know if we owned the whole thing.
4    Q.   The area where the crane was going to be set
5 up, was that on CSX property, to your knowledge?
6    A.   I can't answer that positively either.
7    Q.   But the property upon which the old bridge as
8 well as the new bridge were located, that was on CSX
9 property?
10    A.   Yes.
11    Q.   So were you there anywhere near this location
12 on July 21, 2017?
13    A.   Yes.
14    Q.   Where were you?
15    A.   Throughout the whole project I was at that
16 location, plus, you know, plus other, you know, other
17 areas, you know, checking in on the progress of doing
18 our last minute things we had to do to get ready.
19    Q.   Were there other phases going on of this work
20 at the same time, like phase two or phase four?
21    A.   Phase one and two had already been cut in, I
22 think three months before that, so that was done.
23 Phase four was being built.
24    Q.   What do you mean it was being built?
25    A.   They were putting the houses, digging in the

Page 30

1 cables, putting the signal foundations in, the signals.
2    Q.   And where was phase four work being done in
3 relation to this phase three work?  Is it further down
4 the line, how would you describe it?
5    A.   Yep, further west.
6    Q.   Can you describe for me where this bridge,
7 where the CP436 is located in terms of streets or are
8 you able to give me any other way to identify exactly
9 where it was?
10    A.   Off the top of my head, it's been a while.
11    Q.   That's fine.
12    A.   I can't give you an answer.  That was four
13 years ago, so I can't give you a straight answer.  I'm
14 sorry.
15    Q.   So on July 21, if I understand your testimony
16 correctly, pretty much all of the work for the new
17 bridge had been completed with the exception of putting
18 the horizontal piece on; is that correct?
19    A.   Correct.
20    Q.   Now, you said you had other jobs or other
21 locations you had to monitor on July 31 in addition to
22 this one.  Can you describe for me what types of
23 locations those were?  For example, was it another
24 bridge location or was it -- were you inspecting phase
25 four work?  What were you doing, other than being at

Page 31

1 this location checking out their work?
2    A.   There was two other -- CP437 was part of this
3 cut over and phase, which was a gigantic control point,
4 you know, with numerous signals.  It was five houses,
5 you know, that was a big location, and CP2 was also a
6 location, so again, there's just in the area checking,
7 checking to -- we double check, triple check, making
8 sure everything's good for Sunday.
9    Q.   Now, were there other CSX employees, to your
10 knowledge, at CP436 that day, the 21st, or was it just
11 you?
12    A.   I can't say one hundred percent, you know,
13 that there was.  I would probably guess yes, but I
14 can't say positively.
15    Q.   Now, as part of these jobs and the CP436
16 specifically, does CSX send anyone dealing with safety
17 issues to the location to monitor work being done?
18    A.   Our work or for Clark Rigging.
19    Q.   The work for -- that was being done in this
20 case by Clark.
21    A.   An individual while they're assembling their
22 cranes and stuff, no.
23    Q.   So you would expect Clark to take care of that
24 part of it ; correct?
25    A.   Our involvement with them basically started

Page 32

1 when they got within seven feet of the track, you know,
2 for them, their determination of what kind of crane
3 they needed and what needed to be done to get it ready,
4 you know.  We have no expertise in that so that's why
5 we hired a professional to do that so, you know, we
6 relied on them, you know, knowing I'm having a good
7 quality crane, because we -- and we've had them, my
8 God, for years and pretty much all the cranes look like
9 they're brand new so we never had an issue with that.
10       We make sure they have -- we just make, like I
11 said, our involvement happens when we say, okay, Saturday,
12 when we needed them to put that up, you know, we would
13 have somebody there to make sure if you get within seven
14 feet of a track you have to have some sort of track
15 protection, so we would make sure that, you know, if they
16 were setting up a crane, their outriggers, we would
17 measure.  We would draw lines on the ground.  You can't
18 get -- your outrigger can't go past this line when you get
19 ready to set up, stuff like that.
20    Q.   Do you know specifically where they were
21 setting up the crane on the 21st?
22    A.   I'd say at this location it was from -- I
23 remember it was on, the road was on a corner and then
24 there's a grass, there's a dirt road that goes into with
25 a big grass field there, and they were basically just,

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 33

1  you know, some were in there.  They just pulled, I
2  think they pulled in there and they were assembling it
3  right there.  It was probably, I don't know, I'm
4  guessing fifty to one hundred feet from the track, so
5  basically they were -- they weren't a concern of ours
6  at the moment.
7     Q.  So they were not within that seven foot area
8  that you would be concerned about?
9     A.  No.
10    Q.  So when you were there on the 21st, did you
11  actually go over to where they were setting up this
12  crane for any reason?
13    A.  To get in there I would have to go right by
14  where they were, but I seen them working, but I didn't,
15  you know, I didn't really get involved again because
16  that's got nothing to do with us.
17    Q.  Were there CSX employees still working in that
18  location as the crane was being set up on the 21st?
19    A.  Again, I can't say one hundred percent that,
20  you know, that day there were people there, you know,
21  finishing anything up.  I just don't recall that.
22    Q.  I guess what I'm asking then is, what is the
23  purpose for your traveling to that site on the 21st?
24  What did you do or what were you planning to do that
25  day?

Page 34

1     A.  Again, just seeing how things were going.  We
2  had people there, because when we work, we work four
3  ten-hour shifts Monday through Thursday.  And the cut
4  over, you know, can't have people there Saturday and
5  Sunday so I can't send people home for one day, so
6  basically we had the people there.  We had to work
7  Friday, so again, there might have been people there
8  finishing wiring, making sure the horizontal's
9  completely done, ready to go, you know, they might have
10  been double-checking everything in the house, you know,
11  but, you know, for me to exactly remember exactly what
12  they were doing and who was there or what time, I can't
13  tell you that.
14    Q.  Right, but regardless, you didn't go over and
15  have anything to do with the setup of the crane, you
16  were just there to take a look at the work that the CSX
17  employees were doing, I'm gathering then?
18    A.  That's correct.
19    Q.  And checking to make sure that it's ready for
20  the work the next day?
21    A.  Correct.
22    Q.  Do you have any recollection of anything that
23  happened that day while you were at the CP436 location?
24    A.  No.
25    Q.  Would there be any documentation that would

Page 35

1  give any information about the work being done on that
2  day, on the 21st, by CSX employees at or near CP436?
3     A.  There was a packet that I made up for the cut
4  over meeting on Saturday that everybody got and
5  outlined what was going to happen during the cut over,
6  and also the bulletins, the signal bulletins for the
7  day.
8        MR. GULISANO:  Just to clarify, that's --
9  he asked you if there's anything documenting what
10  CSX employees were doing on the 21st, which is the
11  day the incident when the crane was setting up.
12       THE WITNESS:  No.
13       MR. GULISANO:  Saturday was the day
14  after.
15       THE WITNESS:  Right.  No, for Friday
16  there's nothing no written plan for Friday.
17  BY MR. EARL:
18    Q.  But not just written plan.  You wouldn't have
19  and you didn't, I assume, make any notes about what you
20  saw on the 21st when you went to that location?
21    A.  No.
22    Q.  Do you have a daily logbook that you fill out
23  with respect to what you do each day?
24    A.  No.
25    Q.  Do you have anything that you indicate in

Page 36

1  writing what work you did on a specific day?
2     A.  Every day, no.
3     Q.  Was there -- can you tell me for sure whether
4  there was any writing or not with respect to the work
5  you did on the 21st?
6     A.  Not that I'm aware of.
7     Q.  I'm gathering from your answer that sometimes
8  you would have some notations and some days you
9  wouldn't have any notations about the work you did; is
10  that right?
11    A.  Well, I have a daily planner, but, you know,
12  if I'm on a call or something I might make notes about
13  a call, but I don't write in there, today I'm going to
14  CP436 to check this and this and this.  I don't do
15  that.
16    Q.  Okay.  You don't afterwards write down
17  anything that says, I went out to CP436 and did this,
18  this and this?
19    A.  No.
20    Q.  Are you aware of any documentation that exists
21  at CSX with respect to the work being done by Clark in
22  setting up the crane on July 21, 2017?
23    A.  No.
24    Q.  Are you aware of any documentation that would
25  indicate what work CSX employees were being, were doing

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 37

1  at that location on the 21st of July 2017, if anything?
2  A.  No.
3  Q.  Would there be work records that would
4  indicate what employees were on site that day?
5  A.  Yes.  If you get ahold of payroll records, it
6  would show you who was charging to that particular code
7  that day.
8  Q.  What would that code be?  Would that be the
9  CP436?
10  A.  Yes.  There was -- I don't know if -- it's
11  probably in that packet, if you have a copy of that.
12  Q.  Which packet are you talking about?
13  A.  The cut over meeting.
14  Q.  Oh, okay.  Let's see here.
15      MR. EARL: Why don't we go off the record
16   for a second so we make sure we're talking about the
17   right documents?
18      (A discussion was held off the record.)
19  BY MR. EARL:
20  Q.  Mr. Pirro, right now you're looking at Exhibit
21  K; is that correct?
22  A.  Correct.
23  Q.  Can you tell me what that document is?
24  A.  It's a packet that I made up for the cut over
25  and it basically, from a signal point of view, you

Page 38

1  know, talks about what we're going to do, has the
2  bulletins, the dispatcher bulletins concerning the
3  signal cut over -- the signal suspension, I'm sorry,
4  and then it has the people that are going to be there
5  working and the locations.  Not an in-depth thing but
6  an overall of what needs to be done at each location.
7  Then there's --
8      MR. GULISANO: Can we just...
9      MR. EARL: One comment.  I just realized
10   this doesn't have to be on the record.
11      (A discussion was held off the record.)
12  BY MR. EARL:
13  Q.  So, if I understand correctly, was this
14  document prepared solely with respect to the cut over
15  work that was going to be done on the 22nd and 23rd of
16  July?
17  A.  Correct.  Actually just on the 23rd.  This
18  just has do with the signal portion of the cut over.
19  Q.  So, in other words, this wouldn't have
20  anything to do with respect to the work being done on
21  the 22nd with respect to the horizontal piece being
22  installed on the new bridge?
23  A.  That's correct.
24  Q.  Was there any documentation that you're aware
25  of that would deal with the work being done on the 22nd

Page 39

1  with respect to the horizontal number being attached?
2  A.  No.
3  Q.  That would just the only document that would
4  cover -- that would be, to your knowledge, would be the
5  contract we talked about earlier?
6  A.  That's correct, and conversations with myself
7  and, you know, Gunther, telling him what we needed done
8  and when we needed it done.
9  Q.  I guess what I'm asking is, are you aware of
10  any documentation at CSX or received by CSX dealing
11  with the work being done on either the 22nd or, for
12  that matter, the 21st?
13  A.  No.
14  Q.  So all the documentation that we're looking at
15  would deal with work being done on the 23rd, at least
16  for the CP436 location?
17  A.  That's correct.
18  Q.  Got you.  So I've gone through this, but let
19  me just ask a couple of general questions to make sure
20  I don't have to go through this.  Was there anything in
21  Exhibit K that would be binding or even be provided to
22  Clark with respect to being work being done on the
23  21st?
24  A.  No.
25  Q.  So this has nothing do with the setup of the

Page 40

1  crane?
2  A.  No.
3  Q.  It has no safety provisions or any other
4  requirements for Clark with respect to the work being
5  done on the 21st?
6  A.  Correct.
7      MR. EARL: All right.  Why don't we go
8   off the record again, just so we can figure out
9   which this is?
10      (A discussion was held off the record.)
11  BY MR. EARL:
12  Q.  Do you have Exhibit L in front of you, sir?
13  A.  Yes, sir.
14  Q.  Do you recognize what that is?
15  A.  Yes.
16  Q.  What is it?
17  A.  It's a copy of a PowerPoint presentation that
18  we put together for the pre cut over meeting on the
19  27th.
20  Q.  So the meeting for the cut over was done the
21  day before on the 22nd?
22  A.  That's correct.
23  Q.  So that would have been done on the same day
24  as when the new horizontal structure was being
25  installed?

