# EXHIBIT G

*ALAN WALTER vs.*
*CSX TRANSPORTATION, INC.*

---

*DAVID PIRRO*
*February 10, 2021*

---



METSCHL

AND ASSOCIATES

COURT REPORTERS • LEGAL VIDEO SERVICES

Buffalo, NY: 716 856-1906
Rochester, NY: 585 697-0969
Toll Free: 800 397-1796

*Min-U-Script® with Word Index*

1

1   UNITED STATES DISTRICT COURT

2   WESTERN DISTRICT OF NEW YORK

3   _____

4   ALAN WALTER,

5             Plaintiff,

6             vs                 Civ. No. 1:19-CV-01583(WMS)

7

8   CSX TRANSPORTATION, INC.,

9             Defendant.

10  _____

11  Examination Before Trial of DAVID PIRRO, held pursuant to

12  the Federal Rules of Civil Procedure, in the offices of

13  METSCHL & ASSOCIATES, 295 Main Street, Suite 1098,

14  Buffalo, New York, on Wednesday, February 10, 2021 at

15  12:04 p.m. before Molly Fenske, Notary Public (via

16  webcam).

17

18

19

20

21

22

23

24

25

```
 1   APPEARANCES:

 2
     LOTEMPIO LAW GROUP
 3   BY:  BOYD EARL, ESQ. (via webcam)
     One Franklin Court
 4   181 Franklin Street
     Buffalo, New York  14202
 5   boydearl@gmail.com
     Appearing for the Plaintiff.

 6

 7   NASH CONNORS, PC
     BY:  PHILIP M. GULISANO, ESQ.
 8   344 Delaware Avenue, Suite 400
     Buffalo, New York  14202
 9   Gulisano@nashconnors.com
     Appearing for the Defendant.

10

11

12   PRESENT:

13   David Meyme, CSX representative (via webcam)

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1

 2                    INDEX TO WITNESS

 3

 4   DAVID PIRRO                                    PAGE

 5   Examination by Mr. Earl............................6

 6

 7

 8
                    INDEX TO EXHIBITS
 9                        (attached)

10

11   EXHIBIT                                        PAGE

12   Exhibit J, construction contract between

13          CSX Transportation, Inc. and

14          Niagara Erecting, Inc.......................4

15   Exhibit K, Buffalo Terminal phase 3.............4

16   Exhibit L, PowerPoint presentation..............4

17

18

19                INDEX TO DOCUMENTS REQUESTED

20   DOCUMENT                                        PAGE

21   CSX Safeway booklet.............................57

22

23

24

25
```

```
 1              (Whereupon, Exhibit J, construction
 2      contract between CSX Transportation, Inc. and
 3      Niagara Erecting, Inc; Exhibit K, Buffalo Terminal
 4      phase 3; and Exhibit L, PowerPoint presentation,
 5      were marked for identification.)
 6              THE REPORTER:  Mr. Earl, you'll supply
 7      Mr. Gulisano?
 8              MR. EARL:  Sure.
 9              THE REPORTER:  Will the witness be
10      reading and signing?
11              MR. GULISANO:  No, no read and sign.
12              (Whereupon, the following stipulations
13      were entered into by the respective parties:
14              It is hereby stipulated by and between
15      counsel for the respective parties that the oath of
16      the referee is waived, that signing, filing and
17      certification of the transcript are waived, and all
18      objections, except as to the form of the question,
19      are reserved until the time of trial.)
20              THE REPORTER:  Mr. Earl, is there anyone
21      in the room with you?
22              MR. EARL:  Nope.
23              THE REPORTER:  Mr. Gulisano, is there
24      anyone in the room with you besides the witness?
25              MR. GULISANO:  No, just the two of us.
```

1           THE REPORTER:  Before we proceed, I will

2    ask counsel to agree on the record that, under the

3    current National Emergency, pursuant to Section 319

4    of the Public Health Service Act, there is no

5    objection to this deposition officer administering a

6    binding oath to the witness remotely.  Please state

7    your agreement on the record.

8           MR. EARL:  Yes, agreed.

9           MR. GULISANO:  I agree.

10          DAVID  NICHOLAS  PIRRO,  3026 Camerondale

11   Road, Baldwinsville, New York 13027, having been

12   duly called and sworn, was examined and testified as

13   follows:

14          MR. EARL:  Good morning, or I guess

15   afternoon there, Mr. Pirro.  My name is Boyd Earl.

16   I represent the plaintiff in this case that's been

17   brought against CSX.  I'll be asking you some

18   questions about your knowledge of the case and the

19   circumstances surrounding it.  If you don't

20   understand my question, please just let me know and

21   I'll rephrase it. Sometimes I get a little

22   complicated in my questions because I'm trying to

23   get it perfect or something.

24          Also, if you could do me a favor and wait

25   until my question is done before you answer, it'll

```
 1      make it easier for the court reporter to get the
 2      question and answer down properly.  Everyone kind of
 3      breaks that rule, so if you do I'll mention it to
 4      you occasionally.  And your answers do have to be
 5      verbal.  Nods of the head or saying uh-huh doesn't
 6      really show up that well on a transcript of course.
 7  EXAMINATION BY MR. EARL:
 8      Q.   So, first of all, sir, are you currently
 9  employed?
10      A.   Yes.
11      Q.   With whom?
12      A.   CSX Transportation.
13      Q.   And how long have you worked for?
14      A.   Since September of '08, so twelve and a half
15  years or, yeah, twelve and a half years.
16      Q.   By the way, if I just say CSX in the future
17  you'll understand that to be CSX Transportation, Inc.?
18      A.   Yes, sir.
19      Q.   Just wanted to make sure there's no other
20  related corporation.  That might be confusing here.
21  What's your educational background?
22      A.   Two-year degree in electrical engineering from
23  Onondaga Community College.
24      Q.   When was that?
25      A.   Let's see, '08, '07, probably around 2005,
```

1    2006 time period.  I went through electrical

2    apprenticeship program at my last -- at Chrysler, and

3    as part of that I went to the college and got my

4    degree.

5          Q.   Have you had any additional training since

6    that time, education, training classes, continuing ed,

7    anything like that?

8          A.   There's been plenty of training classes.  Like

9    I said, I'm a journeyman electrician so I went through

10   the journeyman program and, you know, CSX there's, you

11   know, we've had numerous courses that I've taken, you

12   know, taken through them about signal craft, plus all

13   the safety training that we do every year.

14         Q.   That would be more on-the-job training I'm

15   gathering, as opposed to sending you off to a school

16   somewhere?

17         A.   Well, there's a training center in Georgia.

18   It's called the Ready Center, so I've been down there

19   numerous times to take week-long classes.

20         Q.   Now, going back to CSX, when you first hired

21   in September of '08, what was your position?

22         A.   Assistant signal worker or assistant signal

23   maintainer, I guess would be the...

24         Q.   Okay.  What does an assistant signal

25   maintainer do for CSX?

```
 1        A.   Basically works, learns the trade, works with
 2   a signal maintainer and, you know, learns the trade,
 3   and then, when a position becomes available, you know,
 4   you bid on a position.  When you get bid on a position
 5   as the signal maintainer, you're moved up to that
 6   class.
 7                MR. GULISANO:  Can we take -- just go off
 8       the record for a second?
 9                (A discussion was held off the record.)
10   BY MR. EARL:
11        Q.   When you talk about signals, why don't we
12   figure out what that's talking about in terms of what
13   CSX signal maintainers do.  Are we talking about the
14   lights that direct where trains go, or what is it?
15        A.   There's different aspects of it.  A local
16   signal maintainer basically has a section of track, you
17   know, maybe 20 miles of track, and he does all the FRA
18   testing on it, which is, you know, there's different
19   monthly, quarterly, yearly tests.  There's different
20   tests that are required by the FRA, so he does that.
21   If there's trouble calls, he goes out and fixes the
22   trouble, and then there's the signal construction side
23   of it which I've been for most of my career.
24                What we do is we build the new signals so that
25   they'll put new signals, you know, the colored lights like
```

1   you talk about.  Switch machines that direct trains from

2   one track to the other, crossings, you know; when you pull

3   up to crossings and you've got the gates and the flashing

4   lights and all that.  We do all that, plus all cabling.

5          So, basically, signal craft is, basically, it's

6   the way to control the trains on the track, you know.

7   When a train sees the signal it knows by the color of that

8   signal, it knows whether there's a train ahead of them or

9   if it's clear ahead of them, depending on the color, and

10  then by, dependent on what color and which position it is,

11  tells him how fast he can go, and then, like I said,

12  there's switch machines on the track that divert trains

13  from one track on the other.  The switch trains are part

14  of the signal craft also.

15      Q.   So the lights that are used to indicate to the

16  trains if there's a train ahead, that type of thing,

17  are they always in the form of a bridge that goes over

18  the railroad track or are there some that are standards

19  that just come up out of the ground?  Are there

20  different types?

21      A.   Yes, there's lots of types.  There's bridges,

22  cantilevers, which only have -- instead of having the

23  uprights on both sides, have it on one side and it

24  hangs over the track.  There are the single units, like

25  you said, wayside signals, that basically just go on a

1   foundation.  They just go straight up and then they

2   have different, you know, different configurations of

3   lights hanging from them.

4         There's also called dwarf signals which are real

5   low to the ground.  So depending on the application they

6   could be, you know, any one of those.

7   Q.   Okay.  I'm gathering from what you said --

8   well, actually, let me back up just a little bit, just

9   so I have your employment correct, and then we'll talk

10  about that a little bit more.  So you were an assistant

11  signal maintainer for some period of time when you

12  started in '08.  What was your next position?

13  A.   Signal maintainer.

14  Q.   I'm assuming that would be the same general

15  job duties except now you have a more supervisory role,

16  or is it some other distinction?

17  A.   It's just, as I said, the assistant basically;

18  you know, like a training part, and then, when you

19  become a maintainer, again, if you're in the

20  maintenance side of things you have a section of track

21  you're responsible for doing all the testing, answering

22  all the trouble calls.  If you're on the construction

23  side, you know, you're building new locations, building

24  new crossings, you're working on there, you're working

25  on a five man team.  You have a foreman and four

1    maintainers, so depending on which side of the -- if
2    you're on the maintenance side or the construction
3    side.
4        Q.   When did you become a signal maintainer then,
5    approximately?
6        A.   Two weeks after I started.  I was only an
7    assistant for two weeks.
8        Q.   How long did you continue as a signal
9    maintainer then?
10       A.   I think I went into management, became an
11   engineer of signal construction in 2012, I believe it
12   was.
13       Q.   How did your job duties change when you became
14   an engineer of signal construction?
15       A.   Instead of being, you know, on a team
16   constructing it, I was overseeing various teams that
17   constructed the locations to make sure they had, you
18   know, the proper material, make sure they had the
19   proper equipment to do the job safely, you know, do
20   safety audits.
21       Q.   Is there a geographic area that you were
22   responsible for as the engineer of signal construction?
23       A.   Well, basically we go from Newport, New
24   Virginia to Montreal, and from Boston to Erie, PA, but
25   for the most part I was up in the northeast, you know,

1   anywhere from Massachusetts, New Jersey, New York, that
2   was mostly -- I stayed up, I stayed up higher and I
3   didn't go down lower very much.
4       Q.   All right.  Where you are based, do you have
5   an office that you use generally?
6       A.   I have a small office in Syracuse.
7       Q.   Is that generally where you work as a signal
8   maintainer -- or, I'm sorry, as engineer of signal
9   construction?
10      A.   All depends where the work is.  Like I said,
11  we did jobs in Massachusetts, you know, Albany,
12  Syracuse, Buffalo.
13      Q.   Now --
14      A.   Around Erie, PA.
15      Q.   Okay.
16      A.   Wherever work is at the time, that's where I
17  have to go.
18      Q.   How long did you remain an engineer of signal
19  construction?  Did you get a new job after that?
20      A.   Yeah.  I became a general engineer of signal
21  construction so it's basically like, an engineer is
22  basically a manager, so I was a manager.  Then I became
23  a general manager.
24      Q.   So would you be responsible for supervising
25  some of the engineers of signal construction?

1      A.    Correct.

2      Q.    And is that the position you have currently?

3      A.    No.  I'm currently the director of signal

4    construction.

5      Q.    Does that put you in charge of all the signal

6    construction within that geographic area that you

7    talked about?

8      A.    Yes, east region signal construction.  There's

9    three regions, west region, southern region and eastern

10   region.  I'm the director of east regional signal

11   construction.

12     Q.    And I think I probably know, but what are your

13   job duties as the director of the east regional signal

14   construction?

15     A.    Pretty much overseeing everything, you know,

16   all the -- making sure that my managers are doing what

17   they're supposed to be doing, planning the projects

18   ahead of time, making sure we've got, you know, work

19   going forward.  I still go out and travel around, still

20   visit the locations, check on the work, you know, check

21   on the making sure things are being done to my

22   standards and, like I said, basically just overseeing

23   everything that's signal construction.

24     Q.    Okay.  Do you have anything to do with the

25   signal maintenance then in your current position or is

1  it just new construction?

2      A.   Not really.  I interact with them sometimes if

3  they have an issue and they need -- if they need help

4  they'll call me.  If we have somebody available or a

5  team available, we, you know, we'll give them a hand,

6  but per se the everyday working of signal maintenance,

7  no.

8              MR. EARL:  By the way, I guess we should

9      probably mention, it looks like someone from CSX has

10     joined us.  I think they should be on the record at

11     some point, just so we know who's here.

12             MR. GULISANO:  My understanding is that's

13     David Meyme.  Am I pronouncing it correctly?

14             MR. MEYME:  It's Meyme, but either way.

15             THE REPORTER:  Can you spell that for me,

16     please?

17             MR. MEYME:  It's M-E-Y-M-E.

18             THE REPORTER:  Thank you.  Is there

19     anyone in the room with you?

20             MR. MEYME:  No.

21             THE REPORTER:  Thank you.

22             MR. EARL:  Just, for the record, he's a

23     representative of CSX as well?

24             MR. GULISANO:  Correct.

25  BY MR. EARL:

1      Q.   Mr. Pirro, do you have any responsibility for

2  determining when a new signal or when signals will be

3  replaced with new construction, or is that someone

4  else's responsibility?

5      A.   That usually gets done by the project

6  engineers down in Jacksonville, depending on this part

7  or this incident where this incident supposedly

8  happened here or whatever was part of the PTC

9  initiative, the positive train control initiative.

10     Q.   That was a federal directive that there should

11 be ways to stop trains if there are problems, you know,

12 a runaway train, for example, that type of thing?

13     A.   Correct.

14     Q.   I meant to ask, what is the FRA?  You

15 mentioned FRA before.

16     A.   Federal Railroad Administration, the governing

17 body over all railroads.

18     Q.   Thank you.  Now, why don't we talk about this

19 case specifically, just so we can put things in context

20 here.  Now, you indicated that this is part of the PTC

21 work that was being done throughout the country;

22 correct?

23     A.   Correct.

24     Q.   So who made the decision, if you know, that

25 the bridge being replaced in this situation -- I mean,

1  how did it come about that it was determined that that

2  was going to be replaced, if you can tell me?