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 41

1    A.  Correct.
2    Q.  Where was that meeting held?
3    A.  This one, I think, at the VFW, VFW on Walden
4    Avenue.
5    Q.  And I'm going to ask kind of the same
6    questions we had before.  Is there anything in Exhibit
7    L that would deal with Clark's work?
8    A.  No.
9    Q.  Would it have any safety requirements or any
10   other documents in here that would pertain to the work
11   being done by Clark on July 21st?
12   A.  No.
13   Q.  Do you know about what time you were at the
14   CP436 location on the 21st?
15   A.  No.  I was probably there several times in and
16   out but exact times I couldn't tell you.
17   Q.  Do you know if it was morning or afternoon or
18   could it be both or either?
19   A.  It could be both, if I had an educated guess.
20   Q.  While you were at the location, do you have
21   any recollection of actually seeing any employees
22   working to set up a crane?
23   A.  I believe so.
24   Q.  Did you talk to anyone that day about the
25   setup of the crane?

Page 42

1    A.  I can't remember that.
2    Q.  At any point do you recall doing any
3    inspection at all of the equipment being used by Clark
4    to transport the cranes to the location?
5    A.  No.
6    Q.  To your knowledge, was there any safety person
7    at CSX that inspected, for any reason, the vehicles
8    being used to transport the crane to this location?
9    A.  No.
10   Q.  What is your understanding of what happened in
11   this accident, if anything?
12   MR. GULISANO:  I guess, just let me
13   object to the extent I may have explained things.  I
14   don't want to talk about things that we spoke about,
15   but I think you can answer to the extent he's got
16   some other independent information from somewhere.
17   THE WITNESS:  The only thing, the only
18   knowledge I had, I heard absolutely nothing about
19   this that whole weekend and we did several other
20   phases like three or four months after that.  Heard
21   nothing.  Nobody from Clark Rigging or none of my
22   people mentioned anything about anybody getting hurt
23   or injured or tripping or falling or anything.
24   My first knowledge of this incident was
25   probably a year, year and a half afterwards when

Page 43

1    somebody told me that there was a lawsuit.
2    BY MR. EARL:
3    Q.  Did you ever check to see if there was any
4    documentation at CSX that dealt with this accident,
5    other than the lawsuit?
6    A.  No.
7    Q.  Had you ever been advised that there's any
8    accident report or any other documentation at CSX with
9    respect to this accident itself?
10   A.  No.
11   MR. GULISANO:  Just for the record, a
12   search has been performed, pursuant to my
13   obligations in response to your discovery demands,
14   and the answer to those questions is there's
15   nothing.
16   MR. EARL:  Okay.
17   MR. GULISANO:  Yeah.
18   MR. EARL:  Do you have Exhibit E there,
19   Phil?
20   MR. GULISANO:  I do, yep.
21   BY MR. EARL:
22   Q.  It's an interview/signed statement form.  Sir,
23   have you ever seen this document before?
24   A.  No.
25   Q.  I'm assuming that this is not a CSX form; is

Page 44

1    that correct?
2    A.  Correct.
3    Q.  Now, when someone is injured, when the
4    contractor or subcontractor working for CSX, are there
5    any requirements that it be reported to CSX?
6    A.  That I don't know.
7    Q.  All right.  In your experience, if someone is
8    injured on a jobsite with CSX, when someone is working
9    for a contractor or subcontractor, is that something
10   that is generally reported to CSX, to your knowledge?
11   A.  Knock on wood, I've never had anybody -- I've
12   never had a contractor get hurt.
13   Q.  Have you ever talked to anyone about either
14   Niagara Erecting or Clark Companies about this
15   accident?
16   A.  No.
17   Q.  Has anyone ever talked to you about knowledge,
18   other than your attorney, knowledge about how this
19   accident occurred?
20   A.  No.
21   Q.  Did you ever talk to Mr. Minguez about this
22   accident?
23   A.  No.
24   Q.  Do you know Mr. Clark?
25   A.  No.

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 45

1    Q.  So, it would be fair to say that, other than
2  your attorney, you have not spoken to anyone who has
3  indicated that they have any knowledge about how this
4  accident occurred?
5    A.  Correct.
6    Q.  What was happening with this bridge that was
7  being removed?
8    A.  Well, they -- the way they did them, which
9  they've done, you know, they did them for three or four
10  years before this, they would hook the crane up to it
11  to get it all hooked up and then they would have
12  ironworkers there.  They would go out and they would
13  cut, usually I think there was like four bolts at each,
14  the bottom of each leg, so there would be four, eight,
15  twelve, sixteen, at least sixteen bolts.  They would go
16  and they would cut off all the bolts and then we would
17  we would run a 707 during that time, which means there
18  was somebody there that the trains had one of our guys
19  that the trains had to call before they could come
20  through the area.
21      So we would call our guys, say, hey, are we
22  clear, there's nobody going by, and then they would pick
23  up the whole bridge legs horizontal, everything, all the
24  signals on it.  They would pick it up, swing it over to
25  the side, drop it down so the feet are just barely

Page 46

1  touching, and then they would have their ironworkers cut
2  legs on -- one guy on each side that would cut a section
3  of the legs, let it drop.  Then they would lower it down,
4  cut another section of legs, let them drop, cut another
5  section and then they would set the horizontal usually on
6  top.
7      At this location there was a lot of room, so I
8  can't remember if they put it on top of the legs or if
9  they moved it over a hair and dropped it down.  Then we
10  would have another contractor come through with shears on
11  an excavator to cut it up and bring it to the scrap yard.
12    Q.  So this bridge is not going to be reused, it's
13  being destroyed and taken to recycling?
14    A.  Correct.
15    Q.  Is that what actually happened in this case
16  with the bridge we were talking about?
17    A.  Yes.
18    Q.  Might as well ask.  Was there anything that
19  you considered to be unusual about the work being done
20  on those on the 22nd and 23rd?
21    A.  No.
22    Q.  So there wasn't anything unusual that happened
23  as far as you were concerned, it went as planned?
24    A.  Yep.  They probably had it out of the way in,
25  like, five minutes.  They were pretty efficient.  When

Page 47

1  they got it hooked up and they got it cut and we gave
2  them the time, probably within five minutes they had it
3  over there and they were getting ready to cut it up.
4    Q.  To your knowledge, was the crane that was used
5  for the removal of the old bridge the exact same crane
6  that was used for the erection of that horizontal
7  standard?
8    A.  Yes.
9    Q.  All right.  Do you know how many cranes they
10  had there at that location during that period?
11      MR. GULISANO: Objection.  Go ahead.  I
12  object to, quote, at that location.  I'm not sure
13  what you mean.
14  BY MR. EARL:
15    Q.  Okay.  CP436, to make it simple.
16    A.  To do our work, just one.
17    Q.  There was some testimony previously about
18  another crane that was used, a smaller crane, I'm
19  gathering, in order to put together the crane that was
20  used for the removal and erection of the new one.  Do
21  you remember seeing the smaller crane there ever?
22    A.  Again, that was four years ago.  I'm sure I
23  probably did, but, you know, I couldn't tell you what
24  kind it was and how big it was or any of that
25  information.

Page 48

1    Q.  I can't remember if I asked this.  Do you know
2  the plaintiff?  Have you ever seen him or talked to him
3  before?
4    A.  Not that I know of.
5    Q.  Okay.  Do you have any knowledge, other than
6  what you heard from your attorney, about his injuries
7  or treatment?
8    A.  No.
9    Q.  To your knowledge, did anyone at CSX ever
10  specifically inspect the trailer that was involved in
11  this accident?
12    A.  Not that I'm aware of.
13    Q.  All right.  If this incident had been reported
14  to you or someone else at CSX at the time the incident
15  occurred, would, in your experience, CSX have taken any
16  action done an inspection, done anything as a result of
17  that report?
18    A.  I'm sure we would have had to have done a
19  full-blown report.
20    Q.  And there was no full-blown report done in
21  this case?
22    A.  We didn't know about it, so no.
23    Q.  But never was a full-blown report done, I'm
24  assuming; correct?
25    A.  No, because, like I said, the only -- I didn't

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 49

1  know anything about it until a year and a half after,
2  and then the only thing I knew about it was somebody
3  said they got hurt.  That was the extent of it, so I
4  don't know what I would report on.
5      Q.  That's fine.  I just want to make sure that
6  you didn't do any report once you found out that the
7  incident occurred.
8      A.  I've done -- this is the first I've done
9  anything with this other than -- so no.
10     Q.  All right.  Let me see.  So in your mind, is
11  there any distinction between Niagara Erecting and
12  Clark Rigging?
13     A.  Again, it was my understanding it was just --
14  they were the same company, just a different location.
15  Like I said, I don't know that for a fact.  I have no
16  firsthand knowledge of that.  I was just -- that's just
17  something I assumed, because I had seen both names and
18  it was always Gunther that I dealt with.  He's the only
19  person I ever dealt with, so...
20     Q.  Okay.  Now to your knowledge, was there any --
21  I'm sorry, strike that.  Does CSX actually have
22  employees that would be designated as, I guess I would
23  call them safety inspectors, people dealing with safety
24  issues for CSX?
25     A.  At one time we did have, in signal

Page 50

1  construction we did have a safety rep.
2      Q.  Is that before -- was there a safety rep for
3  your division at the time this work was being done in
4  July of 2017?
5      A.  I don't believe so, but I can't remember the
6  exact date when they stopped doing that, so I can't
7  give you one hundred percent answer on that.
8      Q.  When they did have a safety rep, would they be
9  responsible, have any responsibility for inspecting the
10  work done by contractors or subcontractors, or just CSX
11  employees?
12     A.  Again, once the work got, you know, got
13  shifted to us and doing what they were, you know, as
14  far as lifting, putting the bridge up and loading down
15  the bridge, there was just one person, so, you know,
16  no.  I would say no, but again, we did have somebody --
17  a lot of times it was myself with, you know, the crane
18  crews, you know, when they had to do our work and
19  again, we would make sure, you know, they didn't follow
20  the track, you know.  We were in charge of making sure,
21  you know, they did everything by the book.
22     Q.  All right.  Just so --
23     A.  As far as before when, you know, choosing what
24  types of crane, how many cranes, how to put it
25  together, you know, what they brought it on, that was

Page 51

1  something we didn't get involved in.
2      Q.  And when you talk about you or somebody else
3  would be watching to see what they were doing with
4  respect to the erection and demolition of the old
5  bridge, would that be solely dealing with safety issues
6  surrounding the track and trains as opposed to how they
7  were specifically doing their work?
8      A.  Yeah.  You know, they didn't have a harness on
9  or something and they went to climb something, we would
10  say something about that, but as far as how they did
11  their work, again, they were professional crane
12  operators, professional riggers, professional
13  ironworkers so, you know.
14     Q.  If you did see a contractor or subcontractor
15  doing some work unsafely or in a way that you did not
16  consider to be safe, you would point it out to them and
17  ask them to change the way they're doing it?
18     A.  Absolutely.
19     Q.  Were there any other contractors involved in
20  the work being done at or near CP436 other than Niagara
21  Erecting and Clark and any related companies?
22     A.  On which day?
23     Q.  On the 21st.
24     A.  No.
25     Q.  How about on the 22nd and 23rd, were there any

Page 52

1  other contractors there?
2      A.  Probably not.  I don't know when the guy with
3  the shear, I'm not sure.  I don't think he was there on
4  the 23rd.  I think that he did that the following week.
5      Q.  But that was a separate contractor that cut up
6  the old bridge?
7      A.  Excuse me.  I'm still working here.  Give me
8  one second.  Sorry.
9      Q.  So the work being done on cutting up the old
10  bridge, that was a separate contractor, to your
11  knowledge, other than Niagara Erecting or Clark; is
12  that right?
13     A.  That's correct.
14     Q.  Do you remember who it was that was doing that
15  work?
16     A.  I know his name was Brad.  The company, his
17  last name.  That's not going to help you much.
18     Q.  They wouldn't have had anything to do with the
19  cranes or the setup of the cranes?
20     A.  No, it was the recycling company.
21     Q.  Got you.  Just to make sure I've got this
22  clear, was there any specific person that was
23  considered a site inspector at this CP436 location
24  during the period from the 21st to the 23rd?
25     A.  What do you mean by a site inspector?