3      A.    Back when this whole thing started, I guess

4  they made a decision up in this section of the railroad

5  to greenfield everything, so that means put all new

6  houses, all new cable and all new signals in because of

7  the age of the stuff that was there.  So a

8  determination was made to go through and put new

9  everything in.

10      Q.    Was this a rolling project then?  In other

11  words, you would do one set of bridges and then, once

12  that was done, you move on to another set as part of

13  this project?

14      A.    That's correct.

15      Q.    Is there any overall name for this project

16  within the company?

17      A.    This section?

18      Q.    Well, overall.  First of all the entire

19  replacement you were talking about, was there any name?

20      A.    Just PTC.

21      Q.    What about this job involving this bridge?

22  Did it have a specific name?

23      A.    It was called Baltimore -- not Baltimore.  I'm

24  sorry, Buffalo Terminal, phase three.

25      Q.    So I'm gathering, obviously, there were at

1    least two phases before this one?

2         A.    Correct.

3         Q.    And were those prior phases also involved in

4    the replacement of the signal bridges or was it also

5    other work that had to be done as part of this PTC

6    program?

7         A.    It was similar, you know, just different

8    locations.  There were bridges that, you know, new

9    stuff that went up and old stuff that came out.

10        Q.    As part of, let's say phase three, did that

11   involve more work than simply the replacement of those

12   the bridges involved?

13        A.    Yes.  They're like, I say, you would -- there

14   were new signal houses, which housed all the

15   electronics.  So, depending on the location, you know,

16   some locations had, you know, one house, some of them

17   had, like, five houses, and then, depending on where

18   they were in the control point, which a control point

19   is where the switch, you know, the switch machines in

20   there that divert trains from one track to another.

21            Depending on how big of a control point, it is

22   determined how many houses were in the location, so you

23   had, you know, to install new houses, install new cables

24   out to the, all the switch machines.  You would put a new

25   junction box in and run new cables into the new junction

1  box.  Again, it would be the signals.  You would put new

2  signals up, whether it's a wayside, a cantilever or a

3  bridge.  You would wire them all up and then you would pre

4  test it, making sure it's going to work the way it's

5  supposed to work, and then you would have what we call a

6  cut over, which we would take, shut off all the old stuff

7  and turn on all the new stuff.

8      Q.   As part of this phase three project, were

9  certain bridges being removed and then replaced with

10  new bridges?

11     A.   Yes.

12     Q.   Was there a reason for that as opposed to just

13  putting new signals on the existing bridges and was

14  that not possible, I'm gathering?

15     A.   No, them bridges were probably fifty, sixty

16  years old.  They were all steel.  They were all rusted

17  and so...

18     Q.   Okay.  So it was just time to replace them,

19  I'm gathering?

20     A.   Correct.

21     Q.   Now, are you familiar with the location where

22  this accident occurred and which bridge was involved?

23     A.   Yes.

24     Q.   How would they designate the bridge that was

25  involved in that work?  Did it have a name or...

1      A.    CP436, 436.

2      Q.    And you said EP, as in --

3      A.    CP, like control point.

4      Q.    Okay, 436.

5      A.    That one actually was, there were two tracks

6   that were made into a control point, and then the other

7   two tracks were just an automatic, but still the same

8   thing.  There were four tracks there that had signals

9   on them.

10     Q.    All right.  And so, when we talk about control

11  point or CP436, that is the specific bridge that was

12  being worked on at the time that this accident

13  occurred; is that correct?

14     A.    Yes.

15              MR. GULISANO:  Object, only because I

16         don't think there was any work being done on a

17         bridge at the time the accident occurred, but that's

18         my objection.

19              MR. EARL:  Fair enough.

20  BY MR. EARL:

21     Q.    I just want to make sure when you say CP436,

22  that would only involve the one bridge that we're

23  talking about?  It doesn't include several bridges or

24  other signals?

25     A.    As part of the project or just as part of

1   CP436?

2       Q.    Part of CP436.  I'm just trying to figure out

3   if CP436 was limited to this one bridge that was about

4   to be replaced or if it included other work in that

5   area?

6       A.    This particular location there was just that

7   one.

8       Q.    So what was your first involvement with

9   respect to the work that was going to be done at CP436?

10      A.    We did a survey probably a few years before

11  with the people in Jacksonville and the designer to

12  look it over.

13      Q.    Did you have anything to do with the actual

14  bidding of the contract or the contract for the track

15  at CP436?

16      A.    Which work are you referring to?

17      Q.    The work we're talking about, taking down the

18  existing bridge and replaced it with a new one.  Did

19  you have anything to do with the contract provisions or

20  bidding out that contract for the work?

21      A.    Not the contract, but I was the one that

22  brought the -- I don't know what his official word is

23  manager or whoever he was.  I was the one that brought

24  him and out and showed him the locations so that he

25  could determine what kind of equipment he needed to do

1   what he had to do.

2                    MR. GULISANO:  Manager of whom?

3                    THE WITNESS:  What's that?

4                    MR. GULISANO:  Manager of whom?

5                    THE WITNESS:  Clark Rigging.

6   BY MR. EARL:

7       Q.   Now, did that take place, I'm presuming,

8   before July 21, 2017 that you went out with the

9   representative of Clark?

10      A.   Yes, probably, I would guess, three, four or

11  five months before.  I don't have an exact date, but it

12  was pretty well in advance.

13      Q.   And how was Niagara Erecting involved in this

14  project, involved in CP436?

15      A.   I believe they're just another subsidiary of

16  Clark Rigging.

17      Q.   Do you know that for a fact or is that just

18  your understanding?

19      A.   That's just my understanding.

20      Q.   Who is it that came out to that location with

21  you from Clark?

22      A.   Gunther Minguez.  I don't know if I'm

23  pronouncing that right or not.

24      Q.   And the purpose of that was just to show him

25  that the work that needed to be done?

1      A.    Correct.  I would show him the location and

2    then I would tell him where we needed to put -- where

3    we needed to put the old bridge to get it out of the

4    way, and then he would measure the width of the

5    right-of-ways and stuff and find a spot where he could

6    safely set up his crane, and then he would measure to

7    the center of the bridge and how wide the bridge was

8    and by that he would determine how big of a train he

9    would need to safely to do the job.

10      Q.    Now, prior to the work being done at CP436,

11    had you had Clark also doing other work as part of this

12    PTC program?

13      A.    Yes.

14      Q.    So you were familiar with the company and the

15    work that they had done?

16      A.    Yes.

17      Q.    Had you ever had any complaints about the work

18    they had done in the past?

19      A.    No.

20      Q.    Now, was the -- would it be your understanding

21    that the contract had already been approved and signed

22    before you went out to that location to show Mr.

23    Minguez the area?

24      A.    Yes.

25                    MR. EARL:  Phil, do you have the copy of

1      the contract with Niagara, Electric, Inc.?

2                  MR. GULISANO:  This one?

3                  MR. EARL:  Yeah, it says on the upper

4      right SR-2133299.

5                  MR. GULISANO:  Yes, I do.

6                  MR. EARL:  Why don't we mark that as the

7      next?  What are we up to, J?

8                  MR. GULISANO:  I believe J.  Let me

9      confirm.  The last marking was the Social Security

10     so that was I.  So this is J.  I'll mark it Exhibit

11     J.

12                 MR. EARL:  Great, thank you.

13                 MR. GULISANO:  It's a construction

14     contract between CSX Transportation and Niagara

15     Erecting.

16  BY MR. EARL:

17     Q.   Mr. Pirro, could you take a look at that

18  document just briefly and tell me if you recognize it,

19  first of all?

20     A.   I was aware of it, but I hadn't seen it until

21  this happened, because this was before my time as

22  getting involved with these projects.

23     Q.   All right.  Do you know whether this is the

24  contract that would have covered the work for CP436?

25     A.   Yes.

1      Q.   It would have covered that?

2      A.   Yes.

3      Q.   So after you met with Mr. Minguez and showed

4  him the area, what was your next involvement in this

5  specific part of the project with that bridge?

6      A.   With CSX or with Clark Rigging?

7      Q.   Either way.  Did you have -- what was your

8  next involvement with respect to that location?  Did

9  you have to do -- what was the next thing you had to

10  do, if anything?

11      A.   Our teams built the locations.  Like we talked

12  about earlier, they put -- at this location, they put

13  one new house in.  They had to dig in concrete

14  foundations and they put the uprights on both sides of

15  the tracks.  Like I said, there were four tracks there

16  so they had to dig in a concrete foundation on both

17  sides of the four tracks and then they put the uprights

18  in.

19           There's boxes on the junction boxes, on the

20  masts, which we ran the new cables up into that went from

21  the new house to the new signal.  All them wires were

22  landed in the junction box, and then the horizontal had to

23  be put together.  It came in pieces because it was so

24  long.  So it had to be bolted together off to the side and

25  then all the signals were mounted on them and wired and

1  because this location the new signal was, you know, close

2  to the old signal, it would block -- it would block the

3  old signal a little bit so we couldn't put it up ahead of

4  time like we normally did, so we made arrangements the day

5  before, which would have been the Saturday, to have Clark

6  Rigging put the new one up, and then the next day, Sunday,

7  would be when we took the old one down.  Of course, we ran

8  all the new, all the track leads, you know, out to all the

9  tracks you had to dig, and run wires out to each track.

10  That was part of that location also.

11       Q.   So, essentially, if I understand it correctly,

12  you have to have the new one up and ready to go before

13  you take the old one down; correct?

14       A.   Correct.

15       Q.   So who was it that did the work with respect

16  to this prep work -- strike that for a second.  I'm

17  assuming from your answer that at some point Clark

18  Rigging was involved with putting the mast up of the

19  bridge over the tracks itself with the crane; correct?

20       A.   That's correct.

21       Q.   But the other work with respect to putting the

22  side supports up, I'm not sure what you call those, and

23  the foundation and the cables and those, the houses,

24  who did all that work for the new?

25       A.   One of my construction teams.

1      Q.    So they would be CSX employees?

2      A.    Correct.

3      Q.    So the first involvement with respect to CP436

4  with respect to Clark would have been when they came in

5  on Saturday the 20th of July, 2017, in order to lift up

6  the new mast in order to have it locked into place; is

7  that right?

8              MR. GULISANO:  Objection.  Let's get our

9         timing set up.  July 21st was the day of the

10        accident, which was a Friday.  He's talking about

11        Saturday, the 22nd, I believe.  You could ask him.

12        And then Sunday is the 23rd.

13              MR. EARL:  Okay.  Sorry about that.  Now

14        that makes more sense to me.

15  BY MR. EARL:

16     Q.    Let me rephrase my question then.  So the plan

17  was to have Clark, on Saturday the 22nd of July, raise

18  up the new -- it's called a mast; is that correct?

19     A.    The horizontal part of the bridge.

20     Q.    Okay.  So they were -- on the 22nd were

21  supposed to raise the horizontal portion of that mast

22  for it to be installed; correct?

23     A.    Correct.

24     Q.    And who was actually going to be -- to do the

25  installation itself?  Would the installation or the

1    mounting of that horizontal piece been done by Clark

2    employees or someone else?

3        A.   Clark.

4        Q.   Okay.  And then the plan was the following day

5    that Clark would, on the 23rd of July, actually do the

6    work to remove the old signal bridge?

7        A.   Correct.

8        Q.   Did you have any knowledge or conversation,

9    say, with anyone regarding the date that Clark would

10   first set up in that location, whether it be the day

11   before, the day of or some other time?

12       A.   They just asked me, there was an open lot down

13   the street or whatever, and Gunther had asked me if

14   they could start bringing all their equipment to build

15   a bridge if they could park it in there, you know,

16   while they were building the bridge.

17                  MR. GULISANO:  Building the crane or the

18       bridge?

19                  THE WITNESS:  The crane, I'm sorry.

20       While they assembled the crane, so...

21   BY MR. EARL:

22       Q.   Do you know what kind of crane was going to be

23   used as part of this work?

24       A.   The actual crane, no.

25       Q.   All right.  Is that something you had any

1    involvement with selecting the type of crane?

2        A.    No.

3        Q.    So that's something that Clark would take care

4    of to determine what type of crane they needed?

5        A.    Correct.

6        Q.    Now, you said there was an open lot that they

7    asked to use which you approved?

8        A.    Correct.

9        Q.    Was that more of a staging area for the trucks

10   to come in with the parts and then the individual parts

11   be transported to the work location?

12       A.    I believe so, yes.

13       Q.    Were you aware that Clark was going to be at

14   that location on July 21, 2017 setting up the crane?

15       A.    I believe they were there all week.

16       Q.    And you knew that ahead of time, I assume?

17       A.    Yes.

18       Q.    Now, the open lot area that you were talking

19   about, is that a piece of property that, to your

20   knowledge, is owned by CSX?

21       A.    I believe so.

22       Q.    And the area where the old bridge was located,

23   was that also property owned by CSX, to your

24   understanding?

25       A.    I'm not sure exactly where the borderline is,

1    you know, near the tracks, of course, was ours, but how

2    far out and that whole open lot that's there, I do not

3    know if we owned the whole thing.

4         Q.   The area where the crane was going to be set

5    up, was that on CSX property, to your knowledge?

6         A.   I can't answer that positively either.

7         Q.   But the property upon which the old bridge as

8    well as the new bridge were located, that was on CSX

9    property?

10        A.   Yes.

11        Q.   So were you there anywhere near this location

12   on July 21, 2017?

13        A.   Yes.

14        Q.   Where were you?

15        A.   Throughout the whole project I was at that

16   location, plus, you know, plus other, you know, other

17   areas, you know, checking in on the progress of doing

18   our last minute things we had to do to get ready.

19        Q.   Were there other phases going on of this work

20   at the same time, like phase two or phase four?

21        A.   Phase one and two had already been cut in, I

22   think three months before that, so that was done.

23   Phase four was being built.

24        Q.   What do you mean it was being built?

25        A.   They were putting the houses, digging in the

1  cables, putting the signal foundations in, the signals.

2      Q.    And where was phase four work being done in

3  relation to this phase three work?  Is it further down

4  the line, or how would you describe it?

5      A.    Yep, further west.

6      Q.    Can you describe for me where this bridge,

7  where the CP436 is located in terms of streets or are

8  you able to give me any other way to identify exactly

9  where it was?

10     A.    Off the top of my head, it's been a while.

11     Q.    That's fine.

12     A.    I can't give you an answer.  That was four

13  years ago, so I can't give you a straight answer.  I'm

14  sorry.

15     Q.    So on July 21, if I understand your testimony

16  correctly, pretty much all of the work for the new

17  bridge had been completed with the exception of putting

18  the horizontal piece on; is that correct?

19     A.    Correct.

20     Q.    Now, you said you had other jobs or other

21  locations you had to monitor on July 31 in addition to

22  this one.  Can you describe for me what types of

23  locations those were?  For example, was it another

24  bridge location or was it -- were you inspecting phase

25  four work?  What were you doing, other than being at

1  this location checking out their work?