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 53

1    Q.  Well, I'm just asking, was there anyone a
2  specific person designated as a site inspector or would
3  that just be, for example, you going to the location to
4  take a look and see what's going on?  What kind of
5  inspections were there?
6    A.  For our work?
7    Q.  Yeah.
8    A.  Probably just, you know, probably myself, you
9  know, just, again, going through and making sure, you
10  know, making sure everything was done correctly.  We do
11  have signal inspectors who would check all the wiring
12  and stuff and make sure all that was good.
13    Q.  They wouldn't have anything to do with respect
14  to overseeing the work done by the contractors and
15  subcontractors --
16    A.  No.
17    Q.  -- would they?
18    A.  No.
19    Q.  Did CSX have any requirements of contractors
20  and subcontractors with respect to their
21  responsibilities regarding safety towards their own
22  employees?
23    A.  That I don't know.
24    Q.  Let me -- have we marked the contract yet,
25  Phil?

Page 54

1         THE WITNESS: J.
2         MR. GULISANO: Yeah, J, thanks.
3  BY MR. EARL:
4    Q.  So if you could take a look at that, sir, does
5  that one have the Bates numbers on it at the bottom?
6  If not, it doesn't matter.  There's another way to get
7  to it.
8         MR. GULISANO: Give me a second.  Yeah.
9  It's in the packet so it's Bates 79 through 94;
10  right?
11         MR. EARL: Yep, exactly.
12         MR. GULISANO: Again, I'll mark -- I'll
13  have that one marked Exhibit J.
14  BY MR. EARL:
15    Q.  All right.  Sir, let's go to Bates number 83
16  and you'll see it has a section for, under number 12,
17  subcontractors.  Do you see that?
18    A.  Yep.
19    Q.  And the first sentence says, contractor shall
20  submit to the chief for approval a list of any and all
21  subcontractors.  Were you given any list at all during
22  this project with respect to the work being done at
23  CP436?
24    A.  No.
25    Q.  Did you have any understanding as to whether

Page 55

1  there were any subcontractors for the work being done
2  at CP436 at this time?
3    A.  Was I aware that we had a subcontractor coming
4  in? Yes, Clark Rigging.
5    Q.  We'll -- how did you know that Clark Rigging
6  was coming in as a subcontractor to Niagara Erecting,
7  Inc.?  Was that just based on past experience?
8    A.  Just, again, dealing with Gunther.  He was my
9  only point of contact for every time we hired them and
10  did something, he was my only point of contact.
11    Q.  And he was, to your knowledge, working for
12  Clark as opposed to Niagara Erecting; is that right?
13    A.  Well, again, it was, whether I'm right or
14  wrong or not, it was my understanding it was the same
15  company.  I could be wrong about that, but at the time
16  I thought it was the same company.
17    Q.  All right.  So, as far as you were concerned,
18  you just treated them as one entity?
19    A.  Correct.
20    Q.  So you would not have expected them to,
21  Niagara Erecting to give you a list saying that Clark
22  is doing some of the work then?
23    A.  Correct.
24    Q.  Turn to Bates page 85.  There's a section
25  called safety.  Do you have that?

Page 56

1    A.  Yep.
2    Q.  All right.  A couple of things I wanted to ask
3  you about.  It talks at some point about the contractor
4  following the provisions of the manual of accident
5  prevention in construction.  Do you see that in the
6  first paragraph under --
7    A.  Yep, it's underlined.
8    Q.  Is that something you're familiar with, that
9  publication?
10    A.  No.
11    Q.  To your knowledge, have you ever reviewed that
12  book or manual?
13    A.  No.
14    Q.  The next paragraph, number two, talks about a
15  booklet called the CSX Safeway.  It sounds like it's a
16  booklet or book or something like that.  Are you
17  familiar with that?
18    A.  Yes.
19    Q.  What does that deal with?
20    A.  It's a book that has all our safety rules in
21  it, our safe practices I should say.
22    Q.  Was a copy of that provided to Clark, to your
23  knowledge?
24    A.  That I don't know.
25    Q.  Do you know if it was provided to Niagara

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 57

1  Erecting?
2     A.  That I don't know.
3     Q.  Do you know whether, as a matter of routine,
4  that when a contractor is signed, a contractor is
5  provided that document?
6     A.  Never.  I've never signed as a contractor so I
7  really don't know that.
8         MR. EARL:  Okay.  Would you -- Molly,
9     would you do an index for me for a request for the
10    CSX Safeway booklet as it existed in July of 2017?
11        THE REPORTER:  Yes.
12        MR. EARL:  Thank you.
13        THE REPORTER:  You're welcome.
14  BY MR. EARL:
15    Q.  On the last -- or, I'm sorry, the second to
16  last page of this document, Bates number 93, do you
17  know who signed that on behalf of CSX?
18    A.  No.
19    Q.  The title looks like, maybe, AVP purchasing;
20  is that right?  Do you know what AVP purchasing is?
21    A.  No.
22    Q.  It appears that for Niagara Erecting it was
23  signed by David F. Clark, president?
24    A.  It looks like it.
25    Q.  And then let's go to the next page.  I guess

Page 58

1  it's Exhibit A.  I'm just wondering, under Exhibit A it
2  talks about the services.  Is it your understanding
3  that those are the only services that were being
4  provided pursuant to the contract?
5     A.  It just talks about the crane, the
6  ironworkers, the rigging.
7     Q.  I guess my question though is, under the first
8  section where it says services, it talks about labor
9  and equipment for the removal of bridge structures as
10  directed by the engineer signal construction; right?
11    A.  Correct.
12    Q.  Was there a separate contract that would have
13  dealt with the installation, the lifting and
14  installation of the horizontal piece on the new bridge?
15    A.  No.
16    Q.  So it would be your understanding that this
17  contract would cover both the removal of the old
18  structure as well as the lifting and installation of
19  the horizontal piece?
20    A.  I would say so.
21    Q.  And the company was going to be paid, was it
22  five thousand a day?  I can't quite read it.  Do you
23  see that?  I didn't hear an answer.
24    A.  I'm sorry, I didn't hear a question.
25    Q.  I'm sorry.  So was, according to this

Page 59

1  contract, is it your understanding that the general
2  rate was going to be five thousand a day for the work
3  being done pursuant to this contract?
4     A.  It looks like a six to me.  Six K, eight
5  hours, Monday through Friday.
6     Q.  It could be.
7     A.  Overtime.
8     Q.  And that would be a flat rate, unless there's
9  overtime for any of the work the company was doing at
10  that location?
11    A.  Correct.
12    Q.  Would that also include the work being done on
13  the 21st to set up the crane?
14    A.  Yes.
15    Q.  So, for this part of the project, CP436, would
16  it be fair to say that, pursuant to this contract,
17  Niagara Erecting or Clark did work on three separate
18  days?
19    A.  At least.
20    Q.  Was there any additional work that would have
21  been done after the 23rd by Clark or Niagara Erecting?
22    A.  Well, they had to come and tear the crane
23  down.  I don't remember how long that took, so they put
24  the crane together.  Now they have to take it apart.
25    Q.  So if that was done on the 24th they would

Page 60

1  also get paid for that as well?
2     A.  Yep.
3     Q.  Let me just take a look at my notes here.  I
4  think we're almost done.  To your knowledge, did CSX
5  require that either Niagara Erecting or Clark have a
6  safety manager on-site during the work?
7     A.  I don't know that.
8     Q.  Would that be something you would expect would
9  be dealt with by the contract?
10    A.  Correct.  Again, until they got to, you know,
11  the day that they put it up, you know, it was just an
12  understanding.  They were a contractor.  They had to
13  follow our safety rules, but they also should, you
14  know, should follow their own safety protocol.
15    Q.  Were there any photographs taken of the work
16  being done at CP436, for example, either beforehand,
17  during the work or after it was completed?
18    A.  I'm sure there was probably some pictures of
19  the bridge in the air because, you know, that was a
20  pretty large structure, so I'm sure some pictures were
21  taken as it was being lifted.
22    Q.  And would those pictures have been taken by
23  someone at CSX?
24        MR. GULISANO:  You're saying you're sure.
25    Do you know if there were?

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

Page 61

1    THE WITNESS: No, I don't know for sure.
2  I'm guessing.
3    MR. GULISANO: Don't guess. If you know,
4  say you know. If you don't know, then let us know.
5    THE WITNESS: I'm not positive, so I
6  don't know.
7  BY MR. EARL:
8  Q.  Would it be normal procedure with CSX to
9  actually take pictures when work of this type was being
10  done with respect to the removal and erection of a new
11  bridge?
12  A.  No.
13    MR. EARL: So -- well, okay. Never mind.
14  Phil, I am not going to waste your time on it. I
15  would assume they would have looked for any
16  photographs such as that when they're doing their
17  search for you.
18    MR. GULISANO: Those have been requested,
19  yes, so my assumption is there are none.
20    MR. EARL: Okay.
21  BY MR. EARL:
22  Q.  Now, let me just ask you another couple
23  questions on Exhibits K and L. That's the cut in
24  meeting and then --
25    MR. GULISANO: The yellow tabs.