2      A.    There was two other -- CP437 was part of this

3  cut over and phase, which was a gigantic control point,

4  you know, with numerous signals.  It was five houses,

5  you know, that was a big location, and CP2 was also a

6  location, so again, there's just in the area checking,

7  checking to -- we double check, triple check, making

8  sure everything's good for Sunday.

9      Q.    Now, were there other CSX employees, to your

10 knowledge, at CP436 that day, the 21st, or was it just

11 you?

12     A.    I can't say one hundred percent, you know,

13 that there was.  I would probably guess yes, but I

14 can't say positively.

15     Q.    Now, as part of these jobs and the CP436

16 specifically, does CSX send anyone dealing with safety

17 issues to the location to monitor work being done?

18     A.    Our work or for Clark Rigging?

19     Q.    The work for -- that was being done in this

20 case by Clark.

21     A.    An individual while they're assembling their

22 cranes and stuff, no.

23     Q.    So you would expect Clark to take care of that

24 part of it ; correct?

25     A.    Our involvement with them basically started

1  when they got within seven feet of the track, you know,

2  for them, their determination of what kind of crane

3  they needed and what needed to be done to get it ready,

4  you know.  We have no expertise in that so that's why

5  we hired a professional to do that so, you know, we

6  relied on them, you know, knowing I'm having a good

7  quality crane, because we -- and we've had them, my

8  God, for years and pretty much all the cranes look like

9  they're brand new so we never had an issue with that.

10       We make sure they have -- we just make, like I

11  said, our involvement happens when we say, okay, Saturday,

12  when we needed them to put that up, you know, we would

13  have somebody there to make sure if you get within seven

14  feet of a track you have to have some sort of track

15  protection, so we would make sure that, you know, if they

16  were setting up a crane, their outriggers, we would

17  measure.  We would draw lines on the ground.  You can't

18  get -- your outrigger can't go past this line when you get

19  ready to set up, stuff like that.

20     Q.   Do you know specifically where they were

21  setting up the crane on the 21st?

22     A.   I'd say at this location it was from -- I

23  remember it was on, the road was on a corner and then

24  there's a grass, there's a dirt road that goes in with

25  a big grass field there, and they were basically just,

1  you know, some were in there.  They just pulled, I

2  think they pulled in there and they were assembling it

3  right there.  It was probably, I don't know, I'm

4  guessing fifty to one hundred feet from the track, so

5  basically they were -- they weren't a concern of ours

6  at the moment.

7       Q.   So they were not within that seven foot area

8  that you would be concerned about?

9       A.   No.

10      Q.   So when you were there on the 21st, did you

11  actually go over to where they were setting up this

12  crane for any reason?

13      A.   To get in there I would have to go right by

14  where they were, but I seen them working, but I didn't,

15  you know, I didn't really get involved again because

16  that's got nothing to do with us.

17      Q.   Were there CSX employees still working in that

18  location as the crane was being set up on the 21st?

19      A.   Again, I can't say one hundred percent that,

20  you know, that day there were people there, you know,

21  finishing anything up.  I just don't recall that.

22      Q.   I guess what I'm asking then is, what is the

23  purpose for your traveling to that site on the 21st?

24  What did you do or what were you planning to do that

25  day?

1     A.   Again, just seeing how things were going.  We

2  had people there, because when we work, we work four

3  ten-hour shifts Monday through Thursday.  And the cut

4  over, you know, can't have people there Saturday and

5  Sunday so I can't send people home for one day, so

6  basically we had the people there.  We had to work

7  Friday, so again, there might have been people there

8  finishing wiring, making sure the horizontal's

9  completely done, ready to go, you know, they might have

10  been double-checking everything in the house, you know,

11  but, you know, for me to exactly remember exactly what

12  they were doing and who was there or what time, I can't

13  tell you that.

14     Q.   Right, but regardless, you didn't go over and

15  have anything to do with the setup of the crane, you

16  were just there to take a look at the work that the CSX

17  employees were doing, I'm gathering then?

18     A.   That's correct.

19     Q.   And checking to make sure that it's ready for

20  the work the next day?

21     A.   Correct.

22     Q.   Do you have any recollection of anything that

23  happened that day while you were at the CP436 location?

24     A.   No.

25     Q.   Would there be any documentation that would

1  give any information about the work being done on that

2  day, on the 21st, by CSX employees at or near CP436?

3      A.    There was a packet that I made up for the cut

4  over meeting on Saturday that everybody got and

5  outlined what was going to happen during the cut over,

6  and also the bulletins, the signal bulletins for the

7  day.

8              MR. GULISANO:  Just to clarify, that's --

9      he asked you if there's anything documenting what

10     CSX employees were doing on the 21st, which is the

11     day the incident when the crane was setting up.

12              THE WITNESS:  No.

13              MR. GULISANO:  Saturday was the day

14     after.

15              THE WITNESS:  Right.  No, for Friday

16     there's nothing no written plan for Friday.

17  BY MR. EARL:

18      Q.    But not just written plan.  You wouldn't have

19  and you didn't, I assume, make any notes about what you

20  saw on the 21st when you went to that location?

21      A.    No.

22      Q.    Do you have a daily logbook that you fill out

23  with respect to what you do each day?

24      A.    No.

25      Q.    Do you have anything that you indicate in

1  writing what work you did on a specific day?

2      A.   Every day, no.

3      Q.   Was there -- can you tell me for sure whether

4  there was any writing or not with respect to the work

5  you did on the 21st?

6      A.   Not that I'm aware of.

7      Q.   I'm gathering from your answer that sometimes

8  you would have some notations and some days you

9  wouldn't have any notations about the work you did; is

10 that right?

11     A.   Well, I have a daily planner, but, you know,

12 if I'm on a call or something I might make notes about

13 a call, but I don't write in there, today I'm going to

14 CP436 to check this and this and this.  I don't do

15 that.

16     Q.   Okay.  You don't afterwards write down

17 anything that says, I went out to CP436 and did this,

18 this and this?

19     A.   No.

20     Q.   Are you aware of any documentation that exists

21 at CSX with respect to the work being done by Clark in

22 setting up the crane on July 21, 2017?

23     A.   No.

24     Q.   Are you aware of any documentation that would

25 indicate what work CSX employees were being, were doing

1    at that location on the 21st of July 2017, if anything?

2        A.   No.

3        Q.   Would there be work records that would

4    indicate what employees were on site that day?

5        A.   Yes.  If you get ahold of payroll records, it

6    would show you who was charging to that particular code

7    that day.

8        Q.   What would that code be?  Would that be the

9    CP436?

10       A.   Yes.  There was -- I don't know if -- it's

11   probably in that packet, if you have a copy of that.

12       Q.   Which packet are you talking about?

13       A.   The cut over meeting.

14       Q.   Oh, okay.  Let's see here.

15                MR. EARL:  Why don't we go off the record

16       for a second so we make sure we're talking about the

17       right documents?

18                (A discussion was held off the record.)

19   BY MR. EARL:

20       Q.   Mr. Pirro, right now you're looking at Exhibit

21   K; is that correct?

22       A.   Correct.

23       Q.   Can you tell me what that document is?

24       A.   It's a packet that I made up for the cut over

25   and it basically, from a signal point of view, you

1 know, talks about what we're going to do, has the

2 bulletins, the dispatcher bulletins concerning the

3 signal cut over -- the signal suspension, I'm sorry,

4 and then it has the people that are going to be there

5 working and the locations.  Not an in-depth thing but

6 an overall of what needs to be done at each location.

7 Then there's --

8       MR. GULISANO:  Can we just...

9       MR. EARL:  One comment.  I just realized

10  this doesn't have to be on the record.

11      (A discussion was held off the record.)

12 BY MR. EARL:

13  Q.   So, if I understand correctly, was this

14 document prepared solely with respect to the cut over

15 work that was going to be done on the 22nd and 23rd of

16 July?

17  A.   Correct.  Actually just on the 23rd.  This

18 just has do with the signal portion of the cut over.

19  Q.   So, in other words, this wouldn't have

20 anything to do with respect to the work being done on

21 the 22nd with respect to the horizontal piece being

22 installed on the new bridge?

23  A.   That's correct.

24  Q.   Was there any documentation that you're aware

25 of that would deal with the work being done on the 22nd

1    with respect to the horizontal number being attached?

2        A.   No.

3        Q.   That would just the only document that would

4    cover -- that would be, to your knowledge, would be the

5    contract we talked about earlier?

6        A.   That's correct, and conversations with myself

7    and, you know, Gunther, telling him what we needed done

8    and when we needed it done.

9        Q.   I guess what I'm asking is, are you aware of

10   any documentation at CSX or received by CSX dealing

11   with the work being done on either the 22nd or, for

12   that matter, the 21st?

13       A.   No.

14       Q.   So all the documentation that we're looking at

15   would deal with work being done on the 23rd, at least

16   for the CP436 location?

17       A.   That's correct.

18       Q.   Got you.  So I've gone through this, but let

19   me just ask a couple of general questions to make sure

20   I don't have to go through this.  Was there anything in

21   Exhibit K that would be binding or even be provided to

22   Clark with respect to being work being done on the

23   21st?

24       A.   No.

25       Q.   So this has nothing do with the setup of the

1    crane?

2        A.    No.

3        Q.    It has no safety provisions or any other

4    requirements for Clark with respect to the work being

5    done on the 21st?

6        A.    Correct.

7                    MR. EARL:  All right.  Why don't we go

8        off the record again, just so we can figure out

9        which this is?

10                   (A discussion was held off the record.)

11   BY MR. EARL:

12       Q.    Do you have Exhibit L in front of you, sir?

13       A.    Yes, sir.

14       Q.    Do you recognize what that is?

15       A.    Yes.

16       Q.    What is it?

17       A.    It's a copy of a PowerPoint presentation that

18   we put together for the pre cut over meeting on the

19   27th.

20       Q.    So the meeting for the cut over was done the

21   day before on the 22nd?

22       A.    That's correct.

23       Q.    So that would have been done on the same day

24   as when the new horizontal structure was being

25   installed?

41

1    A.    Correct.

2    Q.    Where was that meeting held?

3    A.    This one, I think, at the VFW, VFW on Walden

4  Avenue.

5    Q.    And I'm going to ask kind of the same

6  questions we had before.  Is there anything in Exhibit

7  L that would deal with Clark's work?

8    A.    No.

9    Q.    Would it have any safety requirements or any

10  other documents in here that would pertain to the work

11  being done by Clark on July 21st?

12    A.    No.

13    Q.    Do you know about what time you were at the

14  CP436 location on the 21st?

15    A.    No.  I was probably there several times in and

16  out but exact times I couldn't tell you.

17    Q.    Do you know if it was morning or afternoon or

18  could it be both or either?

19    A.    It could be both, if I had an educated guess.

20    Q.    While you were at the location, do you have

21  any recollection of actually seeing any employees

22  working to set up a crane?

23    A.    I believe so.

24    Q.    Did you talk to anyone that day about the

25  setup of the crane?

1      A.    I can't remember that.

2      Q.    At any point do you recall doing any

3  inspection at all of the equipment being used by Clark

4  to transport the cranes to the location?

5      A.    No.

6      Q.    To your knowledge, was there any safety person

7  at CSX that inspected, for any reason, the vehicles

8  being used to transport the crane to this location?

9      A.    No.

10     Q.    What is your understanding of what happened in

11  this accident, if anything?

12              MR. GULISANO:  I guess, just let me

13          object to the extent I may have explained things.  I

14          don't want to talk about things that we spoke about,

15          but I think you can answer to the extent he's got

16          some other independent information from somewhere.

17              THE WITNESS:  The only thing, the only

18          knowledge I had, I heard absolutely nothing about

19          this that whole weekend and we did several other

20          phases like three or four months after that.  Heard

21          nothing.  Nobody from Clark Rigging or none of my

22          people mentioned anything about anybody getting hurt

23          or injured or tripping or falling or anything.

24              My first knowledge of this incident was

25          probably a year, year and a half afterwards when

1      somebody told me that there was a lawsuit.

2   BY MR. EARL:

3      Q.   Did you ever check to see if there was any

4   documentation at CSX that dealt with this accident,

5   other than the lawsuit?

6      A.   No.

7      Q.   Had you ever been advised that there's any

8   accident report or any other documentation at CSX with

9   respect to this accident itself?

10      A.   No.

11            MR. GULISANO:  Just for the record, a

12      search has been performed, pursuant to my

13      obligations in response to your discovery demands,

14      and the answer to those questions is there's

15      nothing.

16            MR. EARL:  Okay.

17            MR. GULISANO:  Yeah.

18            MR. EARL:  Do you have Exhibit E there,

19      Phil?

20            MR. GULISANO:  I do, yep.

21   BY MR. EARL:

22      Q.   It's an interview/signed statement form.  Sir,

23   have you ever seen this document before?

24      A.   No.

25      Q.   I'm assuming that this is not a CSX form; is

1   that correct?

2       A.   Correct.

3       Q.   Now, when someone is injured, when the

4   contractor or subcontractor working for CSX, are there

5   any requirements that it be reported to CSX?

6       A.   That I don't know.

7       Q.   All right.  In your experience, if someone is

8   injured on a jobsite with CSX, when someone is working

9   for a contractor or subcontractor, is that something

10  that is generally reported to CSX, to your knowledge?

11      A.   Knock on wood, I've never had anybody -- I've

12  never had a contractor get hurt.

13      Q.   Have you ever talked to anyone about either

14  Niagara Erecting or Clark Companies about this

15  accident?

16      A.   No.

17      Q.   Has anyone ever talked to you about knowledge,

18  other than your attorney, knowledge about how this

19  accident occurred?

20      A.   No.

21      Q.   Did you ever talk to Mr. Minguez about this

22  accident?

23      A.   No.

24      Q.   Do you know Mr. Clark?

25      A.   No.

1     Q.   So, it would be fair to say that, other than

2    your attorney, you have not spoken to anyone who has

3    indicated that they have any knowledge about how this

4    accident occurred?

5     A.   Correct.

6     Q.   What was happening with this bridge that was

7    being removed?

8     A.   Well, they -- the way they did them, which

9    they've done, you know, they did them for three or four

10   years before this, they would hook the crane up to it

11   to get it all hooked up and then they would have

12   ironworkers there.  They would go out and they would

13   cut, usually I think there was like four bolts at each,

14   the bottom of each leg, so there would be four, eight,

15   twelve, sixteen, at least sixteen bolts.  They would go

16   and they would cut off all the bolts and then we would

17   we would run a 707 during that time, which means there

18   was somebody there that the trains had one of our guys

19   that the trains had to call before they could come

20   through the area.

21        So we would call our guys, say, hey, are we

22   clear, there's nobody going by, and then they would pick

23   up the whole bridge legs horizontal, everything, all the

24   signals on it.  They would pick it up, swing it over to

25   the side, drop it down so the feet are just barely

 1   touching, and then they would have their ironworkers cut

 2   legs on -- one guy on each side that would cut a section

 3   of the legs, let it drop.  Then they would lower it down,

 4   cut another section of legs, let them drop, cut another

 5   section and then they would set the horizontal usually on

 6   top.