Page 62

1  BY MR. EARL:
2  Q.  Would those be documents that would be
3  provided to anybody at Niagara Erecting or Clark for
4  any reason?
5  A.  They did send representatives to the meeting
6  so, yes, we did gave it to them, but whether they took
7  it with them when they left the meeting or left it on
8  the table, I can't tell you that one hundred percent
9  one way or the other.
10  Q.  Was Clark or Niagara Erecting going to have
11  any involvement in any of the actual cut over work?
12  A.  Well, removing the bridge was part of the cut
13  over work because we had to have the old one out of the
14  way before we could put of the new signal in service.
15  Q.  Fair enough. Just give me one second here. I
16  can't find it right here, but let me just ask it in
17  general. Are you aware of any safety plan that was
18  ever done by either Niagara Erecting or Clark with
19  respect to the work being done at CP436?
20  A.  No.
21    MR. EARL: Okay. Sir, I think that's all
22  I have. Thank you very much.
23    MR. GULISANO: Thanks, guys.
24    ***1:33 p.m.***
25

Page 63

1  STATE OF NEW YORK
   COUNTY OF ERIE
2
3    I, Molly Fenske, a Notary Public in and for the State
   of New York, do hereby certify:
4
    That the witness whose testimony appears herein
5  before was, before the commencement of his deposition,
   duly sworn to testify to the truth, the whole truth and
6  nothing but the truth; that such testimony was taken
   pursuant to notice at the time and place herein set forth;
7  that said testimony was taken down in shorthand by me and
   thereafter under my supervision transcribed into the
8  English language, and I hereby certify the foregoing
   testimony is a full, true and correct transcription of the
9  shorthand notes so taken.

10    I further certify that I am neither counsel for nor
   related to any parties to said action, nor in anywise
11  interested in the outcome thereof.

12    IN WITNESS WHEREOF, I have hereunto subscribed my
   name this 23rd day of February, 2021.
13
14
15
16
17                  Notary Public
18                  State of New York
19
20
21
22
23
24
25

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

---

\*

***1:33 (1)
62:24

**A**

able (1)
30:8
absolutely (2)
42:18;51:18
accident (14)
18:22;19:12,17;
26:10;42:11;43:4,8,9;
44:15,19,22;45:4;
48:11;56:4
according (1)
58:25
Act (1)
5:4
action (1)
48:16
actual (3)
20:13;27:24;62:11
actually (10)
10:8;19:5;26:24;
27:5;33:11;38:17;
41:21;46:15;49:21;
61:9
addition (1)
30:21
additional (2)
7:5;59:20
administering (1)
5:5
Administration (1)
15:16
advance (1)
21:12
advised (1)
43:7
afternoon (2)
5:15;41:17
afterwards (2)
36:16;42:25
again (19)
10:19;18:1;31:6;
33:15,19;34:1,7;40:8;
47:22;49:13;50:12,16,
19;51:11;53:9;54:12;
55:8,13;60:10
against (1)
5:17
age (1)
16:7
ago (2)
30:13;47:22
agree (2)
5:2,9
agreed (1)
5:8
agreement (1)

5:7
ahead (7)
9:8,9,16;13:18;25:3;
28:16;47:11
ahold (1)
37:5
air (1)
60:19
Albany (1)
12:11
almost (1)
60:4
always (2)
9:17;49:18
apart (1)
59:24
appears (1)
57:22
application (1)
10:5
apprenticeship (1)
7:2
approval (1)
54:20
approved (2)
22:21;28:7
approximately (1)
11:5
area (12)
11:21;13:6;20:5;
22:23;24:4;28:9,18,22;
29:4;31:6;33:7;45:20
areas (1)
29:17
around (3)
6:25;12:14;13:19
arrangements (1)
25:4
aspects (1)
8:15
assembled (1)
27:20
assembling (2)
31:21;33:2
Assistant (6)
7:22,22,24;10:10,17;
11:7
assume (3)
28:16;35:19;61:15
assumed (1)
49:17
assuming (4)
10:14;25:17;43:25;
48:24
assumption (1)
61:19
attached (1)
39:1
attorney (3)
44:18;45:2;48:6
audits (1)
11:20
automatic (1)

19:7
available (3)
8:3;14:4,5
Avenue (1)
41:4
AVP (2)
57:19,20
aware (10)
23:20;28:13;36:6,20,
24;38:24;39:9;48:12;
55:3;62:17

**B**

back (3)
7:20;10:8;16:3
background (1)
6:21
Baldwinsville (1)
5:11
Baltimore (2)
16:23,23
barely (1)
45:25
based (2)
12:4;55:7
Basically (15)
8:1,16;9:5,5,25;
10:17;11:23;12:21,22;
13:22;31:25;32:25;
33:5;34:6;37:25
Bates (5)
54:5,9,15;55:24;
57:16
became (4)
11:10,13;12:20,22
become (2)
10:19;11:4
becomes (1)
8:3
beforehand (1)
60:16
behalf (1)
57:17
besides (1)
4:24
bid (2)
8:4,4
bidding (2)
20:14,20
big (5)
17:21;22:8;31:5;
32:25;47:24
binding (2)
5:6;39:21
bit (3)
10:8;10;25:3
block (2)
25:2,2
body (1)
15:17
bolted (1)
24:24

bolts (3)
45:13,15,16
book (4)
50:21;56:12,16,20
booklet (3)
56:15,16;57:10
borderline (1)
28:25
Boston (1)
11:24
both (7)
9:23;24:14,16;41:18,
19;49:17;58:17
bottom (2)
45:14;54:5
box (3)
17:25;18:1;24:22
boxes (2)
24:19,19
Boyd (1)
5:15
Brad (1)
52:16
brand (1)
32:9
breaks (1)
6:3
bridge (43)
9:17;15:25;16:21;
18:3,22,24;19:11,17,
22;20:3,18;22:3,7,7;
24:5;25:19;26:19;27:6,
15,16,18;28:22;29:7,8;
30:6,17,24;38:22;45:6,
23;46:12,16;47:5;
50:14,15;51:5;52:6,10;
58:9,14;60:19;61:11;
62:12
bridges (10)
9:21;16:11;17:4,8,
12;18:9,10,13,15;19:23
briefly (1)
23:18
bring (1)
46:11
bringing (1)
27:14
brought (4)
5:17;20:22,23;50:25
Buffalo (3)
4:3;12:12;16:24
build (2)
8:24;27:14
building (4)
10:23,23;27:16,17
built (3)
24:11;29:23,24
bulletins (1)
35:6,6,6;38:2,2

**C**

cable (1)

16:6
cables (5)
17:23,25;24:20;
25:23;30:1
cabling (1)
9:4
call (8)
14:4;18:5;25:22;
36:12,13;45:19,21;
49:23
called (7)
5:12;7:18;10:4;
16:23;26:18;55:25;
56:15
calls (2)
8:21;10:22
came (4)
17:9;21:20;24:23;
26:4
Camerondale (1)
5:10
Can (12)
8:7;9:11;14:15;
15:19;16:2;30:6,22;
36:3;37:23;38:8;40:8;
42:15
cantilever (1)
18:2
cantilevers (1)
9:22
care (2)
28:3;31:23
career (1)
8:23
case (6)
5:16,18;15:19;31:20;
46:15;48:21
center (3)
7:17,18;22:7
certain (1)
18:9
certification (1)
4:17
change (2)
11:13;51:17
charge (2)
13:5;50:20
charging (1)
37:6
check (5)
13:20,20;31:7,7;
36:14;43:3;53:11
checking (1)
29:17;31:1,6,7;34:19
chief (1)
54:20
choosing (1)
50:23
Chrysler (1)
7:2
circumstances (1)
5:19
clarify (1)

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

35:8
**Clark (42)**
21:5,9,16,21;22:11;
24:6;25:5,17;26:4,17;
27:1,3,5,9;28:3,13;
31:18,20,23;36:21;
39:22;40:4;41:11;42:3,
21;44:14,24;49:12;
51:21;52:11;55:4,5,12,
21;56:22;57:23;59:17,
21;60:5;62:3,10,18
**Clark's (1)**
41:7
**class (1)**
8:6
**classes (3)**
7:6,8,19
**clear (3)**
9:9;45:22;52:22
**climb (1)**
51:9
**close (1)**
25:1
**code (2)**
37:6,8
**College (2)**
6:23;7:3
**color (3)**
9:7,9,10
**colored (1)**
8:25
**coming (2)**
55:3,6
**comment (1)**
38:9
**Community (1)**
6:23
**Companies (2)**
44:14;51:21
**company (9)**
16:16;22:14;49:14;
52:16,20;55:15,16;
58:21;59:9
**complaints (1)**
22:17
**completed (2)**
30:17;60:17
**completely (1)**
34:9
**complicated (1)**
5:22
**concern (1)**
33:5
**concerned (3)**
33:8;46:23;55:17
**concerning (1)**
38:2
**concrete (2)**
24:13,16
**configurations (1)**
10:2
**confirm (1)**
23:9

**confusing (1)**
6:20
**consider (1)**
51:16
**considered (2)**
46:19;52:23
**constructed (1)**
11:17
**constructing (1)**
11:16
**construction (24)**
4:1;8:22;10:22;11:2,
11,14,22;12:9,19,21,
25;13:4,6,8,11,14,23;
14:1;15:3;23:13;25:25;
50:1;56:5;58:10
**contact (2)**
55:9,10
**context (1)**
15:19
**continue (1)**
11:8
**continuing (1)**
7:6
**contract (19)**
4:2;20:14,14,19,20,
21;22:21;23:1,14,24;
39:5;53:24;58:4,12,17;
59:1,3,16;60:9
**contractor (13)**
44:4,9,12;46:10;
51:14;52:5,10;54:19;
56:3;57:4,4,6;60:12
**contractors (5)**
50:10;51:19;52:1;
53:14,19
**control (9)**
9:6;15:9;17:18,18,
21;19:3,6,10;31:3
**conversation (1)**
27:8
**conversations (1)**
39:6
**copy (4)**
22:25;37:11;40:17;
56:22
**corner (1)**
32:23
**corporation (1)**
6:20
**correctly (5)**
14:13;25:11;30:16;
38:13;55:10
**counsel (2)**
4:15;5:2
**country (1)**
15:21
**couple (3)**
39:19;56:2;61:22
**course (3)**
6:6;25:7;29:1
**courses (1)**
7:11

**court (1)**
6:1
**cover (2)**
39:4;58:17
**covered (2)**
23:24;24:1
**CP (1)**
19:3
**CP2 (1)**
31:5
**CP436 (30)**
19:1,11,21;20:1,2,3,
9,15;21:14;22:10;
23:24;26:3;30:7;31:10,
15;34:23;35:2;36:14,
17;37:9;39:16;41:14;
47:15;51:20;52:23;
54:23;55:2;59:15;
60:16;62:19
**CP437 (1)**
31:2
**craft (3)**
7:12;9:5,14
**crane (38)**
22:6;25:19;27:17,19,
20,22,24;28:1,4,14;
29:4;32:2,7,16,21;
33:12,18;34:15;35:11;
36:22;40:1;41:22,25;
42:8;45:10;47:4,5,18,
18,19,21;50:17,24;
51:11;58:5;59:13,22,
24
**cranes (7)**
31:22;32:8;42:4;
47:9;50:24;52:19,19
**crews (1)**
50:18
**crossings (3)**
9:2,3;10:24
**CSX (49)**
4:2;5:17;6:12,16,17;
7:10,20,25;8:13;14:9,
23;23:14;24:6;26:1;
28:20,23;29:5,8;31:9,
16;33:17;34:16;35:2,
10;36:21,25;39:10,10;
42:7;43:4,8,25;44:4,5,
8,10;48:9,14,15;49:21,
24;50:10;53:19;56:15;
57:10,17;60:4,23;61:8
**current (2)**
5:3;13:25
**currently (3)**
6:8;13:2,3
**cut (26)**
18:6;29:21;31:3;
34:3;35:3,5;37:13,24;
38:3,14,18;40:18,20;
45:13,16;46:1,2,4,4,11;
47:1,3;52:5;61:23;
62:11,12
**cutting (1)**