 7           At this location there was a lot of room, so I

 8   can't remember if they put it on top of the legs or if

 9   they moved it over a hair and dropped it down.  Then we

10   would have another contractor come through with shears on

11   an excavator to cut it up and bring it to the scrap yard.

12       Q.   So this bridge is not going to be reused, it's

13   being destroyed and taken to recycling?

14       A.   Correct.

15       Q.   Is that what actually happened in this case

16   with the bridge we were talking about?

17       A.   Yes.

18       Q.   Might as well ask.  Was there anything that

19   you considered to be unusual about the work being done

20   on those on the 22nd and 23rd?

21       A.   No.

22       Q.   So there wasn't anything unusual that happened

23   as far as you were concerned, it went as planned?

24       A.   Yep.  They probably had it out of the way in,

25   like, five minutes.  They were pretty efficient.  When

1    they got it hooked up and they got it cut and we gave

2    them the time, probably within five minutes they had it

3    over there and they were getting ready to cut it up.

4        Q.   To your knowledge, was the crane that was used

5    for the removal of the old bridge the exact same crane

6    that was used for the erection of that horizontal

7    standard?

8        A.   Yes.

9        Q.   All right.  Do you know how many cranes they

10   had there at that location during that period?

11               MR. GULISANO:  Objection.  Go ahead.  I

12       object to, quote, at that location.  I'm not sure

13       what you mean.

14   BY MR. EARL:

15       Q.   Okay.  CP436, to make it simple.

16       A.   To do our work, just one.

17       Q.   There was some testimony previously about

18   another crane that was used, a smaller crane, I'm

19   gathering, in order to put together the crane that was

20   used for the removal and erection of the new one.  Do

21   you remember seeing the smaller crane there ever?

22       A.   Again, that was four years ago.  I'm sure I

23   probably did, but, you know, I couldn't tell you what

24   kind it was and how big it was or any of that

25   information.

1    Q.   I can't remember if I asked this.  Do you know

2    the plaintiff?  Have you ever seen him or talked to him

3    before?

4    A.   Not that I know of.

5    Q.   Okay.  Do you have any knowledge, other than

6    what you heard from your attorney, about his injuries

7    or treatment?

8    A.   No.

9    Q.   To your knowledge, did anyone at CSX ever

10   specifically inspect the trailer that was involved in

11   this accident?

12   A.   Not that I'm aware of.

13   Q.   All right.  If this incident had been reported

14   to you or someone else at CSX at the time the incident

15   occurred, would, in your experience, CSX have taken any

16   action done an inspection, done anything as a result of

17   that report?

18   A.   I'm sure we would have had to have done a

19   full-blown report.

20   Q.   And there was no full-blown report done in

21   this case?

22   A.   We didn't know about it, so no.

23   Q.   But never was a full-blown report done, I'm

24   assuming; correct?

25   A.   No, because, like I said, the only -- I didn't

1    know anything about it until a year and a half after,

2    and then the only thing I knew about it was somebody

3    said they got hurt.  That was the extent of it, so I

4    don't know what I would report on.

5        Q.   That's fine.  I just want to make sure that

6    you didn't do any report once you found out that the

7    incident occurred.

8        A.   I've done -- this is the first I've done

9    anything with this other than -- so no.

10       Q.   All right.  Let me see.  So in your mind, is

11   there any distinction between Niagara Erecting and

12   Clark Rigging?

13       A.   Again, it was my understanding it was just --

14   they were the same company, just a different location.

15   Like I said, I don't know that for a fact.  I have no

16   firsthand knowledge of that.  I was just -- that's just

17   something I assumed, because I had seen both names and

18   it was always Gunther that I dealt with.  He's the only

19   person I ever dealt with, so...

20       Q.   Okay.  Now to your knowledge, was there any --

21   I'm sorry, strike that.  Does CSX actually have

22   employees that would be designated as, I guess I would

23   call them safety inspectors, people dealing with safety

24   issues for CSX?

25       A.   At one time we did have, in signal

1    construction we did have a safety rep.

2        Q.   Is that before -- was there a safety rep for

3    your division at the time this work was being done in

4    July of 2017?

5        A.   I don't believe so, but I can't remember the

6    exact date when they stopped doing that, so I can't

7    give you one hundred percent answer on that.

8        Q.   When they did have a safety rep, would they be

9    responsible, have any responsibility for inspecting the

10   work done by contractors or subcontractors, or just CSX

11   employees?

12       A.   Again, once the work got, you know, got

13   shifted to us and doing what they were, you know, as

14   far as lifting, putting the bridge up and taking down

15   the bridge, there was just one person, so, you know,

16   no.  I would say no, but again, we did have somebody --

17   a lot of times it was myself with, you know, the crane

18   crews, you know, when they had to do our work and

19   again, we would make sure, you know, they didn't follow

20   the track, you know.  We were in charge of making sure,

21   you know, they did everything by the book.

22       Q.   All right.  Just so --

23       A.   As far as before when, you know, choosing what

24   types of crane, how many cranes, how to put it

25   together, you know, what they brought it on, that was

1   something we didn't get involved in.

2       Q.   And when you talk about you or somebody else

3   would be watching to see what they were doing with

4   respect to the erection and demolition of the old

5   bridge, would that be solely dealing with safety issues

6   surrounding the track and trains as opposed to how they

7   were specifically doing their work?

8       A.   Yeah.  You know, they didn't have a harness on

9   or something and they went to climb something, we would

10  say something about that, but as far as how they did

11  their work, again, they were professional crane

12  operators, professional riggers, professional

13  ironworkers so, you know.

14      Q.   If you did see a contractor or subcontractor

15  doing some work unsafely or in a way that you did not

16  consider to be safe, you would point it out to them and

17  ask them to change the way they're doing it?

18      A.   Absolutely.

19      Q.   Were there any other contractors involved in

20  the work being done at or near CP436 other than Niagara

21  Erecting and Clark and any related companies?

22      A.   On which day?

23      Q.   On the 21st.

24      A.   No.

25      Q.   How about on the 22nd and 23rd, were there any

1   other contractors there?

2       A.   Probably not.  I don't know when the guy with

3   the shear, I'm not sure.  I don't think he was there on

4   the 23rd.  I think that he did that the following week.

5       Q.   But that was a separate contractor that cut up

6   the old bridge?

7       A.   Excuse me.  I'm still working here.  Give me

8   one second.  Sorry.

9       Q.   So the work being done on cutting up the old

10  bridge, that was a separate contractor, to your

11  knowledge, other than Niagara Erecting or Clark; is

12  that right?

13      A.   That's correct.

14      Q.   Do you remember who it was that was doing that

15  work?

16      A.   I know his name was Brad.  The company, his

17  last name.  That's not going to help you much.

18      Q.   They wouldn't have had anything to do with the

19  cranes or the setup of the cranes?

20      A.   No, it was the recycling company.

21      Q.   Got you.  Just to make sure I've got this

22  clear, was there any specific person that was

23  considered a site inspector at this CP436 location

24  during the period from the 21st to the 23rd?

25      A.   What do you mean by a site inspector?

1      Q.   Well, I'm just asking, was there anyone a

2   specific person designated as a site inspector or would

3   that just be, for example, you going to the location to

4   take a look and see what's going on?  What kind of

5   inspections were there?

6      A.   For our work?

7      Q.   Yeah.

8      A.   Probably just, you know, probably myself, you

9   know, just, again, going through and making sure, you

10   know, making sure everything was done correctly.  We do

11   have signal inspectors who would check all the wiring

12   and stuff and make sure all that was good.

13      Q.   They wouldn't have anything to do with respect

14   to overseeing the work done by the contractors and

15   subcontractors --

16      A.   No.

17      Q.   -- would they?

18      A.   No.

19      Q.   Did CSX have any requirements of contractors

20   and subcontractors with respect to their

21   responsibilities regarding safety towards their own

22   employees?

23      A.   That I don't know.

24      Q.   Let me -- have we marked the contract yet,

25   Phil?

```
 1                    THE WITNESS:  J.

 2                    MR. GULISANO:  Yeah, J, thanks.

 3     BY MR. EARL:

 4         Q.   So if you could take a look at that, sir, does

 5     that one have the Bates numbers on it at the bottom?

 6     If not, it doesn't matter.  There's another way to get

 7     to it.

 8                    MR. GULISANO:  Give me a second.  Yeah.

 9         It's in the packet so it's Bates 79 through 94;

10         right?

11                    MR. EARL:  Yep, exactly.

12                    MR. GULISANO:  Again, I'll mark -- I'll

13         have that one marked Exhibit J.

14     BY MR. EARL:

15         Q.   All right.  Sir, let's go to Bates number 83

16     and you'll see it has a section for, under number 12,

17     subcontractors.  Do you see that?

18         A.   Yep.

19         Q.   And the first sentence says, contractor shall

20     submit to the chief for approval a list of any and all

21     subcontractors.  Were you given any list at all during

22     this project with respect to the work being done at

23     CP436?

24         A.   No.

25         Q.   Did you have any understanding as to whether
```

1  there were any subcontractors for the work being done

2  at CP436 at this time?

3      A.    Was I aware that we had a subcontractor coming

4  in?  Yes, Clark Rigging.

5      Q.    We'll -- how did you know that Clark Rigging

6  was coming in as a subcontractor to Niagara Erecting,

7  Inc.?  Was that just based on past experience?

8      A.    Just, again, dealing with Gunther.  He was my

9  only point of contact for every time we hired them and

10 did something, he was my only point of contact.

11     Q.    And he was, to your knowledge, working for

12 Clark as opposed to Niagara Erecting; is that right?

13     A.    Well, again, it was, whether I'm right or

14 wrong or not, it was my understanding it was the same

15 company.  I could be wrong about that, but at the time

16 I thought it was the same company.

17     Q.    All right.  So, as far as you were concerned,

18 you just treated them as one entity?

19     A.    Correct.

20     Q.    So you would not have expected them to,

21 Niagara Erecting to give you a list saying that Clark

22 is doing some of the work then?

23     A.    Correct.

24     Q.    Turn to Bates page 85.  There's a section

25 called safety.  Do you have that?

1      A.   Yep.

2      Q.   All right.  A couple of things I wanted to ask

3   you about.  It talks at some point about the contractor

4   following the provisions of the manual of accident

5   prevention in construction.  Do you see that in the

6   first paragraph under --

7      A.   Yep, it's underlined.

8      Q.   Is that something you're familiar with, that

9   publication?

10     A.   No.

11     Q.   To your knowledge, have you ever reviewed that

12  book or manual?

13     A.   No.

14     Q.   The next paragraph, number two, talks about a

15  booklet called the CSX Safeway.  It sounds like it's a

16  booklet or book or something like that.  Are you

17  familiar with that?

18     A.   Yes.

19     Q.   What does that deal with?

20     A.   It's a book that has all our safety rules in

21  it, our safe practices I should say.

22     Q.   Was a copy of that provided to Clark, to your

23  knowledge?

24     A.   That I don't know.

25     Q.   Do you know if it was provided to Niagara

1   Erecting?

2       A.   That I don't know.

3       Q.   Do you know whether, as a matter of routine,

4   that when a contractor is signed, a contractor is

5   provided that document?

6       A.   Never.  I've never signed as a contractor so I

7   really don't know that.

8               MR. EARL:  Okay.  Would you -- Molly,

9       would you do an index for me for a request for the

10      CSX Safeway booklet as it existed in July of 2017?

11              THE REPORTER:  Yes.

12              MR. EARL:  Thank you.

13              THE REPORTER:  You're welcome.

14  BY MR. EARL:

15      Q.   On the last -- or, I'm sorry, the second to

16  last page of this document, Bates number 93, do you

17  know who signed that on behalf of CSX?

18      A.   No.

19      Q.   The title looks like, maybe, AVP purchasing;

20  is that right?  Do you know what AVP purchasing is?

21      A.   No.

22      Q.   It appears that for Niagara Erecting it was

23  signed by David F. Clark, president?

24      A.   It looks like it.

25      Q.   And then let's go to the next page.  I guess

1   it's Exhibit A.  I'm just wondering, under Exhibit A it

2   talks about the services.  Is it your understanding

3   that those are the only services that were being

4   provided pursuant to the contract?

5        A.   It just talks about the crane, the

6   ironworkers, the rigging.

7        Q.   I guess my question though is, under the first

8   section where it says services, it talks about labor

9   and equipment for the removal of bridge structures as

10  directed by the engineer signal construction; right?

11       A.   Correct.

12       Q.   Was there a separate contract that would have

13  dealt with the installation, the lifting and

14  installation of the horizontal piece on the new bridge?

15       A.   No.

16       Q.   So it would be your understanding that this

17  contract would cover both the removal of the old

18  structure as well as the lifting and installation of

19  the horizontal piece?

20       A.   I would say so.

21       Q.   And the company was going to be paid, was it

22  five thousand a day?  I can't quite read it.  Do you

23  see that?  I didn't hear an answer.

24       A.   I'm sorry, I didn't hear a question.

25       Q.   I'm sorry.  So was, according to this

1    contract, is it your understanding that the general

2    rate was going to be five thousand a day for the work

3    being done pursuant to this contract?

4         A.   It looks like a six to me.  Six K, eight

5    hours, Monday through Friday.

6         Q.   It could be.

7         A.   Overtime.

8         Q.   And that would be a flat rate, unless there's

9    overtime for any of the work the company was doing at

10   that location?

11        A.   Correct.

12        Q.   Would that also include the work being done on

13   the 21st to set up the crane?

14        A.   Yes.

15        Q.   So, for this part of the project, CP436, would

16   it be fair to say that, pursuant to this contract,

17   Niagara Erecting or Clark did work on three separate

18   days?

19        A.   At least.

20        Q.   Was there any additional work that would have

21   been done after the 23rd by Clark or Niagara Erecting?

22        A.   Well, they had to come and tear the crane

23   down.  I don't remember how long that took, so they put

24   the crane together.  Now they have to take it apart.

25        Q.   So if that was done on the 24th they would

1   also get paid for that as well?

2       A.   Yep.

3       Q.   Let me just take a look at my notes here.  I

4   think we're almost done.  To your knowledge, did CSX

5   require that either Niagara Erecting or Clark have a

6   safety manager on-site during the work?

7       A.   I don't know that.

8       Q.   Would that be something you would expect would

9   be dealt with by the contract?

10      A.   Correct.  Again, until they got to, you know,

11  the day that they put it up, you know, it was just an

12  understanding.  They were a contractor.  They had to

13  follow our safety rules, but they also should, you

14  know, should follow their own safety protocol.

15      Q.   Were there any photographs taken of the work

16  being done at CP436, for example, either beforehand,

17  during the work or after it was completed?

18      A.   I'm sure there was probably some pictures of

19  the bridge in the air because, you know, that was a

20  pretty large structure, so I'm sure some pictures were

21  taken as it was being lifted.

22      Q.   And would those pictures have been taken by

23  someone at CSX?