52:9

**D**

**daily (2)**
35:22;36:11
**date (3)**
21:11;27:9;50:6
**DAVID (3)**
5:10;14:13;57:23
**day (28)**
25:4,6;26:9;27:4,10,
11;31:10;33:20,25;
34:5,20,23;35:2,7,11,
13,23;36:1,2;37:4,7;
40:21,23;41:24;51:22;
58:22;59:2;60:11
**days (2)**
36:8;59:18
**deal (4)**
38:25;39:15;41:7;
56:19
**dealing (5)**
31:16;39:10;49:23;
51:5;55:8
**dealt (5)**
43:4;49:18,19;58:13;
60:9
**decision (2)**
15:24;16:4
**degree (2)**
6:22;7:4
**demands (1)**
43:13
**demolition (1)**
51:4
**dependent (1)**
9:10
**depending (7)**
9:9;10:5;11:1;15:6;
17:15,17,21
**depends (1)**
12:10
**deposition (1)**
5:5
**describe (3)**
30:4,6,22
**designate (1)**
18:24
**designated (2)**
49:22;53:2
**designer (1)**
20:11
**destroyed (1)**
46:13
**determination (2)**
16:8;32:2
**determine (3)**
20:25;22:8;28:4
**determined (2)**
16:1;17:22
**determining (1)**
15:2

**different (8)**
8:15,18,19;9:20;
10:2,2;17:7;49:14
**dig (3)**
24:13,16;25:9
**digging (1)**
29:25
**direct (2)**
8:14;9:1
**directed (1)**
58:10
**directive (1)**
15:10
**director (3)**
13:3,10,13
**dirt (1)**
32:24
**discovery (1)**
43:13
**discussion (4)**
8:9;37:18;38:11;
40:10
**dispatcher (1)**
38:2
**distinction (2)**
10:16;49:11
**divert (2)**
9:12;17:20
**division (1)**
50:3
**document (7)**
23:18;37:23;38:14;
39:3;43:23;57:5,16
**documentation (8)**
34:25;36:20,24;
38:24;39:10,14;43:4,8
**documenting (1)**
35:9
**documents (3)**
37:17;41:10;62:2
**done (60)**
5:25;13:21;15:5,21;
16:12;17:5;19:16;20:9;
21:25;22:10,15,18;
27:1;29:22;30:2;31:17,
19;32:3;34:9;35:1;
36:21;38:6,15,20,25;
39:7,8,11,15,22;40:5,
20,23;41:11;45:9;
46:19;48:16,16,18,20,
23;49:8,8;50:3,10;
51:20;52:9;53:10,14;
54:22;55:1;59:3,12,21,
25;60:4,16;61:10;
62:18,19
**double (1)**
31:7
**double-checking (1)**
34:10
**down (15)**
6:2;7:18;12:3;15:6;
20:17;25:7,13;27:12;
30:3;36:16;45:25;46:3,

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

9;50:14;59:23
**draw (1)**
  32:17
**drop (3)**
  45:25;46:3,4
**dropped (1)**
  46:9
**duly (1)**
  5:12
**during (7)**
  35:5;45:17;47:10;
  52:24;54:21;60:6,17
**duties (3)**
  10:15;11:13;13:13
**dwarf (1)**
  10:4

**E**

**Earl (47)**
  4:6,8,20,22;5:8,14,
  15;6:7;8:10;14:8,22,
  25;19:19,20;21:6;
  22:25;23:3,6,12,16;
  26:13,15;27:21;35:17;
  37:15,19;38:9,12;40:7,
  11;43:2,16,18,21;
  47:14;54:3,11,14;57:8,
  12,14;61:7,13,20,21;
  62:1,21
**earlier (2)**
  24:12;39:5
**easier (1)**
  6:1
**east (3)**
  13:8,10,13
**eastern (1)**
  13:9
**ed (1)**
  7:6
**educated (1)**
  41:19
**education (1)**
  7:6
**educational (1)**
  6:21
**efficient (1)**
  46:25
**eight (2)**
  45:14;59:4
**either (9)**
  14:14;24:7;29:6;
  39:11;41:18;44:13;
  60:5,16;62:18
**Electric (1)**
  23:1
**electrical (2)**
  6:22;7:1
**electrician (1)**
  7:9
**electronics (1)**
  17:15
**else (3)**

27:2;48:14;51:2
**else's (1)**
  15:4
**Emergency (1)**
  5:3
**employed (1)**
  6:9
**employees (13)**
  26:1;27:2;31:9;
  33:17;34:17;35:2,10;
  36:25;37:4;41:21;
  49:22;50:11;53:22
**employment (1)**
  10:9
**engineer (8)**
  11:11,14,22;12:8,18,
  20,21;58:10
**engineering (1)**
  6:22
**engineers (2)**
  12:25;15:6
**enough (2)**
  19:19;62:15
**entered (1)**
  4:13
**entire (1)**
  16:18
**entity (1)**
  55:18
**EP (1)**
  19:2
**equipment (5)**
  11:19;20:25;27:14;
  42:3;58:9
**Erecting (18)**
  4:3;21:13;23:15;
  44:14;49:11;51:21;
  52:11;55:6,12,21;57:1,
  22;59:17,21;60:5;62:3,
  10,18
**erection (4)**
  47:6,20;51:4;61:10
**Erie (2)**
  11:24;12:14
**essentially (1)**
  25:11
**even (1)**
  39:21
**everybody (1)**
  35:4
**everyday (1)**
  14:6
**Everyone (1)**
  6:2
**everything's (1)**
  31:8
**exact (4)**
  21:11;41:16;47:5;
  50:6
**exactly (5)**
  28:25;30:8;34:11,11;
  54:11
**EXAMINATION (1)**

6:7
**examined (1)**
  5:12
**example (4)**
  15:12;30:23;53:3;
  60:16
**excavator (1)**
  46:11
**except (2)**
  4:18;10:15
**exception (1)**
  30:17
**Excuse (1)**
  52:7
**Exhibit (12)**
  4:1,3,4;23:10;37:20;
  39:21;40:12;41:6;
  43:18;54:13;58:1,1
**Exhibits (1)**
  61:23
**existed (1)**
  57:10
**existing (2)**
  18:13;20:18
**exists (1)**
  36:20
**expect (2)**
  31:23;60:8
**expected (1)**
  55:20
**experience (3)**
  44:7;48:15;55:7
**expertise (1)**
  32:4
**explained (1)**
  42:13
**extent (3)**
  42:13,15;49:3

**F**

**fact (2)**
  21:17;49:15
**Fair (4)**
  19:19;45:1;59:16;
  62:15
**falling (1)**
  42:23
**familiar (4)**
  18:21;22:14;56:8,17
**far (6)**
  29:2;46:23;50:14,23;
  51:10;55:17
**fast (1)**
  9:11
**favor (1)**
  5:24
**federal (2)**
  15:10,16
**feet (4)**
  32:1,14;33:4;45:25
**few (1)**
  20:10

**field (1)**
  32:25
**fifty (2)**
  18:15;33:4
**figure (3)**
  8:12;20:2;40:8
**filing (1)**
  4:16
**fill (1)**
  35:22
**find (2)**
  22:5;62:16
**fine (2)**
  30:11;49:5
**finishing (2)**
  33:21;34:8
**first (12)**
  6:8;7:20;16:18;20:8;
  23:19;26:3;27:10;
  42:24;49:8;54:19;56:6;
  58:7
**firsthand (1)**
  49:16
**five (8)**
  10:25;17:17;21:11;
  31:4;46:25;47:2;58:22;
  59:2
**fixes (1)**
  8:21
**flashing (1)**
  9:3
**flat (1)**
  59:8
**follow (3)**
  50:19;60:13,14
**following (4)**
  4:12;27:4;52:4;56:4
**follows (1)**
  5:13
**foot (1)**
  33:7
**foreman (1)**
  10:25
**form (4)**
  4:18;9:17;43:22,25
**forward (1)**
  13:19
**found (1)**
  49:6
**foundation (3)**
  10:1;24:16;25:23
**foundations (2)**
  24:14;30:1
**four (16)**
  10:25;19:8;21:10;
  24:15,17;29:20,23;
  30:2,12,25;34:2;42:20;
  45:9,13,14;47:22
**FRA (4)**
  8:17,20;15:14,15
**Friday (5)**
  26:10;34:7;35:15,16;
  59:5

**front (1)**
  40:12
**full-blown (3)**
  48:19,20,23
**further (2)**
  30:3,5
**future (1)**
  6:16

**G**

**gates (1)**
  9:3
**gathering (8)**
  7:15;10:7;16:25;
  18:14,19;34:17;36:7;
  47:19
**gave (2)**
  47:1;62:6
**general (6)**
  10:14;12:20,23;
  39:19;59:1;62:17
**generally (3)**
  12:5,7;44:10
**geographic (1)**
  11:21;13:6
**Georgia (1)**
  7:17
**gets (1)**
  15:5
**gigantic (1)**
  31:3
**given (1)**
  54:21
**God (1)**
  32:8
**goes (3)**
  8:21;9:17;32:24
**Good (4)**
  5:14;31:8;32:6;
  53:12
**governing (1)**
  15:16
**grass (1)**
  32:24,25
**Great (1)**
  23:12
**greenfield (1)**
  16:5
**ground (3)**
  9:19;10:5;32:17
**guess (14)**
  5:14;7:23;14:8;16:3;
  21:10;31:13;33:22;
  39:9;41:19;42:12;
  49:22;57:25;58:7;61:3
**guessing (2)**
  33:4;61:2
**Gulisano (33)**
  4:7,11,23,25;5:9;8:7;
  14:12,24;19:15;21:2,4;
  23:2,5,8,13;26:8;
  27:17;35:8,13;38:8;

42:12;43:11,17,20;
47:11;54:2,8,12;60:24;
61:3,18,25;62:23
**Gunther (5)**
21:22;27:13;39:7;
49:18;55:8
**guy (2)**
46:2;52:2
**guys (3)**
45:18,21;62:23

## H

**hair (1)**
46:9
**half (4)**
6:14,15;42:25;49:1
**hand (1)**
14:5
**hanging (1)**
10:3
**hangs (1)**
9:24
**happen (1)**
35:5
**happened (6)**
15:8;23:21;34:23;
42:10;46:15,22
**happening (1)**
45:6
**happens (1)**
32:11
**harness (1)**
51:8
**head (2)**
6:5;30:10
**Health (1)**
5:4
**hear (2)**
58:23,24
**heard (3)**
42:18,20;48:6
**held (5)**
8:9;37:18;38:11;
40:10;41:2
**help (2)**
14:3;52:17
**hereby (1)**
4:14
**hey (1)**
45:21
**higher (1)**
12:2
**hired (3)**
7:20;32:5;55:9
**home (1)**
34:5
**hook (1)**
45:10
**hooked (2)**
45:11;47:1
**horizontal (13)**
24:22;26:19,21;27:1;

30:18;38:21;39:1;
40:24;45:23;46:5;47:6;
58:14,19
**horizontal's (1)**
34:8
**hours (1)**
59:5
**house (4)**
17:16;24:13,21;
34:10
**housed (1)**
17:14
**houses (8)**
16:6;17:14,17,22,23;
25:23;29:25;31:4
**hundred (5)**
31:12;33:4,19;50:7;
62:8
**hurt (3)**
42:22;44:12;49:3