24              MR. GULISANO:  You're saying you're sure.

25      Do you know if there were?

```
1                    THE WITNESS:  No, I don't know for sure.
2         I'm guessing.
3                    MR. GULISANO:  Don't guess.  If you know,
4         say you know.  If you don't know, then let us know.
5                    THE WITNESS:  I'm not positive, so I
6         don't know.
7    BY MR. EARL:
8         Q.   Would it be normal procedure with CSX to
9    actually take pictures when work of this type was being
10   done with respect to the removal and erection of a new
11   bridge?
12        A.   No.
13                   MR. EARL:  So -- well, okay.  Never mind.
14        Phil, I am not going to waste your time on it.  I
15        would assume they would have looked for any
16        photographs such as that when they're doing their
17        search for you.
18                   MR. GULISANO:  Those have been requested,
19        yes, so my assumption is there are none.
20                   MR. EARL:  Okay.
21   BY MR. EARL:
22        Q.   Now, let me just ask you another couple
23   questions on Exhibits K and L.  That's the cut in
24   meeting and then --
25                   MR. GULISANO:  The yellow tabs.
```

1    BY MR. EARL:

2        Q.    Would those be documents that would be

3    provided to anybody at Niagara Erecting or Clark for

4    any reason?

5        A.    They did send representatives to the meeting

6    so, yes, we did gave it to them, but whether they took

7    it with them when they left the meeting or left it on

8    the table, I can't tell you that one hundred percent

9    one way or the other.

10       Q.    Was Clark or Niagara Erecting going to have

11   any involvement in any of the actual cut over work?

12       A.    Well, removing the bridge was part of the cut

13   over work because we had to have the old one out of the

14   way before we could put of the new signal in service.

15       Q.    Fair enough.  Just give me one second here.  I

16   can't find it right here, but let me just ask it in

17   general.  Are you aware of any safety plan that was

18   ever done by either Niagara Erecting or Clark with

19   respect to the work being done at CP436?

20       A.    No.

21            MR. EARL:  Okay.  Sir, I think that's all

22   I have.  Thank you very much.

23            MR. GULISANO:  Thanks, guys.

24            ***1:33 p.m.***

25

1   STATE OF NEW YORK
    COUNTY OF ERIE
2
          I, Molly Fenske, a Notary Public in and for the State
3   of New York, do hereby certify:

4         That the witness whose testimony appears herein
    before was, before the commencement of his deposition,
5   duly sworn to testify to the truth, the whole truth and
    nothing but the truth; that such testimony was taken
6   pursuant to notice at the time and place herein set forth;
    that said testimony was taken down in shorthand by me and
7   thereafter under my supervision transcribed into the
    English language, and I hereby certify the foregoing
8   testimony is a full, true and correct transcription of the
    shorthand notes so taken.
9
          I further certify that I am neither counsel for nor
10  related to any parties to said action, nor in anywise
    interested in the outcome thereof.
11
          IN WITNESS WHEREOF, I have hereunto subscribed my
12  name this 23rd day of February, 2021.

13

14

15

16                        _Molly K. Fenske_

17

18                        Notary Public
                          State of New York
19

20

21

22

23

24

25

**\***

**\*\*\*1:33 (1)**
62:24

**A**

**able (1)**
30:8
**absolutely (2)**
42:18;51:18
**accident (14)**
18:22;19:12,17;
26:10;42:11;43:4,8,
9;44:15,19,22;45:4;
48:11;56:4
**according (1)**
58:25
**Act (1)**
5:4
**action (1)**
48:16
**actual (3)**
20:13;27:24;62:11
**actually (10)**
10:8;19:5;26:24;
27:5;33:11;38:17;
41:21;46:15;49:21;
61:9
**addition (1)**
30:21
**additional (2)**
7:5;59:20
**administering (1)**
5:5
**Administration (1)**
15:16
**advance (1)**
21:12
**advised (1)**
43:7
**afternoon (2)**
5:15;41:17
**afterwards (2)**
36:16;42:25
**again (19)**
10:19;18:1;31:6;
33:15,19;34:1,7;
40:8;47:22;49:13;
50:12,16,19;51:11;
53:9;54:12;55:8,13;
60:10
**against (1)**
5:17
**age (1)**
16:7
**ago (2)**
30:13;47:22
**agree (2)**
5:2,9
**agreed (1)**
5:8

**agreement (1)**
5:7
**ahead (7)**
9:8,9,16;13:18;
25:3;28:16;47:11
**ahold (1)**
37:5
**air (1)**
60:19
**Albany (1)**
12:11
**almost (1)**
60:4
**always (2)**
9:17;49:18
**apart (1)**
59:24
**appears (1)**
57:22
**application (1)**
10:5
**apprenticeship (1)**
7:2
**approval (1)**
54:20
**approved (2)**
22:21;28:7
**approximately (1)**
11:5
**area (12)**
11:21;13:6;20:5;
22:23;24:4;28:9,18,
22;29:4;31:6;33:7;
45:20
**areas (1)**
29:17
**around (3)**
6:25;12:14;13:19
**arrangements (1)**
25:4
**aspects (1)**
8:15
**assembled (1)**
27:20
**assembling (2)**
31:21;33:2
**Assistant (6)**
7:22,22,24;10:10,
17;11:7
**assume (3)**
28:16;35:19;61:15
**assumed (1)**
49:17
**assuming (4)**
10:14;25:17;43:25;
48:24
**assumption (1)**
61:19
**attached (1)**
39:1
**attorney (3)**
44:18;45:2;48:6
**audits (1)**

**11:20**
**automatic (1)**
19:7
**available (3)**
8:3;14:4,5
**Avenue (1)**
41:4
**AVP (2)**
57:19,20
**aware (10)**
23:20;28:13;36:6,
20,24;38:24;39:9;
48:12;55:3;62:17

**B**

**back (3)**
7:20;10:8;16:3
**background (1)**
6:21
**Baldwinsville (1)**
5:11
**Baltimore (2)**
16:23,23
**barely (1)**
45:25
**based (2)**
12:4;55:7
**Basically (15)**
8:1,16;9:5,5,25;
10:17;11:23;12:21,
22;13:22;31:25;
32:25;33:5;34:6;
37:25
**Bates (5)**
54:5,9,15;55:24;
57:16
**became (4)**
11:10,13;12:20,22
**become (2)**
10:19;11:4
**becomes (1)**
8:3
**beforehand (1)**
60:16
**behalf (1)**
57:17
**besides (1)**
4:24
**bid (2)**
8:4,4
**bidding (2)**
20:14,20
**big (5)**
17:21;22:8;31:5;
32:25;47:24
**binding (2)**
5:6;39:21
**bit (3)**
10:8,10;25:3
**block (2)**
25:2,2
**body (1)**

**15:17**
**bolted (1)**
24:24
**bolts (3)**
45:13,15,16
**book (4)**
50:21;56:12,16,20
**booklet (1)**
56:15,16;57:10
**borderline (1)**
28:25
**Boston (1)**
11:24
**both (7)**
9:23;24:14,16;
41:18;19;49:17;
58:17
**bottom (2)**
45:14;54:5
**box (3)**
17:25;18:1;24:22
**boxes (2)**
24:19,19
**Boyd (1)**
5:15
**Brad (1)**
52:16
**brand (1)**
32:9
**breaks (1)**
6:3
**bridge (43)**
9:17;15:25;16:21;
18:3,22,24;19:11,17,
22;20:3,18;22:3,7,7;
24:5;25:19;26:19;
27:6,15,16,18;28:22;
29:7,8;30:6,17,24;
38:22;45:6,23;46:12,
16;47:5;50:14,15;
51:5;52:6,10;58:9,
14;60:19;61:11;
62:12
**bridges (10)**
9:21;16:11;17:4,8,
12;18:9,10,13,15;
19:23
**briefly (1)**
23:18
**bring (1)**
46:11
**bringing (1)**
27:14
**brought (4)**
5:17;20:22,23;
50:25
**Buffalo (3)**
4:3;12:12;16:24
**build (2)**
8:24;27:14
**building (4)**
10:23,23;27:16,17
**built (3)**

**24:11;29:23,24**
**bulletins (4)**
35:6,6;38:2,2

**C**

**cable (1)**
16:6
**cables (5)**
17:23,25;24:20;
25:23;30:1
**cabling (1)**
9:4
**call (8)**
14:4;18:5;25:22;
36:12,13;45:19,21;
49:23
**called (5)**
5:12;7:18;10:4;
16:23;26:18;55:25;
56:15
**calls (2)**
8:21;10:22
**came (4)**
17:9;21:20;24:23;
26:4
**Camerondale (1)**
5:10
**Can (12)**
8:7;9:11;14:15;
15:19;16:22;30:6,22;
36:3;37:23;38:8;
40:8;42:15
**cantilever (1)**
18:2
**cantilevers (1)**
9:22
**care (2)**
28:3;31:23
**career (1)**
8:23
**case (6)**
5:16,18;15:19;
31:20;46:15;48:21
**center (3)**
7:17,18;22:7
**certain (1)**
18:9
**certification (1)**
4:17
**change (2)**
11:13;51:17
**charge (2)**
13:5;50:20
**charging (1)**
37:6
**check (7)**
13:20,20;31:7,7;
36:14;43:3;53:11
**checking (5)**
29:17;31:1,6,7;
34:19
**chief (1)**

54:20
**choosing (1)**
50:23
**Chrysler (1)**
7:2
**circumstances (1)**
5:19
**clarify (1)**
35:8
**Clark (42)**
21:5,9,16,21;
22:11;24:6;25:5,17;
26:4,17;27:1,3,5,9;
28:3,13;31:18,20,23;
36:21;39:22;40:4;
41:11;42:3,21;44:14,
24;49:12;51:21;
52:11;55:4,5,12,21;
56:22;57:23;59:17,
21;60:5;62:3,10,18
**Clark's (1)**
41:7
**class (1)**
8:6
**classes (3)**
7:6,8,19
**clear (3)**
9:9;45:22;52:22
**climb (1)**
51:9
**close (1)**
25:1
**code (2)**
37:6,8
**College (2)**
6:23;7:3
**color (3)**
9:7,9,10
**colored (1)**
8:25
**coming (2)**
55:3,6
**comment (1)**
38:9
**Community (1)**
6:23
**Companies (2)**
44:14;51:21
**company (9)**
16:16;22:14;49:14;
52:16,20;55:15,16;
58:21;59:9
**complaints (1)**
22:17
**completed (2)**
30:17;60:17
**completely (1)**
34:9
**complicated (1)**
5:22
**concern (1)**
33:5
**concerned (3)**

33:8;46:23;55:17
**concerning (1)**
38:2
**concrete (2)**
24:13,16
**configurations (1)**
10:2
**confirm (1)**
23:9
**confusing (1)**
6:20
**consider (1)**
51:16
**considered (2)**
46:19;52:23
**constructed (1)**
11:17
**constructing (1)**
11:16
**construction (24)**
4:1;8:22;10:22;
11:2,11,14,22;12:9,
19,21,25;13:4,6,8,11,
14,23;14:1;15:3;
23:13;25:25;50:1;
56:5;58:10
**contact (2)**
55:9,10
**context (1)**
15:19
**continue (1)**
11:8
**continuing (1)**
7:6
**contract (19)**
4:2;20:14,14,19,20,
21;22:21;23:1,14,24;
39:5;53:24;58:4,12,
17;59:1,3,16;60:9
**contractor (13)**
44:4,9,12;46:10;
51:14;52:5,10;54:19;
56:3;57:4,4,6;60:12
**contractors (5)**
50:10;51:19;52:1;
53:14,19
**control (9)**
9:6;15:9;17:18,18,
21;19:3,6,10;31:3
**conversation (1)**
27:8
**conversations (1)**
39:6
**copy (4)**
22:25;37:11;40:17;
56:22
**corner (1)**
32:23
**corporation (1)**
6:20
**correctly (5)**
14:13;25:11;30:16;
38:13;53:10

**counsel (2)**
4:15;5:2
**country (1)**
15:21
**couple (3)**
39:19;56:2;61:22
**course (3)**
6:6;25:7;29:1
**courses (1)**
7:11
**court (1)**
6:1
**cover (2)**
39:4;58:17
**covered (2)**
23:24;24:1
**CP (1)**
19:3
**CP2 (1)**
31:5
**CP436 (30)**
19:1,11,21;20:1,2,
3,9,15;21:14;22:10;
23:24;26:3;30:7;
31:10,15;34:23;35:2;
36:14,17;37:9;39:16;
41:14;47:15;51:20;
52:23;54:23;55:2;
59:15;60:16;62:19
**CP437 (1)**
31:2
**craft (3)**
7:12;9:5,14
**crane (38)**
22:6;25:19;27:17,
19,20,22,24;28:1,4,
14;29:4;32:2,7,16,21;
33:12,18;34:15;
35:11;36:22;40:1;
41:22,25;42:8;45:10;
47:4,5,18,18,19,21;
50:17,24;51:11;58:5;
59:13,22,24
**cranes (7)**
31:22;32:8;42:4;
47:9;50:24;52:19,19
**crews (1)**
50:18
**crossings (2)**
9:2,3;10:24
**CSX (49)**
4:2;5:17;6:12,16,
17;7:10,20,25;8:13;
14:9,23;23:14;24:6;
26:1;28:20,23;29:5,
8;31:9,16;33:17;
34:16;35:2,10;36:21,
25;39:10,10;42:7;
43:4,8,25;44:4,5,8,
10;48:9,14,15;49:21,
24;50:10;53:19;
56:15;57:10,17;60:4,
23;61:8

**current (2)**
5:3;13:25
**currently (3)**
6:8;13:2,3
**cut (26)**
18:6;29:21;31:3;
34:3;35:3,5;37:13,
24;38:3,14,18;40:18,
20;45:13,16;46:1,2,4,
4,11;47:1,3;52:5;
61:23;62:11,12
**cutting (1)**
52:9

## D

**daily (2)**
35:22;36:11
**date (3)**
21:11;27:9;50:6
**DAVID (3)**
5:10;14:13;57:23
**day (28)**
25:4,6;26:9;27:4,
10,11;31:10;33:20,
25;34:5,20,23;35:2,7,
11,13,23;36:1,2;37:4,
7;40:21,23;41:24;
51:22;58:22;59:2;
60:11
**days (2)**
36:8;59:18
**deal (4)**
38:25;39:15;41:7;
56:19
**dealing (5)**
31:16;39:10;49:23;
51:5;55:8
**dealt (5)**
43:4;49:18,19;
58:13;60:9
**decision (2)**
15:24;16:4
**degree (2)**
6:22;7:4
**demands (1)**
43:13
**demolition (1)**
51:4
**dependent (1)**
9:10
**depending (7)**
9:9;10:5;11:1;
15:6;17:15,17,21
**depends (1)**
12:10
**deposition (1)**
5:5
**describe (3)**
30:4,6,22
**designate (1)**
18:24
**designated (2)**