## I

**identification (1)**
4:5
**identify (1)**
30:8
**Inc (5)**
4:2,3;6:17;23:1;55:7
**incident (7)**
15:7,7;35:11;42:24;
48:13,14;49:7
**include (2)**
19:23;59:12
**included (1)**
20:4
**independent (1)**
42:16
**in-depth (1)**
38:5
**index (1)**
57:9
**indicate (4)**
9:15;35:25;36:25;
37:4
**indicated (2)**
15:20;45:3
**individual (2)**
28:10;31:21
**information (3)**
35:1;42:16;47:25
**initiative (2)**
15:9,9
**injured (3)**
42:23;44:3,8
**injuries (1)**
48:6
**inspect (1)**
48:10
**inspected (1)**
42:7
**inspecting (2)**
30:24;50:9

**inspection (2)**
42:3;48:16
**inspections (1)**
53:5
**inspector (3)**
52:23,25;53:2
**inspectors (2)**
49:23;53:11
**install (2)**
17:23,23
**installation (5)**
26:25,25;58:13,14,
18
**installed (3)**
26:22;38:22;40:25
**instead (2)**
9:22;11:15
**interact (1)**
14:2
**interview/signed (1)**
43:22
**into (6)**
4:13;11:10;17:25;
19:6;24:20;26:6
**involve (2)**
17:11;19:22
**involved (12)**
17:3,12;18:22,25;
21:13,14;23:22;25:18;
33:15;48:10;51:1,19
**involvement (8)**
20:8;24:4,8;26:3;
28:1;31:25;32:11;
62:11
**involving (1)**
16:21
**ironworkers (4)**
45:12;46:1;51:13;
58:6
**issue (2)**
14:3;32:9
**issues (3)**
31:17;49:24;51:5

## J

**Jacksonville (2)**
15:6;20:11
**Jersey (1)**
12:1
**job (7)**
10:15;11:13,19;
12:19;13:13;16:21;
22:9
**jobs (3)**
12:11;30:20;31:15
**jobsite (1)**
44:8
**joined (1)**
14:10
**journeyman (2)**
7:9,10
**July (15)**

21:8;26:5,9,17;27:5;
28:14;29:12;30:15,21;
36:22;37:1;38:16;
41:11;50:4;57:10
**junction (4)**
17:25,25;24:19,22

## K

**kind (7)**
6:2;20:25;27:22;
32:2;41:5;47:24;53:4
**knew (2)**
28:16;49:2
**Knock (1)**
44:11
**knowing (1)**
32:6
**knowledge (23)**
5:18;27:8;28:20;
29:5;31:10;39:4;42:6,
18,24;44:10,17,18;
45:3;47:4;48:5,9;
49:16,20;52:11;55:11;
56:11,23;60:4
**knows (2)**
9:7,8

## L

**labor (1)**
58:8
**landed (1)**
24:22
**large (1)**
60:20
**last (6)**
7:2;23:9;29:18;
52:17;57:15,16
**lawsuit (2)**
43:1,5
**leads (1)**
25:8
**learns (2)**
8:1,2
**least (4)**
17:1;39:15;45:15;
59:19
**left (2)**
62:7,7
**leg (1)**
45:14
**legs (5)**
45:23;46:2,3,4,8
**lift (1)**
26:5
**lifted (1)**
60:21
**lifting (3)**
50:14;58:13,18
**lights (5)**
8:14,25;9:4,15;10:3
**limited (1)**

20:3
**line (2)**
30:4;32:18
**lines (1)**
32:17
**list (3)**
54:20,21;55:21
**little (4)**
5:21;10:8,10;25:3
**local (1)**
8:15
**located (3)**
28:22;29:8;30:7
**location (39)**
17:15,22;18:21;20:6;
21:20;22:1,22;24:8,12;
25:1,10;27:10;28:11,
14;29:11,16;30:24;
31:1,5,6,17;32:22;
33:18;34:23;35:20;
37:1;38:6;39:16;41:14,
20;42:4,8;46:7;47:10,
12;49:14;52:23;53:3;
59:10
**locations (10)**
10:23;11:17;13:20;
17:8,16;20:24;24:11;
30:21,23;38:5
**locked (1)**
26:6
**logbook (1)**
35:22
**long (5)**
6:13;11:8;12:18;
24:24;59:23
**look (7)**
20:12;23:17;32:8;
34:16;53:4;54:4;60:3
**looked (1)**
61:15
**looking (2)**
37:20;39:14
**looks (4)**
14:9;57:19,24;59:4
**lot (6)**
27:12;28:6,18;29:2;
46:7;50:17
**lots (1)**
9:21
**low (1)**
10:5
**lower (2)**
12:3;46:3

## M

**machines (4)**
9:1,12;17:19,24
**maintainer (11)**
7:23,25;8:2,5,16;
10:11,13,19;11:4,9;
12:8
**maintainers (2)**

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

8:13;11:1
**maintenance (4)**
10:20;11:2;13:25;
14:6
**makes (1)**
26:14
**making (9)**
13:16,18,21;18:4;
31:7;34:8;50:20;53:9,
10
**man (1)**
10:25
**management (1)**
11:10
**manager (7)**
12:22,22,23;20:23;
21:2,4;60:6
**managers (1)**
13:16
**manual (2)**
56:4,12
**many (3)**
17:22;47:9;50:24
**mark (3)**
23:6,10;54:12
**marked (3)**
4:5;53:24;54:13
**marking (1)**
23:9
**Massachusetts (2)**
12:1,11
**mast (4)**
25:18;26:6,18,21
**masts (1)**
24:20
**material (1)**
11:18
**matter (3)**
39:12;54:6;57:3
**may (1)**
42:13
**maybe (2)**
8:17;57:19
**mean (4)**
15:25;29:24;47:13;
52:25
**means (2)**
16:5;45:17
**meant (1)**
15:14
**measure (3)**
22:4,6;32:17
**meeting (8)**
35:4;37:13;40:18,20;
41:2;61:24;62:5,7
**mention (2)**
6:3;14:9
**mentioned (2)**
15:15;42:22
**met (1)**
24:3
**Meyme (5)**
14:13,14,14,17,20

**M-E-Y-M-E (1)**
14:17
**might (5)**
6:20;34:7,9;36:12;
46:18
**miles (1)**
8:17
**mind (2)**
49:10;61:13
**Minguez (4)**
21:22;22:23;24:3;
44:21
**minute (1)**
29:18
**minutes (2)**
46:25;47:2
**Molly (1)**
57:8
**moment (1)**
33:6
**Monday (2)**
34:3;59:5
**monitor (2)**
30:21;31:17
**monthly (1)**
8:19
**months (3)**
21:11;29:22;42:20
**Montreal (1)**
11:24
**more (6)**
7:14;10:10,15;17:11;
26:14;28:9
**morning (2)**
5:14;41:17
**most (2)**
8:23;11:25
**mostly (1)**
12:2
**mounted (1)**
24:25
**mounting (1)**
27:1
**move (1)**
16:12
**moved (2)**
8:5;46:9
**much (6)**
12:3;13:15;30:16;
32:8;52:17;62:22
**myself (3)**
39:6;50:17;53:8

**N**

**name (7)**
5:15;16:15,19,22;
18:25;52:16,17
**names (1)**
49:17
**National (1)**
5:3
**near (4)**

29:1,11;35:2;51:20
**need (3)**
14:3,3;22:9
**needed (10)**
20:25;21:25;22:2,3;
28:4;32:3,3,12;39:7,8
**needs (1)**
38:6
**New (48)**
5:11;8:24,25;10:23,
24;11:23;12:1,1,19;
14:1;15:2,3;16:5,6,6,8;
17:8,14,23,23,24,25,
25;18:1,7,10,13;20:18;
24:13,20,21,21;25:1,6,
8,12,24;26:6,18;29:8;
30:16;32:9;38:22;
40:24;47:20;58:14;
61:10;62:14
**Newport (1)**
11:23
**next (9)**
10:12;23:7;24:4,8,9;
25:6;34:20;56:14;
57:25
**Niagara (19)**
4:3;21:13;23:1,14;
44:14;49:11;51:20;
52:11;55:6,12,21;
56:25;57:22;59:17,21;
60:5;62:3,10,18
**NICHOLAS (1)**
5:10
**Nobody (2)**
42:21;45:22
**Nods (1)**
6:5
**none (2)**
42:21;61:19
**Nope (1)**
4:22
**normal (1)**
61:8
**normally (1)**
25:4
**northeast (1)**
11:25
**notations (2)**
36:8,9
**notes (3)**
35:19;36:12;60:3
**number (5)**
39:1;54:15,16;56:14;
57:16
**numbers (1)**
54:5
**numerous (3)**
7:11,19;31:4

**O**

**oath (2)**
4:15;5:6

**Object (3)**
19:15;42:13;47:12
**objection (4)**
5:5;19:18;26:8;
47:11
**objections (1)**
4:18
**obligations (1)**
43:13
**obviously (1)**
16:25
**occasionally (1)**
6:4
**occurred (7)**
18:22;19:13,17;
44:19;45:4;48:15;49:7
**off (12)**
7:15;8:7;9:18;6;
24:24;30:10;37:15,18;
38:11;40:8,10;45:16
**office (2)**
12:5,6
**officer (1)**
5:5
**official (1)**
20:22
**old (17)**
17:9;18:6,16;22:3;
25:2,3,7,13;27:6;
28:22;29:7;47:5;51:4;
52:6,9;58:17;62:13
**once (3)**
16:11;49:6;50:12
**one (45)**
9:2,13,23;10:6;
16:1;17:1,16,20;19:5,
22;20:3,7,18,21,23;
23:2;24:13;25:6,7,12,
13,25;29:21;30:22;
31:12;33:4,19;34:5;
38:9;41:3;45:18;46:2;
47:16,20;49:25;50:7,
15;52:8;54:5,13;55:18;
62:8,9,13,15
**only (13)**
9:22;11:6;19:15,22;
39:3;42:17,17;48:25;
49:2,18;55:9,10;58:3
**Onondaga (1)**
6:23
**on-site (1)**
60:6
**on-the-job (1)**
7:14
**open (4)**
27:12;28:6,18;29:2
**operators (1)**
51:12
**opposed (4)**
7:15;18:12;51:6;
55:12
**order (3)**
26:5,6;47:19

**ours (2)**
29:1;33:5
**out (26)**
8:12,21;9:19;13:19;
17:9,24;20:2,20,24;
21:8,20;22:3,22;25:8,
9;29:2;31:1;35:22;
36:17;40:8;41:16;
45:12;46:24;49:6;
51:16;62:13
**outlined (1)**
35:5
**outrigger (1)**
32:18
**outriggers (1)**
32:16
**over (24)**
9:17,24;15:17;18:6;
20:12;25:19;31:3;
33:11;34:4,14;35:4,5;
37:13,24;38:3,14,18;
40:18,20;45:24;46:9;
47:3;62:11,13
**overall (3)**
16:15,18;38:6
**overseeing (4)**
11:16;13:15,22;
53:14
**Overtime (2)**
59:7,9
**own (2)**
53:21;60:14
**owned (3)**
28:20,23;29:3