49:22;53:2
**designer (1)**
20:11
**destroyed (1)**
46:13
**determination (2)**
16:8;32:2
**determine (3)**
20:25;22:8;28:4
**determined (2)**
16:1;17:22
**determining (1)**
15:2
**different (8)**
8:15,18,19;9:20;
10:2,2;17:7;49:14
**dig (3)**
24:13,16;25:9
**digging (1)**
29:25
**direct (2)**
8:14;9:1
**directed (1)**
58:10
**directive (1)**
15:10
**director (3)**
13:3,10,13
**dirt (1)**
32:24
**discovery (1)**
43:13
**discussion (4)**
8:9;37:18;38:11;
40:10
**dispatcher (1)**
38:2
**distinction (2)**
10:16;49:11
**divert (2)**
9:12;17:20
**division (1)**
50:3
**document (7)**
23:18;37:23;38:14;
39:3;43:23;57:5,16
**documentation (8)**
34:25;36:20,24;
38:24;39:10,14;43:4,
8
**documenting (1)**
35:9
**documents (3)**
37:17;41:10;62:2
**done (60)**
5:25;13:21;15:5,
21;16:12;17:5;19:16;
20:9;21:25;22:10,15,
18;27:1;29:22;30:2;
31:17,19;32:3;34:9;
35:1;36:21;38:6,15,
20,25;39:7,8,11,15,
22;40:5,20,23;41:11;

Case 1:19-cv-01583-WMS-JJM   Document 32-8   Filed 09/15/21   Page 68 of 74

ALAN WALTER vs.                                                          DAVID PIRRO
CSX TRANSPORTATION, INC.                                         February 10, 2021

45:9;46:19;48:16,16,
18,20,23;49:8,8;50:3,
10;51:20;52:9;53:10,
14;54:22;55:1;59:3,
12,21,25;60:4,16;
61:10;62:18,19
**double (1)**
31:7
**double-checking (1)**
34:10
**down (15)**
6:2;7:18;12:3;
15:6;20:17;25:7,13;
27:12;30:3;36:16;
45:25;46:3,9;50:14;
59:23
**draw (1)**
32:17
**drop (3)**
45:25;46:3,4
**dropped (1)**
46:9
**duly (1)**
5:12
**during (7)**
35:5;45:17;47:10;
52:24;54:21;60:6,17
**duties (3)**
10:15;11:13;13:13
**dwarf (1)**
10:4

## E

**Earl (47)**
4:6,8,20,22;5:8,14,
15;6:7;8:10;14:8,22,
25;19:19,20,21:6;
22:25;23:3,6,12,16;
26:13,15;27:21;
35:17;37:15,19;38:9,
12;40:7,11;43:2,16,
18,21;47:14;54:3,11,
14;57:8,12,14;61:7,
13,20,21;62:1,21
**earlier (2)**
24:12;39:5
**easier (1)**
6:1
**east (3)**
13:8,10,13
**eastern (1)**
13:9
**ed (1)**
7:6
**educated (1)**
41:19
**education (1)**
7:6
**educational (1)**
6:21
**efficient (1)**
46:25

**eight (2)**
45:14;59:4
**either (1)**
14:14;24:7;29:6;
39:11;41:18;44:13;
60:5,16;62:18
**Electric (1)**
23:1
**electrical (2)**
6:22;7:1
**electrician (1)**
7:9
**electronics (1)**
17:15
**else (3)**
27:2;48:14;51:2
**else's (1)**
15:4
**Emergency (1)**
5:3
**employed (1)**
6:9
**employees (13)**
26:1;27:2;31:9;
33:17;34:17;35:2,10;
36:25;37:4;41:21;
49:22;50:11;53:22
**employment (1)**
10:9
**engineer (8)**
11:11,14,22;12:8,
18,20,21;58:10
**engineering (1)**
6:22
**engineers (2)**
12:25;15:6
**enough (2)**
19:19;62:15
**entered (1)**
4:13
**entire (1)**
16:18
**entity (1)**
55:18
**EP (1)**
19:2
**equipment (5)**
11:19;20:25;27:14;
42:3;58:9
**Erecting (18)**
4:3;21:13;23:15;
44:14;49:11;51:21;
52:11;55:6,12,21;
57:1,22;59:17,21;
60:5;62:3,10,18
**erection (4)**
47:6,20;51:4;61:10
**Erie (2)**
11:24;12:14
**essentially (1)**
25:11
**even (1)**
39:21

**everybody (1)**
35:4
**everyday (1)**
14:6
**Everyone (1)**
6:2
**everything's (1)**
31:8
**exact (4)**
21:11;41:16;47:5;
50:6
**exactly (5)**
28:25;30:8;34:11,
11;54:11
**EXAMINATION (1)**
6:7
**examined (1)**
5:12
**example (4)**
15:12;30:23;53:3;
60:16
**excavator (1)**
46:11
**except (2)**
4:18;10:15
**exception (1)**
30:17
**Excuse (1)**
52:7
**Exhibit (12)**
4:1,3,4;23:10;
37:20;39:21;40:12;
41:6;43:18;54:13;
58:1,1
**Exhibits (1)**
61:23
**existed (1)**
57:10
**existing (2)**
18:13;20:18
**exists (1)**
36:20
**expect (2)**
31:23;60:8
**expected (1)**
55:20
**experience (3)**
44:7;48:15;55:7
**expertise (1)**
32:4
**explained (1)**
42:13
**extent (3)**
42:13,15;49:3

## F

**fact (2)**
21:17;49:15
**Fair (4)**
19:19;45:1;59:16;
62:15
**falling (1)**

42:23
**familiar (4)**
18:21;22:14;56:8,
17
**far (6)**
29:2;46:23;50:14,
23;51:10;55:17
**fast (1)**
9:11
**favor (1)**
5:24
**federal (2)**
15:10,16
**feet (4)**
32:1,14;33:4;45:25
**few (1)**
20:10
**field (1)**
32:25
**fifty (2)**
18:15;33:4
**figure (3)**
8:12;20:2;40:8
**filing (1)**
4:16
**fill (1)**
35:22
**find (2)**
22:5;62:16
**fine (2)**
30:11;49:5
**finishing (2)**
33:21;34:8
**first (12)**
6:8;7:20;16:18;
20:8;23:19;26:3;
27:10;42:24;49:8;
54:19;56:6;58:7
**firsthand (1)**
49:16
**five (8)**
10:25;17:17;21:11;
31:4;46:25;47:2;
58:22;59:2
**fixes (1)**
8:21
**flashing (1)**
9:3
**flat (1)**
59:8
**follow (3)**
50:19;60:13,14
**following (4)**
4:12;27:4;52:4;
56:4
**follows (1)**
5:13
**foot (1)**
33:7
**foreman (1)**
10:25
**form (4)**
4:18;9:17;43:22,25

**forward (1)**
13:19
**found (1)**
49:6
**foundation (3)**
10:1;24:16;25:23
**foundations (2)**
24:14;30:1
**four (16)**
10:25;19:8;21:10;
24:15,17;29:20,23;
30:2,12,25;34:2;
42:20;45:9,13,14;
47:22
**FRA (4)**
8:17,20;15:14,15
**Friday (5)**
26:10;34:7;35:15,
16;59:5
**front (1)**
40:12
**full-blown (3)**
48:19,20,23
**further (2)**
30:3,5
**future (1)**
6:16

## G

**gates (1)**
9:3
**gathering (8)**
7:15;10:7;16:25;
18:14,19;34:17;36:7;
47:19
**gave (2)**
47:1;62:6
**general (6)**
10:14;12:20,23;
39:19;59:1;62:17
**generally (3)**
12:5,7;44:10
**geographic (2)**
11:21;13:6
**Georgia (1)**
7:17
**gets (1)**
15:5
**gigantic (1)**
31:3
**given (1)**
54:21
**God (1)**
32:8
**goes (3)**
8:21;9:17;32:24
**Good (4)**
5:14;31:8;32:6;
53:12
**governing (1)**
15:16
**grass (2)**

Case 1:19-cv-01583-WMS-JJM   Document 32-8   Filed 09/15/21   Page 69 of 74

ALAN WALTER vs.                                              DAVID PIRRO
CSX TRANSPORTATION, INC.                              February 10, 2021

32:24,25
**Great (1)**
23:12
**greenfield (1)**
16:5
**ground (3)**
9:19;10:5;32:17
**guess (14)**
5:14;7:23;14:8;
16:3;21:10;31:13;
33:22;39:9;41:19;
42:12;49:22;57:25;
58:7;61:3
**guessing (2)**
33:4;61:2
**Gulisano (33)**
4:7,11,23,25;5:9;
8:7;14:12,24;19:15;
21:2,4;23:2,5,8,13;
26:8;27:17;35:8,13;
38:8;42:12;43:11,17,
20;47:11;54:2,8,12;
60:24;61:3,18,25;
62:23
**Gunther (5)**
21:22;27:13;39:7;
49:18;55:8
**guy (2)**
46:2;52:2
**guys (3)**
45:18,21;62:23

**H**

**hair (1)**
46:9
**half (4)**
6:14,15;42:25;49:1
**hand (1)**
14:5
**hanging (1)**
10:3
**hangs (1)**
9:24
**happen (1)**
35:5
**happened (6)**
15:8;23:21;34:23;
42:10;46:15,22
**happening (1)**
45:6
**happens (1)**
32:11
**harness (1)**
51:8
**head (2)**
6:5;30:10
**Health (1)**
5:4
**hear (2)**
58:23,24
**heard (3)**
42:18,20;48:6

held (5)
8:9;37:18;38:11;
40:10;41:2
**help (2)**
14:3;52:17
**hereby (1)**
4:14
**hey (1)**
45:21
**higher (1)**
12:2
**hired (3)**
7:20;32:5;55:9
**home (1)**
34:5
**hook (1)**
45:10
**hooked (2)**
45:11;47:1
**horizontal (13)**
24:22;26:19,21;
27:1;30:18;38:21;
39:1;40:24;45:23;
46:5;47:6;58:14,19
**horizontal's (1)**
34:8
**hours (1)**
59:5
**house (4)**
17:16;24:13,21;
34:10
**housed (1)**
17:14
**houses (8)**
16:6;17:14,17,22,
23;25:23;29:25;31:4
**hundred (5)**
31:12;33:4,19;
50:7;62:8
**hurt (3)**
42:22;44:12;49:3

**I**

**identification (1)**
4:5
**identify (1)**
30:8
**Inc (5)**
4:2,3;6:17;23:1;
55:7
**incident (7)**
15:7,7;35:11;
42:24;48:13,14;49:7
**include (2)**
19:23;59:12
**included (1)**
20:4
**independent (1)**
42:16
**in-depth (1)**
38:5
**index (1)**

57:9
**indicate (4)**
9:15;35:25;36:25;
37:4
**indicated (2)**
15:20;45:3
**individual (2)**
28:10;31:21
**information (3)**
35:1;42:16;47:25
**initiative (2)**
15:9,9
**injured (3)**
42:23;44:3,8
**injuries (1)**
48:6
**inspect (1)**
48:10
**inspected (1)**
42:7
**inspecting (2)**
30:24;50:9
**inspection (2)**
42:3;48:16
**inspections (1)**
53:5
**inspector (3)**
52:23,25;53:2
**inspectors (2)**
49:23;53:11
**install (2)**
17:23,23
**installation (5)**
26:25,25;58:13,14,
18
**installed (3)**
26:22;38:22;40:25
**instead (2)**
9:22;11:15
**interact (1)**
14:2
**interview/signed (1)**
43:22
**into (6)**
4:13;11:10;17:25;
19:6;24:20;26:6
**involve (2)**
17:11;19:22
**involved (12)**
17:3,12;18:22,25;
21:13,14;23:22;
25:18;33:15;48:10;
51:1,19
**involvement (8)**
20:8;24:4,8;26:3;
28:1;31:25;32:11;
62:11
**involving (1)**
16:21
**ironworkers (4)**
45:12;46:1;51:13;
58:6
**issue (2)**

14:3;32:9
**issues (3)**
31:17;49:24;51:5

**J**

**Jacksonville (2)**
15:6;20:11
**Jersey (1)**
12:1
**job (7)**
10:15;11:13,19;
12:19;13:13;16:21;
22:9
**jobs (3)**
12:11;30:20;31:15
**jobsite (1)**
44:8
**joined (1)**
14:10
**journeyman (2)**
7:9,10
**July (15)**
21:8;26:5,9,17;
27:5;28:14;29:12;
30:15,21;36:22;37:1;
38:16;41:11;50:4;
57:10
**junction (4)**
17:25,25;24:19,22

**K**

**kind (7)**
6:2;20:25;27:22;
32:2;41:5;47:24;53:4
**knew (2)**
28:16;49:2
**Knock (1)**
44:11
**knowing (1)**
32:6
**knowledge (23)**
5:18;27:8;28:20;
29:5;31:10;39:4;
42:6,18,24;44:10,17,
18;45:3;47:4;48:5,9;
49:16,20;52:11;
55:11;56:11,23;60:4
**knows (2)**
9:7,8

**L**

**labor (1)**
58:8
**landed (1)**
24:22
**large (1)**
60:20
**last (6)**
7:2;23:9;29:18;
52:17;57:15,16

**lawsuit (2)**
43:1,5
**leads (1)**
25:8
**learns (2)**
8:1,2
**least (4)**
17:1;39:15;45:15;
59:19
**left (2)**
62:7,7
**leg (1)**
45:14
**legs (5)**
45:23;46:2,3,4,8
**lift (1)**
26:5
**lifted (1)**
60:21
**lifting (3)**
50:14;58:13,18
**lights (5)**
8:14,25;9:4,15;
10:3
**limited (1)**
20:3
**line (2)**
30:4;32:18
**lines (1)**
32:17
**list (3)**
54:20,21;55:21
**little (4)**
5:21;10:8,10;25:3
**local (1)**
8:15
**located (3)**
28:22;29:8;30:7
**location (39)**
17:15,22;18:21;
20:6;21:20;22:1,22;
24:8,12;25:1,10;
27:10;28:11,14;
29:11,16;30:24;31:1,
5,6,17;32:22;33:18;
34:23;35:20;37:1;
38:6;39:16;41:14,20;
42:4,8;46:7;47:10,
12;49:14;52:23;53:3;
59:10
**locations (10)**
10:23;11:17;13:20;
17:8,16;20:24;24:11;
30:21,23;38:5
**locked (1)**
26:6
**logbook (1)**
35:22
**long (5)**
6:13;11:8;12:18;
24:24;59:23
**look (7)**
20:12;23:17;32:8;

34:16;53:4;54:4;60:3
**looked (1)**
  61:15
**looking (2)**
  37:20;39:14
**looks (4)**
  14:9;57:19,24;59:4
**lot (6)**
  27:12;28:6,18;
  29:2;46:7;50:17
**lots (1)**
  9:21
**low (1)**
  10:5
**lower (2)**
  12:3;46:3

**M**

**machines (4)**
  9:1,12;17:19,24
**maintainer (11)**
  7:23,25;8:2,5,16;
  10:11,13,19;11:4,9;
  12:8
**maintainers (2)**
  8:13;11:1
**maintenance (4)**
  10:20;11:2;13:25;
  14:6
**makes (1)**
  26:14
**making (9)**
  13:16,18,21;18:4;
  31:7;34:8;50:20;
  53:9,10
**man (1)**
  10:25
**management (1)**
  11:10
**manager (7)**
  12:22,22,23;20:23;
  21:2,4;60:6
**managers (1)**
  13:16
**manual (2)**
  56:4,12
**many (3)**
  17:22;47:9;50:24
**mark (3)**
  23:6,10;54:12
**marked (3)**
  4:5;53:24;54:13
**marking (1)**
  23:9
**Massachusetts (2)**
  12:1,11
**mast (4)**
  25:18;26:6,18,21
**masts (1)**
  24:20
**material (1)**
  11:18