**P**

**PA (2)**
11:24;12:14
**packet (5)**
35:3;37:11,12,24;
54:9
**page (3)**
55:24;57:16,25
**paid (2)**
58:21;60:1
**paragraph (2)**
56:6,14
**park (1)**
27:15
**part (24)**
7:3;9:13;10:18;
11:25;15:6,8,20;16:12;
17:5,10;18:8;19:25,25;
20:2;22:11;24:5;25:10;
26:19;27:23;31:2,15,
24;59:15;62:12
**particular (2)**
20:6;37:6
**parties (2)**
4:13,15
**parts (2)**
28:10,10

past (3)
  22:18;32:18;55:7
payroll (1)
  37:5
people (10)
  20:11;33:20;34:2,4,
  5,6,7;38:4;42:22;49:23
per (1)
  14:6
percent (4)
  31:12;33:19;50:7;
  62:8
perfect (1)
  5:23
performed (1)
  43:12
period (4)
  7:1;10:11;47:10;
  52:24
person (5)
  42:6;49:19;50:15;
  52:22;53:2
pertain (1)
  41:10
phase (12)
  4:4;16:24;17:10;
  18:8;29:20,20,21,23;
  30:2,3,24;31:3
phases (4)
  17:1,3;29:19;42:20
Phil (4)
  22:25;43:19;53:25;
  61:14
photographs (2)
  60:15;61:16
pick (2)
  45:22,24
pictures (4)
  60:18,20,22;61:9
piece (6)
  27:1;28:19;30:18;
  38:21;58:14,19
pieces (1)
  24:23
PIRRO (5)
  5:10,15;15:1;23:17;
  37:20
place (2)
  21:7;26:6
plaintiff (2)
  5:16;48:2
plan (5)
  26:16;27:4;35:16,18;
  62:17
planned (1)
  46:23
planner (1)
  36:11
planning (2)
  13:17;33:24
Please (3)
  5:6,20;14:16
plenty (1)

7:8
plus (4)
  7:12;9:4;29:16,16
pm*** (1)
  62:24
point (15)
  14:11;17:18,18,21;
  19:3,6,11;25:17;31:3;
  37:25;42:2;51:16;55:9,
  10;56:3
portion (2)
  26:21;38:18
position (8)
  7:21;8:3,4,4;9:10;
  10:12;13:2,25
positive (2)
  15:9;61:5
positively (2)
  29:6;31:14
possible (1)
  18:14
PowerPoint (1)
  4:4;40:17
practices (1)
  56:21
pre (2)
  18:3;40:18
prep (1)
  25:16
prepared (1)
  38:14
presentation (2)
  4:4;40:17
president (1)
  57:23
presuming (1)
  21:7
Pretty (6)
  13:15;21:12;30:16;
  32:8;46:25;60:20
prevention (1)
  56:5
previously (1)
  47:17
prior (2)
  17:3;22:10
probably (18)
  6:25;13:12;14:9;
  18:15;20:10;21:10;
  31:13;33:3;37:11;
  41:15;42:25;46:24;
  47:2,23;52:2;53:8,8;
  60:18
problems (1)
  15:11
procedure (1)
  61:8
proceed (1)
  5:1
professional (4)
  32:5;51:11,12,12
program (4)
  7:2,10;17:6;22:12

progress (1)
  29:17
project (11)
  15:5;16:10,13,15;
  18:8;19:25;21:14;24:5;
  29:15;54:22;59:15
projects (2)
  13:17;23:22
pronouncing (2)
  14:13;21:23
proper (2)
  11:18,19
properly (1)
  6:2
property (5)
  28:19,23;29:5,7,9
protection (1)
  32:15
protocol (1)
  60:14
provided (6)
  39:21;56:22,25;57:5;
  58:4;62:3
provisions (1)
  20:19;40:3;56:4
PTC (5)
  15:8,20;16:20;17:5;
  22:12
Public (1)
  5:4
publication (1)
  56:9
pull (1)
  9:2
pulled (2)
  33:1,2
purchasing (2)
  57:19,20
purpose (1)
  21:24;33:23
pursuant (5)
  5:3;43:12;58:4;59:3,
  16
put (24)
  8:25;13:5;15:19;
  16:5,8;17:24;18:1;
  22:2,3;24:12,12,14,17,
  23;25:3,6;32:12;40:18;
  46:8;47:19;50:24;
  59:23;60:11;62:14
putting (7)
  18:13;25:18,21;
  29:25;30:1,17;50:14

Q

quality (1)
  32:7
quarterly (1)
  8:19
quite (1)
  58:22
quote (1)

47:12

R

railroad (3)
  9:18;15:16;16:4
railroads (1)
  15:17
raise (2)
  26:17,21
ran (2)
  24:20;25:7
rate (2)
  59:2,8
read (2)
  4:11;58:22
reading (1)
  4:10
Ready (8)
  7:18;25:12;29:18;
  32:3,19;34:9,19;47:3
real (1)
  10:4
realized (1)
  38:9
really (4)
  6:6;14:2;33:15;57:7
reason (4)
  18:12;33:12;42:7;
  62:4
recall (2)
  33:21;42:2
received (1)
  39:10
recognize (2)
  23:18;40:14
recollection (2)
  34:22;41:21
record (13)
  5:2,7,8;8:9;14:10,22;
  37:15,18;38:10,11;
  40:8,10;43:11
records (2)
  37:3,5
recycling (2)
  46:13;52:20
referee (1)
  4:16
referring (1)
  20:16
regarding (2)
  27:9;53:21
regardless (1)
  34:14
region (4)
  13:8,9,9,10
regional (2)
  13:10,13
regions (1)
  13:9
related (2)
  6:20;51:21
relation (1)

30:3
relied (1)
  32:6
remain (1)
  12:18
remember (9)
  32:23;34:11;42:1;
  46:8;47:21;48:1;50:5;
  52:14;59:23
remotely (1)
  5:6
removal (5)
  47:5,20;58:9,17;
  61:10
remove (1)
  27:6
removed (2)
  18:9;45:7
removing (1)
  62:12
rep (3)
  50:1,2,8
rephrase (2)
  5:21;26:16
replace (1)
  18:18
replaced (6)
  15:3,25;16:2;18:9;
  20:4,18
replacement (3)
  16:19;17:4,11
report (7)
  43:8;48:17,19,20,23;
  49:4,6
reported (3)
  44:5,10;48:13
REPORTER (11)
  4:6,9,20,23;5:1;6:1;
  14:15,18,21;57:11,13
represent (1)
  5:16
representative (2)
  14:23;21:9
representatives (1)
  62:5
request (1)
  57:9
requested (1)
  61:18
require (1)
  60:5
required (1)
  8:20
requirements (4)
  40:4;41:9;44:5;
  53:19
reserved (1)
  4:19
respect (22)
  20:9;24:8;25:15,21;
  26:3,4;35:23;36:4,21;
  38:14,20,21;39:1,22;
  40:4;43:9;51:4;53:13,

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

20;54:22;61:10;62:19
**respective (2)**
  4:13,15
**response (1)**
  43:13
**responsibilities (1)**
  53:21
**responsibility (3)**
  15:1,4;50:9
**responsible (4)**
  10:21;11:22;12:24;
  50:9
**result (1)**
  48:16
**reused (1)**
  46:12
**reviewed (1)**
  56:11
**riggers (1)**
  51:12
**Rigging (11)**
  21:5,16;24:6;25:6,
  18;31:18;42:21;49:12;
  55:4,5;58:6
**right (30)**
  12:4;19:10;21:23;
  23:4,23;26:7;27:25;
  33:3,13;34:14;35:15;
  36:10;37:17,20;40:7;
  44:7;47:9;48:13;49:10;
  50:22;52:12;54:10,15;
  55:12,13,17;56:2;
  57:20;58:10;62:16
**right-of-ways (1)**
  22:5
**Road (3)**
  5:11;32:23,24
**role (1)**
  10:15
**rolling (1)**
  16:10
**room (4)**
  4:21,24;14:19;46:7
**routine (1)**
  57:3
**rule (1)**
  6:3
**rules (2)**
  56:20;60:13
**run (3)**
  17:25;25:9;45:17
**runaway (1)**
  15:12
**rusted (1)**
  18:16

## S

**safe (2)**
  51:16;56:21
**safely (3)**
  11:19;22:6,9
**safety (19)**

7:13;11:20;31:16;
  40:3;41:9;42:6;49:23,
  23;50:1,2,8;51:5;
  53:21;55:25;56:20;
  60:6,13,14;62:17
**Safeway (2)**
  56:15;57:10
**same (9)**
  10:14;19:7;29:20;
  40:23;41:5;47:5;49:14;
  55:14,16
**Saturday (8)**
  25:5;26:5,11,17;
  32:11;34:4;35:4,13
**saw (1)**
  35:20
**saying (3)**
  6:5;55:21;60:24
**school (1)**
  7:15
**scrap (1)**
  46:11
**se (1)**
  14:6
**search (2)**
  43:12;61:17
**second (7)**
  8:8;25:16;37:16;
  52:8;54:8;57:15;62:15
**Section (11)**
  5:3;8:16;10:20;16:4,
  17;46:2,4,5;54:16;
  55:24;58:8
**Security (1)**
  23:9
**seeing (3)**
  34:1;41:21;47:21
**sees (1)**
  9:7
**selecting (1)**
  28:1
**send (3)**
  31:16;34:5;62:5
**sending (1)**
  7:15
**sense (1)**
  26:14
**sentence (1)**
  54:19
**separate (4)**
  52:5,10;58:12;59:17
**September (2)**
  6:14;7:21
**Service (2)**
  5:4;62:14
**services (3)**
  58:2,3,8
**set (11)**
  16:11,12;22:6;26:9;
  27:10;29:4;32:19;
  33:18;41:22;46:5;
  59:13
**setting (6)**

28:14;32:16,21;
  33:11;35:11;36:22
**setup (4)**
  34:15;39:25;41:25;
  52:19
**seven (3)**
  32:1,13;33:7
**several (3)**
  19:23;41:15;42:19
**shall (1)**
  54:19
**shear (1)**
  52:3
**shears (1)**
  46:10
**shifted (1)**
  50:13
**shifts (1)**
  34:3
**show (5)**
  6:6;21:24;22:1,22;
  37:6
**showed (2)**
  20:24;24:3
**shut (1)**
  18:6
**side (11)**
  8:22;9:23;10:20,23;
  11:1,2,3;24:24;25:22;
  45:25;46:2
**sides (3)**
  9:23;24:14,17
**sign (1)**
  4:11
**signal (51)**
  7:12,22,22,24;8:2,5,
  13,16,22;9:5,7,8,14;
  10:11,13;11:4,8,11,14,
  22;12:7,8,18,20,25;
  13:3,5,8,10,13,23,25;
  14:6;15:2;17:4,14;
  24:21;25:1,2,3;27:6;
  30:1;35:6;37:25;38:3,
  3,18;49:25;53:11;
  58:10;62:14
**signals (16)**
  8:11,24,25;9:25;
  10:4;15:2;16:6;18:1,2,
  13;19:8,24;24:25;30:1;
  31:4;45:24
**signed (5)**
  22:21;57:4,6,17,23
**signing (2)**
  4:10,16
**similar (1)**
  17:7
**simple (1)**
  47:15
**simply (1)**
  17:11
**single (1)**
  9:24
**site (2)**