**matter (3)**
  39:12;54:6;57:3
**may (1)**
  42:13
**maybe (2)**
  8:17;57:19
**mean (4)**
  15:25;29:24;47:13;
  52:25
**means (2)**
  16:5;45:17
**meant (1)**
  15:14
**measure (3)**
  22:4,6;32:17
**meeting (8)**
  35:4;37:13;40:18,
  20;41:2;61:24;62:5,7
**mention (2)**
  6:3;14:9
**mentioned (2)**
  15:15;42:22
**met (1)**
  24:3
**Meyme (5)**
  14:13,14,14,17,20
**M-E-Y-M-E (1)**
  14:17
**might (5)**
  6:20;34:7,9;36:12;
  46:18
**miles (1)**
  8:17
**mind (2)**
  49:10;61:13
**Minguez (4)**
  21:22;22:23;24:3;
  44:21
**minute (1)**
  29:18
**minutes (2)**
  46:25;47:2
**Molly (1)**
  57:8
**moment (1)**
  33:6
**Monday (2)**
  34:3;59:5
**monitor (2)**
  30:21;31:17
**monthly (1)**
  8:19
**months (3)**
  21:11;29:22;42:20
**Montreal (1)**
  11:24
**more (6)**
  7:14;10:10,15;
  17:11;26:14;28:9
**morning (2)**
  5:14;41:17
**most (2)**
  8:23;11:25

**mostly (1)**
  12:2
**mounted (1)**
  24:25
**mounting (1)**
  27:1
**move (1)**
  16:12
**moved (2)**
  8:5;46:9
**much (6)**
  12:3;13:15;30:16;
  32:8;52:17;62:22
**myself (3)**
  39:6;50:17;53:8

**N**

**name (7)**
  5:15;16:15,19,22;
  18:25;52:16,17
**names (1)**
  49:17
**National (1)**
  5:3
**near (4)**
  29:1,11;35:2;51:20
**need (3)**
  14:3,3;22:9
**needed (10)**
  20:25;21:25;22:2,
  3;28:4;32:3,3,12;
  39:7,8
**needs (1)**
  38:6
**New (48)**
  5:11;8:24,25;
  10:23,24;11:23;12:1,
  1,19;14:1;15:2,3;
  16:5,6,6,8;17:8,14,
  23,23,24,25,25;18:1,
  7,10,13;20:18;24:13,
  20,21,21;25:1,6,8,12,
  24;26:6,18;29:8;
  30:16;32:9;38:22;
  40:24;47:20;58:14;
  61:10;62:14
**Newport (1)**
  11:23
**next (9)**
  10:12;23:7;24:4,8,
  9;25:6;34:20;56:14;
  57:25
**Niagara (19)**
  4:3;21:13;23:1,14;
  44:14;49:11;51:20;
  52:11;55:6,12,21;
  56:25;57:22;59:17,
  21;60:5;62:3,10,18
**NICHOLAS (1)**
  5:10
**Nobody (2)**
  42:21;45:22

**Nods (1)**
  6:5
**none (2)**
  42:21;61:19
**Nope (1)**
  4:22
**normal (1)**
  61:8
**normally (1)**
  25:4
**northeast (1)**
  11:25
**notations (2)**
  36:8,9
**notes (3)**
  35:19;36:12;60:3
**number (5)**
  39:1;54:15,16;
  56:14;57:16
**numbers (1)**
  54:5
**numerous (3)**
  7:11,19;31:4

**O**

**oath (2)**
  4:15;5:6
**Object (3)**
  19:15;42:13;47:12
**objection (4)**
  5:5;19:18;26:8;
  47:11
**objections (1)**
  4:18
**obligations (1)**
  43:13
**obviously (1)**
  16:25
**occasionally (1)**
  6:4
**occurred (7)**
  18:22;19:13,17;
  44:19;45:4;48:15;
  49:7
**off (12)**
  7:15;8:7,9;18:6;
  24:24;30:10;37:15,
  18;38:11;40:8,10;
  45:16
**office (2)**
  12:5,6
**officer (1)**
  5:5
**official (1)**
  20:22
**old (17)**
  17:9;18:6,16;22:3;
  25:2,3,7,13;27:6;
  28:22;29:7;47:5;
  51:4;52:6,9;58:17;
  62:13
**once (3)**

16:11;49:6;50:12
**one (45)**
  9:2,13,23;10:6;
  16:11;17:1,16,20;
  19:5,22;20:3,7,18,21,
  23;23:2;24:13;25:6,
  7,12,13,25;29:21;
  30:22;31:12;33:4,19;
  34:5;38:9;41:3;
  45:18;46:2;47:16,20;
  49:25;50:7,15;52:8;
  54:5,13;55:18;62:8,9,
  13,15
**only (13)**
  9:22;11:6;19:15,
  22;39:3;42:17,17;
  48:25;49:2,18;55:9,
  10;58:3
**Onondaga (1)**
  6:23
**on-site (1)**
  60:6
**on-the-job (1)**
  7:14
**open (4)**
  27:12;28:6,18;29:2
**operators (1)**
  51:12
**opposed (4)**
  7:15;18:12;51:6;
  55:12
**order (3)**
  26:5,6;47:19
**ours (2)**
  29:1;33:5
**out (26)**
  8:12,21;9:19;
  13:19;17:9,24;20:2,
  20,24;21:8,20;22:3,
  22;25:8,9;29:2;31:1;
  35:22;36:17;40:8;
  41:16;45:12;46:24;
  49:6;51:16;62:13
**outlined (1)**
  35:5
**outrigger (1)**
  32:18
**outriggers (1)**
  32:16
**over (24)**
  9:17,24;15:17;
  18:6;20:12;25:19;
  31:3;33:11;34:4,14;
  35:4,5;37:13,24;38:3,
  14,18;40:18,20;
  45:24;46:9;47:3;
  62:11,13
**overall (3)**
  16:15,18;38:6
**overseeing (4)**
  11:16;13:15,22;
  53:14
**Overtime (2)**

Case 1:19-cv-01583-WMS-JJM    Document 32-8    Filed 09/15/21    Page 71 of 74

ALAN WALTER vs.                                                          DAVID PIRRO
CSX TRANSPORTATION, INC.                                              February 10, 2021

59:7,9
**own (2)**
  53:21;60:14
**owned (3)**
  28:20,23;29:3

**P**

**PA (2)**
  11:24;12:14
**packet (5)**
  35:3;37:11,12,24;
  54:9
**page (3)**
  55:24;57:16,25
**paid (2)**
  58:21;60:1
**paragraph (2)**
  56:6,14
**park (1)**
  27:15
**part (24)**
  7:3;9:13;10:18;
  11:25;15:6,8,20;
  16:12;17:5,10;18:8;
  19:25,25;20:2;22:11;
  24:5;25:10;26:19;
  27:23;31:2,15,24;
  59:15;62:12
**particular (2)**
  20:6;37:6
**parties (2)**
  4:13,15
**parts (2)**
  28:10,10
**past (3)**
  22:18;32:18;55:7
**payroll (1)**
  37:5
**people (10)**
  20:11;33:20;34:2,
  4,5,6,7;38:4;42:22;
  49:23
**per (1)**
  14:6
**percent (4)**
  31:12;33:19;50:7;
  62:8
**perfect (1)**
  5:23
**performed (1)**
  43:12
**period (4)**
  7:1;10:11;47:10;
  52:24
**person (5)**
  42:6;49:19;50:15;
  52:22;53:2
**pertain (1)**
  41:10
**phase (12)**
  4:4;16:24;17:10;
  18:8;29:20,20,21,23;

30:2,3,24;31:3
**phases (4)**
  17:1,3;29:19;42:20
**Phil (5)**
  22:25;43:19;53:25;
  61:14
**photographs (2)**
  60:15;61:16
**pick (2)**
  45:22,24
**pictures (5)**
  60:18,20,22;61:9
**piece (6)**
  27:1;28:19;30:18;
  38:21;58:14,19
**pieces (1)**
  24:23
**PIRRO (5)**
  5:10,15;15:1;
  23:17;37:20
**place (2)**
  21:7;26:6
**plaintiff (2)**
  5:16;48:2
**plan (5)**
  26:16;27:4;35:16,
  18;62:17
**planned (1)**
  46:23
**planner (1)**
  36:11
**planning (2)**
  13:17;33:24
**Please (3)**
  5:6,20;14:16
**plenty (1)**
  7:8
**plus (4)**
  7:12;9:4;29:16,16
**pm*** (1)**
  62:24
**point (15)**
  14:11;17:18,18,21;
  19:3,6,11;25:17;
  31:3;37:25;42:2;
  51:16;55:9,10;56:3
**portion (2)**
  26:21;38:18
**position (8)**
  7:21;8:3,4,4;9:10;
  10:12;13:2,25
**positive (2)**
  15:9;61:5
**positively (2)**
  29:6;31:14
**possible (1)**
  18:14
**PowerPoint (2)**
  4:4;40:17
**practices (1)**
  56:21
**pre (2)**
  18:3;40:18

**prep (1)**
  25:16
**prepared (1)**
  38:14
**presentation (2)**
  4:4;40:17
**president (1)**
  57:23
**presuming (1)**
  21:7
**Pretty (6)**
  13:15;21:12;30:16;
  32:8;46:25;60:20
**prevention (1)**
  56:5
**previously (1)**
  47:17
**prior (2)**
  17:3;22:10
**probably (18)**
  6:25;13:12;14:9;
  18:15;20:10;21:10;
  31:13;33:3;37:11;
  41:15;42:25;46:24;
  47:2,23;52:2;53:8,8;
  60:18
**problems (1)**
  15:11
**procedure (1)**
  61:8
**proceed (1)**
  5:1
**professional (4)**
  32:5;51:11,12,12
**program (4)**
  7:2,10;17:6;22:12
**progress (1)**
  29:17
**project (11)**
  15:5;16:10,13,15;
  18:8;19:25;21:14;
  24:5;29:15;54:22;
  59:15
**projects (2)**
  13:17;23:22
**pronouncing (1)**
  14:13;21:23
**proper (2)**
  11:18,19
**properly (1)**
  6:2
**property (5)**
  28:19,23;29:5,7,9
**protection (1)**
  32:15
**protocol (1)**
  60:14
**provided (6)**
  39:21;56:22,25;
  57:5;58:4;62:3
**provisions (3)**
  20:19;40:3;56:4
**PTC (5)**

15:8,20;16:20;
  17:5;22:12
**Public (1)**
  5:4
**publication (1)**
  56:9
**pull (1)**
  9:2
**pulled (2)**
  33:1,2
**purchasing (2)**
  57:19,20
**purpose (2)**
  21:24;33:23
**pursuant (5)**
  5:3;43:12;58:4;
  59:3,16
**put (24)**
  8:25;13:5;15:19;
  16:5,8;17:24;18:1;
  22:2,3;24:12,12,14,
  17,23;25:3,6;32:12;
  40:18;46:8;47:19;
  50:24;59:23;60:11;
  62:14
**putting (7)**
  18:13;25:18,21;
  29:25;30:1,17;50:14

**Q**

**quality (1)**
  32:7
**quarterly (1)**
  8:19
**quite (1)**
  58:22
**quote (1)**
  47:12

**R**

**railroad (3)**
  9:18;15:16;16:4
**railroads (1)**
  15:17
**raise (2)**
  26:17,21
**ran (2)**
  24:20;25:7
**rate (2)**
  59:2,8
**read (2)**
  4:11;58:22
**reading (1)**
  4:10
**Ready (8)**
  7:18;25:12;29:18;
  32:3,19;34:9,19;47:3
**real (1)**
  10:4
**realized (1)**
  38:9

**really (4)**
  6:6;14:2;33:15;
  57:7
**reason (4)**
  18:12;33:12;42:7;
  62:4
**recall (2)**
  33:21;42:2
**received (1)**
  39:10
**recognize (2)**
  23:18;40:14
**recollection (2)**
  34:22;41:21
**record (13)**
  5:2,7,8;8:9;14:10,
  22;37:15,18;38:10,
  11;40:8,10;43:11
**records (2)**
  37:3,5
**recycling (2)**
  46:13;52:20
**referee (1)**
  4:16
**referring (1)**
  20:16
**regarding (2)**
  27:9;53:21
**regardless (1)**
  34:14
**region (4)**
  13:8,9,9,10
**regional (2)**
  13:10,13
**regions (1)**
  13:9
**related (2)**
  6:20;51:21
**relation (1)**
  30:3
**relied (1)**
  32:6
**remain (1)**
  12:18
**remember (9)**
  32:23;34:11;42:1;
  46:8;47:21;48:1;
  50:5;52:14;59:23
**remotely (1)**
  5:6
**removal (5)**
  47:5,20;58:9,17;
  61:10
**remove (1)**
  27:6
**removed (2)**
  18:9;45:7
**removing (1)**
  62:12
**rep (3)**
  50:1,2,8
**rephrase (2)**
  5:21;26:16

Case 1:19-cv-01583-WMS-JJM    Document 32-8    Filed 09/15/21    Page 72 of 74

ALAN WALTER vs.                                                    DAVID PIRRO
CSX TRANSPORTATION, INC.                                    February 10, 2021

**replace (1)**
18:18
**replaced (6)**
15:3,25;16:2;18:9;
20:4,18
**replacement (3)**
16:19;17:4,11
**report (7)**
43:8;48:17,19,20,
23;49:4,6
**reported (3)**
44:5,10;48:13
**REPORTER (11)**
4:6,9,20,23;5:1;
6:1;14:15,18,21;
57:11,13
**represent (1)**
5:16
**representative (2)**
14:23;21:9
**representatives (1)**
62:5
**request (1)**
57:9
**requested (1)**
61:18
**require (1)**
60:5
**required (1)**
8:20
**requirements (4)**
40:4;41:9;44:5;
53:19
**reserved (1)**
4:19
**respect (22)**
20:9;24:8;25:15,
21;26:3,4;35:23;
36:4,21;38:14,20,21;
39:1,22;40:4;43:9;
51:4;53:13,20;54:22;
61:10;62:19
**respective (2)**
4:13,15
**response (1)**
43:13
**responsibilities (1)**
53:21
**responsibility (3)**
15:1,4;50:9
**responsible (4)**
10:21;11:22;12:24;
50:9
**result (1)**
48:16
**reused (1)**
46:12
**reviewed (1)**
56:11
**riggers (1)**
51:12
**Rigging (11)**
21:5,16;24:6;25:6,

18;31:18;42:21;
49:12;55:4,5;58:6
**right (30)**
12:4;19:10;21:23;
23:4,23;26:7;27:25;
33:3,13;34:14;35:15;
36:10;37:17,20;40:7;
44:7;47:9;48:13;
49:10;50:22;52:12;
54:10,15;55:12,13,
17;56:2;57:20;58:10;
62:16
**right-of-ways (1)**
22:5
**Road (3)**
5:11;32:23,24
**role (1)**
10:15
**rolling (1)**
16:10
**room (4)**
4:21,24;14:19;46:7
**routine (1)**
57:3
**rule (1)**
6:3
**rules (2)**
56:20;60:13
**run (3)**
17:25;25:9;45:17
**runaway (1)**
15:12
**rusted (1)**
18:16