33:23;37:4;52:23,25;
  53:2
**situation (1)**
  15:25
**six (2)**
  59:4,4
**sixteen (2)**
  45:15,15
**sixty (1)**
  18:15
**small (1)**
  12:6
**smaller (2)**
  47:18,21
**Social (1)**
  23:9
**solely (2)**
  38:14;51:5
**somebody (7)**
  14:4;32:13;43:1;
  45:18;49:2;50:16;51:2
**someone (8)**
  14:9;15:3;27:2;44:3,
  7,8;48:14;60:23
**Sometimes (3)**
  5:21;14:2;36:7
**somewhere (2)**
  7:16;42:16
**sorry (11)**
  12:8;16:24;26:13;
  27:19;30:14;38:3;
  49:21;52:8;57:15;
  58:24,25
**sort (1)**
  32:14
**sounds (1)**
  56:15
**southern (1)**
  13:9
**specific (6)**
  16:22;19:11;24:5;
  36:1;52:22;53:2
**specifically (5)**
  15:19;31:16;32:20;
  48:10;51:7
**spell (1)**
  14:15
**spoke (1)**
  42:14
**spoken (1)**
  45:2
**spot (1)**
  22:5
**SR-2133299 (1)**
  23:4
**staging (1)**
  28:9
**standard (1)**
  47:7
**standards (2)**
  9:18;13:22
**start (1)**
  27:14

**started (4)**
  10:12;11:6;16:3;
  31:25
**state (1)**
  5:6
**statement (1)**
  43:22
**stayed (2)**
  12:2,2
**steel (1)**
  18:16
**still (5)**
  13:19,19;19:7;33:17;
  52:7
**stipulated (1)**
  4:14
**stipulations (1)**
  4:12
**stop (1)**
  15:11
**stopped (1)**
  50:6
**straight (2)**
  10:1;30:13
**street (1)**
  27:13
**streets (1)**
  30:7
**strike (2)**
  25:16;49:21
**structure (2)**
  40:24;58:18;60:20
**structures (1)**
  58:9
**stuff (9)**
  16:7;17:9,9;18:6,7;
  22:5;31:22;32:19;
  53:12
**subcontractor (5)**
  44:4,9;51:14;55:3,6
**subcontractors (6)**
  50:10;53:15,20;
  54:17,21;55:1
**submit (1)**
  54:20
**subsidiary (1)**
  21:15
**Sunday (4)**
  25:6;26:12;31:8;
  34:5
**supervising (1)**
  12:24
**supervisory (1)**
  10:15
**supply (1)**
  4:6
**supports (1)**
  25:22
**supposed (3)**
  13:17;18:5;26:21
**supposedly (1)**
  15:7
**Sure (35)**

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

4:8;6:19;11:17,18;
13:16,18,21;18:4;
19:21;25:22;28:25;
31:8;32:10,13,15;34:8,
19;36:3;37:16;39:19;
47:12,22;48:18;49:5;
50:19,20;52:3,21;53:9,
10,12;60:18,20,24;61:1
**surrounding (2)**
5:19;51:6
**survey (1)**
20:10
**suspension (1)**
38:3
**swing (1)**
45:24
**Switch (6)**
9:1,12,13;17:19,19,
24
**sworn (1)**
5:12
**Syracuse (2)**
12:6,12

### T

**table (1)**
62:8
**tabs (1)**
61:25
**talk (9)**
8:11;9:1;10:9;15:18;
19:10;41:24;42:14;
44:21;51:2
**talked (6)**
13:7;24:11;39:5; .
44:13,17;48:2
**talking (10)**
8:12,13;16:19;19:23;
20:17;26:10;28:18;
37:12,16;46:16
**talks (6)**
38:1;56:3,14;58:2,5,
8
**team (3)**
10:25;11:15;14:5
**teams (3)**
11:16;24:11;25:25
**tear (1)**
59:22
**telling (1)**
39:7
**tells (1)**
9:11
**ten-hour (1)**
34:3
**Terminal (2)**
4:3;16:24
**terms (2)**
8:12;30:7
**test (1)**
18:4
**testified (1)**

5:12
**testimony (2)**
30:15;47:17
**testing (2)**
8:18;10:21
**tests (2)**
8:19,20
**thanks (2)**
54:2;62:23
**though (1)**
58:7
**thought (1)**
55:16
**thousand (2)**
58:22;59:2
**three (10)**
13:9;16:24;17:10;
18:8;21:10;29:22;30:3;
42:20;45:9;59:17
**throughout (2)**
15:21;29:15
**Thursday (1)**
34:3
**times (4)**
7:19;41:15,16;50:17
**timing (1)**
26:9
**title (1)**
57:19
**today (1)**
36:13
**together (6)**
24:23,24;40:18;
47:19;50:25;59:24
**told (1)**
43:1
**took (3)**
25:7;59:23;62:6
**top (3)**
30:10;46:6,8
**touching (1)**
46:1
**towards (1)**
53:21
**track (19)**
8:16,17;9:2,6,12,13,
18,24;10:20;17:20;
20:14;25:8,9;32:1,14,
14;33:4;50:20;51:6
**tracks (9)**
19:5,7,8;24:15,15,
17;25:9,19;29:1
**trade (2)**
8:1,2
**trailer (1)**
48:10
**train (6)**
9:7,8,16;15:9,12;
22:8
**training (7)**
7:5,6,8,13,14,17;
10:18
**trains (11)**

8:14;9:1,6,12,13,16;
15:11;17:20;45:18,19;
51:6
**transcript (2)**
4:17;6:6
**transport (2)**
42:4,8
**Transportation (4)**
4:2;6:12,17;23:14
**transported (1)**
28:11
**travel (1)**
13:19
**traveling (1)**
33:23
**treated (1)**
55:18
**treatment (1)**
48:7
**trial (8)**
4:19
**triple (1)**
31:7
**tripping (1)**
42:23
**trouble (3)**
8:21,22;10:22
**trucks (1)**
28:9
**trying (2)**
5:22;20:2
**turn (2)**
18:7;55:24
**twelve (3)**
6:14,15;45:15
**two (10)**
4:25;11:6,7;17:1;
19:5,7;29:20,21;31:2;
56:14
**Two-year (1)**
6:22
**type (5)**
9:16;15:12;28:1,4;
61:9
**types (4)**
9:20,21;30:22;50:24

### U

**under (5)**
5:2;54:16;56:6;58:1,
7
**underlined (1)**
56:7
**units (1)**
9:24
**unless (1)**
59:8
**unsafely (1)**
51:15
**unusual (2)**
46:19,22
**up (51)**

6:6;8:5;9:3,19;10:1,
8;11:25;12:2,2;16:4;
17:9;18:2,3,22;6,23:7;
24:20;25:3,6,12,18,22;
26:5,9,18;27:10;28:14;
29:5;32:12,16,19,21;
33:11,18,21;35:3,11;
36:22;37:24;41:22;
45:10,11,23,24;46:11;
47:1,3;50:14;52:5,9;
59:13;60:11
**upon (1)**
29:7
**upper (1)**
23:3
**uprights (3)**
9:23;24:14,17
**use (2)**
12:5;28:7
**used (2)**
9:15;27:23;42:3,8;
47:4,6,18,20
**usually (3)**
15:5;45:13;46:5

### V

**various (1)**
11:16
**vehicles (1)**
42:7
**verbal (1)**
6:5
**VFW (2)**
41:3,3
**view (1)**
37:25
**Virginia (1)**
11:24
**visit (1)**
13:20

### W

**wait (1)**
5:24
**waived (2)**
4:16,17
**Walden (1)**
41:3
**waste (1)**
61:14
**watching (1)**
51:3
**way (15)**
6:16;9:6;14:8,14;
18:4;22:4;24:7;30:8;
45:8;46:24;51:15,17;
54:6;62:9,14
**ways (1)**
15:11
**wayside (2)**
9:25;18:2

**week (2)**
28:15;52:4
**weekend (1)**
42:19
**week-long (1)**
7:19
**weeks (2)**
11:6,7
**welcome (1)**
57:13
**weren't (1)**
33:5
**west (2)**
13:9;30:5
**What's (2)**
6:21;21:3;53:4
**Whereupon (2)**
4:1,12
**Wherever (1)**
12:16
**whole (6)**
16:3;29:2,3,15;
42:19;45:23
**who's (1)**
14:11
**wide (1)**
22:7
**width (1)**
22:4
**wire (1)**
18:3
**wired (1)**
24:25
**wires (2)**
24:21;25:9
**wiring (2)**
34:8;53:11
**within (6)**
13:6;16:16;32:1,13;
33:7;47:2
**witness (12)**
4:9,24;5:6;21:3,5;
27:19;35:12,15;42:17;
54:1;61:1,5
**wondering (1)**
58:1
**wood (1)**
44:11
**word (1)**
20:22
**words (2)**
16:11;38:19
**work (89)**
12:7,10,16;13:18,20;
15:21;17:5,11;18:4,5,
25;19:16;20:4,9,16,17,
20;21:25;22:10,11,15,
17;23:24;25:15,16,21,
24;27:6,23;28:11;
29:19;30:2,3,16,25;
31:1,17,18,19;34:2,2,6,
16,20;35:1;36:1,4,9,21,
25;37:3;38:15,20,25;

39:11,15,22;40:4;41:7,
10;46:19;47:16;50:3,
10,12,18;51:7,11,15,
20;52:9,15;53:6,14;
54:22;55:1,22;59:2,9,
12,17,20;60:6,15,17;
61:9;62:11,13,19
**worked (2)**
6:13;19:12
**worker (1)**
7:22
**working (11)**
10:24,24;14:6;33:14,
17;38:5;41:22;44:4,8;
52:7;55:11
**works (2)**
8:1,1
**write (2)**
36:13,16
**writing (2)**
36:1,4
**written (2)**
35:16,18
**wrong (2)**
55:14,15

## Y

**yard (1)**
46:11
**year (4)**
7:13;42:25,25;49:1
**yearly (1)**
8:19
**years (8)**
6:15,15;18:16;20:10;
30:13;32:8;45:10;
47:22
**yellow (1)**
61:25
**Yep (8)**
30:5;43:20;46:24;
54:11,18;56:1,7;60:2
**York (2)**
5:11;12:1

## 0

**07 (1)**
6:25
**08 (4)**
6:14,25;7:21;10:12

## 1

**12 (1)**
54:16
**13027 (1)**
5:11

## 2

**20 (1)**

8:17
**2005 (1)**
6:25
**2006 (1)**
7:1
**2012 (1)**
11:11
**2017 (8)**
21:8;26:5;28:14;
29:12;36:22;37:1;50:4;
57:10
**20th (1)**
26:5
**21 (5)**
21:8;28:14;29:12;
30:15;36:22
**21st (19)**
26:9;31:10;32:21;
33:10,18,23;35:2,10,
20;36:5;37:1;39:12,23;
40:5;41:11,14;51:23;
52:24;59:13
**22nd (10)**
26:11,17,20;38:15,
21,25;39:11;40:21;
46:20;51:25
**23rd (10)**
26:12;27:5;38:15,17;
39:15;46:20;51:25;
52:4,24;59:21
**24th (1)**
59:25
**27th (1)**
40:19

## 3

**3 (1)**
4:4
**3026 (1)**
5:10
**31 (1)**
30:21
**319 (1)**
5:3

## 4

**436 (2)**
19:1,4

## 7

**707 (1)**
45:17
**79 (1)**
54:9

## 8

**83 (1)**
54:15
**85 (1)**

55:24

## 9

**93 (1)**
57:16
**94 (1)**
54:9