# S

**safe (2)**
51:16;56:21
**safely (3)**
11:19;22:6,9
**safety (19)**
7:13;11:20;31:16;
40:3;41:9;42:6;
49:23,23;50:1,2,8;
51:5;53:21;55:25;
56:20;60:6,13,14;
62:17
**Safeway (2)**
56:15;57:10
**same (9)**
10:14;19:7;29:20;
40:23;41:5;47:5;
49:14;55:14,16
**Saturday (8)**
25:5;26:5,11,17;
32:11;34:4;35:4,13
**saw (1)**
35:20
**saying (3)**
6:5;55:21;60:24
**school (1)**
7:15

**scrap (1)**
46:11
**se (1)**
14:6
**search (2)**
43:12;61:17
**second (7)**
8:8;25:16;37:16;
52:8;54:8;57:15;
62:15
**Section (11)**
5:3;8:16;10:20;
16:4,17;46:2,4,5;
54:16;55:24;58:8
**Security (1)**
23:9
**seeing (3)**
34:1;41:21;47:21
**sees (1)**
9:7
**selecting (1)**
28:1
**send (3)**
31:16;34:5;62:5
**sending (1)**
7:15
**sense (1)**
26:14
**sentence (1)**
54:19
**separate (4)**
52:5,10;58:12;
59:17
**September (2)**
6:14;7:21
**Service (2)**
5:4;62:14
**services (3)**
58:2,3,8
**set (11)**
16:11,12;22:6;
26:9;27:10;29:4;
32:19;33:18;41:22;
46:5;59:13
**setting (6)**
28:14;32:16,21;
33:11;35:11;36:22
**setup (4)**
34:15;39:25;41:25;
52:19
**seven (3)**
32:1,13;33:7
**several (3)**
19:23;41:15;42:19
**shall (1)**
54:19
**shear (1)**
52:3
**shears (1)**
46:10
**shifted (1)**
50:13
**shifts (1)**

34:3
**show (5)**
6:6;21:24;22:1,22;
37:6
**showed (2)**
20:24;24:3
**shut (1)**
18:6
**side (11)**
8:22;9:23;10:20,
23;11:1,2,3;24:24;
25:22;45:25;46:2
**sides (3)**
9:23;24:14,17
**sign (1)**
4:11
**signal (51)**
7:12,22,22,24;8:2,
5,13,16,22;9:5,7,8,
14;10:11,13;11:4,8,
11,14,22;12:7,8,18,
20,25;13:3,5,8,10,13,
23,25;14:6;15:2;
17:4,14;24:21;25:1,2,
3;27:6;30:1;35:6;
37:25;38:3,3,18;
49:25;53:11;58:10;
62:14
**signals (16)**
8:11,24,25;9:25;
10:4;15:2;16:6;18:1,
2,13;19:8,24;24:25;
30:1;31:4;45:24
**signed (5)**
22:21;57:4,6,17,23
**signing (2)**
4:10,16
**similar (1)**
17:7
**simple (1)**
47:15
**simply (1)**
17:11
**single (1)**
9:24
**site (5)**
33:23;37:4;52:23,
25;53:2
**situation (1)**
15:25
**Six (2)**
59:4,4
**sixteen (2)**
45:15,15
**sixty (1)**
18:15
**small (1)**
12:6
**smaller (2)**
47:18,21
**Social (1)**
23:9
**solely (2)**

38:14;51:5
**somebody (7)**
14:4;32:13;43:1;
45:18;49:2;50:16;
51:2
**someone (7)**
14:9;15:3;27:2;
44:3,7,8;48:14;60:23
**Sometimes (1)**
5:21;14:2;36:7
**somewhere (2)**
7:16;42:16
**sorry (11)**
12:8;16:24;26:13;
27:19;30:14;38:3;
49:21;52:8;57:15;
58:24,25
**sort (1)**
32:14
**sounds (1)**
56:15
**southern (1)**
13:9
**specific (6)**
16:22;19:11;24:5;
36:1;52:22;53:2
**specifically (5)**
15:19;31:16;32:20;
48:10;51:7
**spell (1)**
14:15
**spoke (1)**
42:14
**spoken (1)**
45:2
**spot (1)**
22:5
**SR-2133299 (1)**
23:4
**staging (1)**
28:9
**standard (1)**
47:7
**standards (2)**
9:18;13:22
**start (1)**
27:14
**started (4)**
10:12;11:6;16:3;
31:25
**state (1)**
5:6
**statement (1)**
43:22
**stayed (2)**
12:2,2
**steel (1)**
18:16
**still (5)**
13:19,19;19:7;
33:17;52:7
**stipulated (1)**
4:14

ALAN WALTER vs.
CSX TRANSPORTATION, INC.

DAVID PIRRO
February 10, 2021

**stipulations (1)**
4:12
**stop (1)**
15:11
**stopped (1)**
50:6
**straight (2)**
10:1;30:13
**street (1)**
27:13
**streets (1)**
30:7
**strike (2)**
25:16;49:21
**structure (3)**
40:24;58:18;60:20
**structures (1)**
58:9
**stuff (9)**
16:7;17:9,9;18:6,7;
22:5;31:22;32:19;
53:12
**subcontractor (5)**
44:4,9;51:14;55:3,
6
**subcontractors (5)**
50:10;53:15,20;
54:17,21;55:1
**submit (1)**
54:20
**subsidiary (1)**
21:15
**Sunday (4)**
25:6;26:12;31:8;
34:5
**supervising (1)**
12:24
**supervisory (1)**
10:15
**supply (1)**
4:6
**supports (1)**
25:22
**supposed (3)**
13:17;18:5;26:21
**supposedly (1)**
15:7
**Sure (35)**
4:8;6:19;11:17,18;
13:16,18,21;18:4;
19:21;25:22;28:25;
31:8;32:10,13,15;
34:8,19;36:3;37:16;
39:19;47:12,22;
48:18;49:5;50:19,20;
52:3,21;53:9,10,12;
60:18,20,24;61:1
**surrounding (2)**
5:19;51:6
**survey (1)**
20:10
**suspension (1)**
38:3

**swing (1)**
45:24
**Switch (6)**
9:1,12,13;17:19,19,
24
**sworn (1)**
5:12
**Syracuse (2)**
12:6,12

**T**

**table (1)**
62:8
**tabs (1)**
61:25
**talk (9)**
8:11;9:1;10:9;
15:18;19:10;41:24;
42:14;44:21;51:2
**talked (6)**
13:7;24:11;39:5;
44:13,17;48:2
**talking (10)**
8:12,13;16:19;
19:23;20:17;26:10;
28:18;37:12,16;
46:16
**talks (6)**
38:1;56:3,14;58:2,
5,8
**team (3)**
10:25;11:15;14:5
**teams (3)**
11:16;24:11;25:25
**tear (1)**
59:22
**telling (1)**
39:7
**tells (1)**
9:11
**ten-hour (1)**
34:3
**Terminal (2)**
4:3;16:24
**terms (2)**
8:12;30:7
**test (1)**
18:4
**testified (1)**
5:12
**testimony (2)**
30:15;47:17
**testing (2)**
8:18;10:21
**tests (2)**
8:19,20
**thanks (2)**
54:2;62:23
**though (1)**
58:7
**thought (1)**
55:16

**thousand (2)**
58:22;59:2
**three (10)**
13:9;16:24;17:10;
18:8;21:10;29:22;
30:3;42:20;45:9;
59:17
**throughout (2)**
15:21;29:15
**Thursday (1)**
34:3
**times (4)**
7:19;41:15,16;
50:17
**timing (1)**
26:9
**title (1)**
57:19
**today (1)**
36:13
**together (6)**
24:23,24;40:18;
47:19;50:25;59:24
**told (1)**
43:1
**took (3)**
25:7;59:23;62:6
**top (3)**
30:10;46:6,8
**touching (1)**
46:1
**towards (1)**
53:21
**track (19)**
8:16,17;9:2,6,12,
13,18,24;10:20;
17:20;20:14;25:8,9;
32:1,14,14;33:4;
50:20;51:6
**tracks (9)**
19:5,7,8;24:15,15,
17;25:9,19;29:1
**trade (2)**
8:1,2
**trailer (1)**
48:10
**train (6)**
9:7,8,16;15:9,12;
22:8
**training (7)**
7:5,6,8,13,14,17;
10:18
**trains (11)**
8:14;9:1,6,12,13,
16;15:11;17:20;
45:18,19;51:6
**transcript (2)**
4:17;6:6
**transport (1)**
42:4,8
**Transportation (4)**
4:2;6:12,17;23:14
**transported (1)**

28:11
**travel (1)**
13:19
**traveling (1)**
33:23
**treated (1)**
55:18
**treatment (1)**
48:7
**trial (1)**
4:19
**triple (1)**
31:7
**tripping (1)**
42:23
**trouble (3)**
8:21,22;10:22
**trucks (1)**
28:9
**trying (2)**
5:22;20:2
**turn (2)**
18:7;55:24
**twelve (3)**
6:14,15;45:15
**two (10)**
4:25;11:6,7;17:1;
19:5,7;29:20,21;
31:2;56:14
**Two-year (1)**
6:22
**type (5)**
9:16;15:12;28:1,4;
61:9
**types (4)**
9:20,21;30:22;
50:24

**U**

**under (5)**
5:2;54:16;56:6;
58:1,7
**underlined (1)**
56:7
**units (1)**
9:24
**unless (1)**
59:8
**unsafely (1)**
51:15
**unusual (2)**
46:19,22
**up (51)**
6:6;8:5;9:3,19;
10:1,8;11:25;12:2,2;
16:4;17:9;18:2,3;
22:6;23:7;24:20;
25:3,6,12,18,22;26:5,
9,18;27:10;28:14;
29:5;32:12,16,19,21;
33:11,18,21;35:3,11;
36:22;37:24;41:22;

45:10,11,23,24;
46:11;47:1,3;50:14;
52:5,9;59:13;60:11
**upon (1)**
29:7
**upper (1)**
23:3
**uprights (3)**
9:23;24:14,17
**use (2)**
12:5;28:7
**used (8)**
9:15;27:23;42:3,8;
47:4,6,18,20
**usually (3)**
15:5;45:13;46:5

**V**

**various (1)**
11:16
**vehicles (1)**
42:7
**verbal (1)**
6:5
**VFW (2)**
41:3,3
**view (1)**
37:25
**Virginia (1)**
11:24
**visit (1)**
13:20

**W**

**wait (1)**
5:24
**waived (2)**
4:16,17
**Walden (1)**
41:3
**waste (1)**
61:14
**watching (1)**
51:3
**way (15)**
6:16;9:6;14:8,14;
18:4;22:4;24:7;30:8;
45:8;46:24;51:15,17;
54:6;62:9,14
**ways (1)**
15:11
**wayside (2)**
9:25;18:2
**week (2)**
28:15;52:4
**weekend (1)**
42:19
**week-long (1)**
7:19
**weeks (2)**
11:6,7

**welcome (1)**
  57:13
**weren't (1)**
  33:5
**west (2)**
  13:9;30:5
**What's (3)**
  6:21;21:3;53:4
**Whereupon (2)**
  4:1,12
**Wherever (1)**
  12:16
**whole (6)**
  16:3;29:2,3,15;
  42:19;45:23
**who's (1)**
  14:11
**wide (1)**
  22:7
**width (1)**
  22:4
**wire (1)**
  18:3
**wired (1)**
  24:25
**wires (2)**
  24:21;25:9
**wiring (2)**
  34:8;53:11
**within (6)**
  13:6;16:16;32:1,
  13;33:7;47:2
**witness (12)**
  4:9,24;5:6;21:3,5;
  27:19;35:12,15;
  42:17;54:1;61:1,5
**wondering (1)**
  58:1
**wood (1)**
  44:11
**word (1)**
  20:22
**words (2)**
  16:11;38:19
**work (89)**
  12:7,10,16;13:18,
  20;15:21;17:5,11;
  18:4,5,25;19:16;20:4,
  9,16,17,20;21:25;
  22:10,11,15,17;
  23:24;25:15,16,21,
  24;27:6,23;28:11;
  29:19;30:2,3,16,25;
  31:1,17,18,19;34:2,2,
  6,16,20;35:1;36:1,4,
  9,21,25;37:3;38:15,
  20,25;39:11,15,22;
  40:4;41:7,10;46:19;
  47:16;50:3,10,12,18;
  51:7,11,15,20;52:9,
  15;53:6,14;54:22;
  55:1,22;59:2,9,12,17,
  20;60:6,15,17;61:9;

62:11,13,19
**worked (2)**
  6:13;19:12
**worker (1)**
  7:22
**working (11)**
  10:24,24;14:6;
  33:14,17;38:5;41:22;
  44:4,8;52:7;55:11
**works (2)**
  8:1,1
**write (2)**
  36:13,16
**writing (2)**
  36:1,4
**written (2)**
  35:16,18
**wrong (2)**
  55:14,15

### Y

**yard (1)**
  46:11
**year (4)**
  7:13;42:25,25;49:1
**yearly (1)**
  8:19
**years (8)**
  6:15,15;18:16;
  20:10;30:13;32:8;
  45:10;47:22
**yellow (1)**
  61:25
**Yep (8)**
  30:5;43:20;46:24;
  54:11,18;56:1,7;60:2
**York (2)**
  5:11;12:1

### 0

**07 (1)**
  6:25
**08 (4)**
  6:14,25;7:21;10:12

### 1

**12 (1)**
  54:16
**13027 (1)**
  5:11

### 2

**20 (1)**
  8:17
**2005 (1)**
  6:25
**2006 (1)**
  7:1
**2012 (1)**

11:11
**2017 (8)**
  21:8;26:5;28:14;
  29:12;36:22;37:1;
  50:4;57:10
**20th (1)**
  26:5
**21 (5)**
  21:8;28:14;29:12;
  30:15;36:22
**21st (19)**
  26:9;31:10;32:21;
  33:10,18,23;35:2,10,
  20;36:5;37:1;39:12,
  23;40:5;41:11,14;
  51:23;52:24;59:13
**22nd (10)**
  26:11,17,20;38:15,
  21,25;39:11;40:21;
  46:20;51:25
**23rd (10)**
  26:12;27:5;38:15,
  17;39:15;46:20;
  51:25;52:4,24;59:21
**24th (1)**
  59:25
**27th (1)**
  40:19

### 3

**3 (1)**
  4:4
**3026 (1)**
  5:10
**31 (1)**
  30:21
**319 (1)**
  5:3

### 4

**436 (2)**
  19:1,4

### 7

**707 (1)**
  45:17
**79 (1)**
  54:9

### 8

**83 (1)**
  54:15
**85 (1)**
  55:24

### 9

**93 (1)**
  57:16

**94 (1)**
  54:9