# EXHIBIT 3

1    UNITED STATES DISTRICT COURT

2    WESTERN DISTRICT OF NEW YORK

3    ------------------------------------------------

4    **ALAN WALTER,**

5         Plaintiff,

6    -vs-                         19-CV-01583-WMS-JJM

7

8    **CSX TRANSPORTATION INC.,**

9         Defendant.
     ------------------------------------------------

10              Examination Before Trial of

11   **RICHARD RYDZA,** held before Jennifer A.

12   Drakulich, Notary Public, at DePaolo Crosby

13   Reporting Services, 135 Delaware Avenue, Suite

14   301, Buffalo, New York, on Wednesday, October

15   21st, 2020 at 12:50 p.m., pursuant to notice.

16

17

18

19

20

21

22

23

1      **A P P E A R A N C E S**

2      APPEARING FOR THE PLAINTIFF:

3                  **LOTEMPIO P.C. LAW GROUP**
                   **BY:  HEATHER BAUMEISTER, ESQ.,**
4                  181 Franklin Street
                   Buffalo, New York 14202
5                  (716) 855-3761

6      APPEARING FOR THE DEFENDANT:

7                  **NASH CONNORS, P.C.**
                   **BY:  PHILIP M. GULISANO, ESQ.,**
8                  344 Delaware Avenue
                   Suite 400
9                  Buffalo, New York 14202
                   (716) 842-4121

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1
                       **W I T N E S S E S**
     WITNESS              EXAMINATION              PAGE
2
     RICHARD RYDZA
3
                    By Ms. Baumeister        4, 30
4                   By Mr. Gulisano             19

5
                       **E X H I B I T S**
6    EXHIBIT           DESCRIPTION            PAGE

7     (No exhibits marked)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

1    **R I C H A R D    R Y D Z A**

2    110 Labelle Avenue, Blasdell, New York 14219

3    having been first duly sworn, was examined and

4    testified as follows:

5

6    **EXAMINATION BY MS. BAUMEISTER:**

7    Q. Mr. Rydza, my name is Heather Baumeister.  I

8       represent Alan Walter with respect to the

9       injuries he sustained from the accident on

10      July 21st, 2017.  I'm just going to ask you a

11      couple questions today to find out what

12      happened.  Have you ever given a deposition

13      before?

14   A. Yes.

15   Q. I'll just go over the ground rules just so

16      we're all on the same page.  The court

17      reporter here is going to take down everything

18      that's said.  She can only take down one

19      person at a time.  If you let me finish my

20      question before you answer, that's the best

21      way to go.  She can't take down head nods

22      or --

23   A. Correct.

RICHARD RYDZA

1    Q.  -- shoulder shrugs or anything like that, so

2        verbal responses.  If I ask a question that

3        you don't understand, just let me know and

4        I'll rephrase it so we're all on the same

5        page.  Okay?

6    A.  Yes.

7    Q.  What's your date of birth?

8    A.  June 7th, 1961.

9    Q.  Can you give me a little bit of your education

10       history?

11    A.  I have a two-year degree in criminal justice,

12       two-year degree in occupational health and

13       safety and industrial hygiene, four-year

14       degree, dual degree, in environmental

15       engineering technology and safety in

16       engineering technology.  I'm also a New York

17       State certified building and fire inspector

18       with all these sorts of certifications you

19       need to run a business.

20    Q.  Where are you currently employed?

21    A.  Thermo Fisher, Grand Island.

22    Q.  All right.  So at Thermo Fisher, when did you

23       start there?

RICHARD RYDZA

1    A. March 23rd, this year, 2020.

2    Q. Okay.  What position do you have?

3    A. Environmental health and safety specialist.

4    Q. And where did you work before that?

5    A. Aurubis.

6    Q. Okay.  When did you start there?

7    A. Asking me for a date.  I was there three

8       years, so sometime in 20 -- when I left

9       Clark's.  2016 it was sometime.  I went from

10      Clark to there.

11   Q. Okay.  So you were at Clark Rigging.  When did

12      you start there?  If you can approximate.

13   A. Don't recall exactly.  Maybe 2015, 2014.  I'm

14      not going to remember.

15   Q. So either 2014 or --

16   A. That could even be wrong.

17   Q. Okay.  Do you remember what positions you had

18      when you were there?

19   A. At which one?

20   Q. Sorry.  Clark.

21   A. Yes.  Environmental health and safety.  They

22      call me a director.

23   Q. Okay.

RICHARD RYDZA

```
 1    A.  I think the exact title was risk and safety

 2        manager.

 3    Q.  Okay.  And did you hold that position

 4        throughout your entire time at Clark?

 5    A.  Yes.

 6    Q.  Okay.  And you said you left there around

 7        2016?

 8    A.  Yes.  Could be.

 9    Q.  All right.  On July 21st, 2017, do you

10        remember what project was being done on that

11        day?

12            MR. GULISANO:  Can we just clarify?

13        First of all, he said he left in 2016.

14            THE WITNESS:  End of 2016 sometime.

15            MR. GULISANO:  And now you're

16        questioning him on something that has happened

17        in 2017 --

18            MS. BAUMEISTER:  Oh.  I see.

19            MR. GULISANO:  So technically, by his

20        testimony, he wasn't employed by Clark at that

21        time, so maybe he was, but maybe he wasn't.

22    Q.  Were you employed by Clark on July 21st, 2017?

23    A.  I probably was.  I may have been, but I don't
```

RICHARD RYDZA

1        remember the exact dates.

2    Q. Okay.  Were you employed by Clark Rigging on

3        the day that Alan Walter was injured?

4    A. Yes.

5    Q. Okay.  And you were on the job site that day?

6    A. No, I was not.

7    Q. Do you remember where you were?

8    A. I was at another job site, then came to the

9        Clark main office and was requested to respond

10       to an incident that just happened at a job

11       site -- CSX job site.

12   Q. Okay.  Do you know what the project was on the

13       job site for CSX?

14   A. Clark had the contract to remove all the

15       towers -- the old existing towers for CSX, so

16       I believe that was one of the locations they

17       were setting up and stationing the crane to

18       remove one of the towers.

19   Q. And do you know if that was CSX's property

20       they were on?

21   A. I have no idea whose property.  It was -- may

22       I continue?

23   Q. Oh.  Yes.

RICHARD RYDZA

1    A. I know there's a roadway and a sign that says

2       CSX, but it doesn't indicate whether it's the

3       property or not being so far from the tracks.

4    Q. But the job that the project that was being

5       done was for tracks that are on the property

6       -- strike that.  You don't have to answer

7       that.  Okay.  Do you know what equipment was

8       being used on on that day?

9    A. There was a crane, I can recall.  There's

10      other equipment than a crane being offloaded

11      on the flatbed trailer, so there was a

12      semitrailer and a tractor.  And then there was

13      other ancillary equipment used to lift items

14      up and place them into position.

15   Q. Okay.  So you said you were not on the job

16      site at the time Mr. Walter was injured; is

17      that correct?

18   A. Correct.

19   Q. Okay.  But you had said that you were called

20      to the job site after he was injured?

21   A. Correct, and I did get there and he was still

22      there.  He was still waiting for an emergency

23      vehicle to respond, I guess.

RICHARD RYDZA

1    Q. Do you remember about what time that was?

2    A. Later in the afternoon.  I can't pinpoint a

3       time.

4    Q. Okay.  So when you got there, could you just

5       recount what you remember happened?

6    A. Drove up a roadway, access to the rail yard or

7       the rail tracks.  I remember seeing a flatbed

8       with a semitrailer there.  Al was sitting on

9       the edge of the back of the trailer.  I don't

10      remember where the crane was positioned at

11      all.  That's kind of what I observed as I was

12      approaching.

13   Q. Okay.  Did you see the trailer at all when you

14      got there?

15   A. Yes.

16   Q. Okay.  I'm going to show you what's marked as

17      Exhibit B.  Can you identify what's in that

18      picture?

19   A. It is a semitrailer.

20   Q. Okay.

21   A. A flat semitrailer bed.

22   Q. Is that an accurate representation of the

23      trailer that was on the job site that day?

RICHARD RYDZA

1    A. Refreshing, yes.

2    Q. Okay.  I'll show you what's marked as Exhibit

3       C.  Could you tell me what's in that picture?

4    A. Appears to be the same semitrailer flatbed.

5    Q. Is that a true and accurate representation of

6       what it would have looked like when you

7       arrived there?

8    A. Yes.  Refreshed me as to where the crane was,

9       too.

10   Q. Okay.  So when you got there, Mr. Walter was

11      sitting on the side of the trailer.  Did he

12      indicate to you that he was injured?

13   A. Yes.

14   Q. He did.  Do you remember what he said?

15   A. Says his back hurts really bad, had difficulty

16      moving and ambulating, so I said wait for an

17      emergency vehicle.

18   Q. And he went in the emergency vehicle.  Do you

19      know if he returned?

20   A. I don't remember.  I don't recall what

21      happened after that.  I'm sorry.

22   Q. Three years ago, too.  It's a long time to

23      remember.  So when you got to the job site,

RICHARD RYDZA

1          you said the plank was -- the plank was

2          missing in the trailer bed at the time when

3          you got there?

4     A.  Yes, it was.  He identified that as the area

5          where he fell through the vehicle or the

6          trailer.

7     Q.  Okay.  And when you got there, was there

8          anything on the trailer?

9     A.  No.  Nothing.

10    Q.  No.  Okay.  Do you know if anyone replaced the

11         board after?  The missing plank in the

12         trailer?

13    A.  I have no idea, but I put out a warning a

14         couple weeks ago that those flatbed trucks and

15         trailers needed to be complete throughout and

16         throughout, that all the decking needed to be

17         finished to give no opportunities for any

18         pebbles, rocks, debris, or for people to fall

19         through, because I think we did have a near

20         miss on one where someone almost fell through

21         but didn't get injured.  That's why I put that

22         out.

23    Q.  And when you say a couple weeks before, do you

RICHARD RYDZA

1      mean a couple weeks before the July 21st, 2017

2      date of the accident?

3  A.  Yeah.  It could have been a month or two

4      before that.  The incidents with stones --

5      it's a requirement that those flatbeds are

6      finished and there's no opportunity for stones

7      to fly out of them, hit other vehicles -- any

8      other objects to come out of them.  Everything

9      needs to be secure on them.

10          I think it's Section 393 that also

11     states that -- it's not that section.  It's

12     the OSHA standard that openings greater than

13     one inch, they have to be -- because that's

14     considered a working surface, so there can be

15     no openings on there where somebody can fall

16     through that's greater than one inch in

17     diameter.

18  Q.  Whose job is it to make sure that the trailers

19     are up to code?

20  A.  It's everybody's responsibility --

21          MR. GULISANO:  Objection.

22          THE WITNESS:  Did you say something?

23          MR. GULISANO:  I just objected.  You can

RICHARD RYDZA

1          answer.

2     A.   It's everybody's responsibility technically.

3          So the driver -- this came from the Syracuse

4          warehouse, and I think I put out a memo there,

5          maybe an e-mail, demanding that I didn't want

6          to see any more of these flatbeds coming into

7          our area without being properly repaired

8          because then they're going to get a citation

9          and possibly damage other people's property

10          and equipment if things fall through those

11          penetrations.

12              So that was a Syracuse trailer.  So the

13          driver's responsible not to drive his truck

14          when it's out of compliance.  It's my

15          responsibility to go around and audit

16          facilities to make sure that I look for

17          non-compliance issues, and when I find them, I

18          usually put out an e-mail or hazard alert, and

19          it's also the owner's responsibility.

20              And when you're on a construction site,

21          it's also -- whoever you're working for, it's

22          their responsibility or their safety person to

23          make sure the equipment is coming onto their

RICHARD RYDZA

1          property in a safe manner also, so there's

2          multiple people responsible.

3      Q. You said this trailer came from the Syracuse

4          warehouse?

5      A. Yes.  It was driven by a Syracuse driver.  I

6          forget his name exactly.

7      Q. Would there have been anything on it at that

8          point in time?

9      A. There could have been -- the crane could have

10         been on it, most likely.  I'm guessing they

11         drove the crane on it possibly.

12     Q. Okay.  Do you know if any sort of accident

13         report was filled out?

14     A. Yes.  I generated an accident report.

15     Q. Do you know what typically goes in an accident

16         report or what you put in it?

17     A. It can be quite lengthy depending on the

18         person.  The name of the person, the date of

19         the injury, the time of the injury.  I'll take

20         pictures and put the pictures in with the

21         accident report I would take about what

22         happened.

23              The supervisor will also fill out their

RICHARD RYDZA

1     version of what happened if they were on site

2     at the time.  I'll take statements, so I think

3     I took a statement, a signed statement from

4     Alan as far as what happened, and one of the

5     other truck operators there.

6  Q. Okay.  Do you know who the supervisor was on

7     that day?

8  A. I do not recall.

9  Q. I'm sorry if I asked you this before, but do

10    you know if the trailer was repaired after?  I

11    did ask you this.

12  A. I don't recall if it was, but it better have

13    been.

14  Q. Okay.  Okay.  So your role at Clark Rigging is

15    as a director, or was as a director, at that

16    point in time?

17  A. Correct.  Manager, whatever you want to call

18    me.

19  Q. So you do a little bit of everything, then?

20  A. When you're hired in that position, you do the

21    environmental safety, the health.  You do all

22    their fit testing, so it's hands-on.  It's a

23    combination.

1    Q.  Okay.  And then with respect to trailers that

2        are used, those come from various warehouses

3        or various locations?

4    A.  Yes.  Depending on where the need is.  There

5        might be not enough trailers in the Western

6        New York area, and depending on what they need

7        to transport to and from each location on the

8        job site, those trailers might -- they might

9        stay in Buffalo.  They might move to

10       Rochester.  They might go to Syracuse.  They

11       might stay on the job site for a period of

12       time.

13   Q.  And then you had said that there's a

14       possibility that the piece of equipment could

15       have been on the trailer that was coming from

16       the Syracuse warehouse?

17   A.  Correct.  And again, I don't recall if they

18       were unloading it or loading it.

19   Q.  Okay.  That being said, is it fair to say that

20       no one at the Buffalo site would have been a

21       part of that loading within the Syracuse

22       office?

23   A.  Explain that.

RICHARD RYDZA

1    Q. So would it have been someone in Syracuse not

2       associated with the Buffalo, I guess, office

3       or sector, you could say?  Would it be someone

4       in Syracuse that would have potentially loaded

5       the piece of equipment on this trailer?

6    A. Correct.  And each location has their own

7       mechanic working on those trailers.

8    Q. Is it all Clark --

9    A. It's all Clark.

10   Q. -- Rigging?

11   A. Correct.

12   Q. And then do you know if the trailer that I

13      showed you in the pictures, if that was

14      brought directly to the job site at CSX?

15   A. Yes.

16   Q. It was.  Okay.

17   A. From Syracuse directly to the site, correct.

18   Q. Okay.

19          MS. BAUMEISTER:  I think that's all I

20      have.

21          MR. GULISANO:  You're not out of the

22      woods yet.

23          THE WITNESS:  I know.  I don't want to

RICHARD RYDZA

1          miss this appointment.

2                MR. GULISANO:  So I'll do my best to get

3          through it.

4

5          **EXAMINATION BY MR. GULISANO:**

6     Q. Just so I understand, you had no involvement

7          in the work being performed on the day of the

8          incident, correct?

9     A. Correct.

10    Q. Not to minimize your knowledge, but probably

11         at the time of the incident you had no idea

12         really what was taking place until the

13         accident was brought to your attention and you

14         went to investigate it.  Is that fair?

15    A. Correct.  Correct.

16    Q. With respect to the trailer, it's been

17         referred to as a lowboy trailer.  Do you

18         understand that term?

19    A. Yes.

20    Q. Okay.  How did you learn that that lowboy

21         trailer was brought from Syracuse?

22    A. Because a Syracuse driver -- it was advised

23         that's where it came from.

RICHARD RYDZA

```
 1    Q. What do you mean "it was advised"?
 2    A. It was advised from our central terminal that
 3       dispatches that that came from that location.
 4       It was a Syracuse driver that drove it to that
 5       location.
 6    Q. So what did you do to determine that?
 7    A. I asked our dispatch guy.  I asked everybody.
 8    Q. After the accident you asked the dispatch
 9       where the trailer came from and was told it
10       came from Syracuse, correct?
11    A. Correct.
12    Q. As you sit here right now, do you know when it
13       came from Syracuse what was on the lowboy
14       trailer?
15    A. I do not.
16    Q. Okay.
17    A. I don't recall.
18    Q. You don't know if it was loaded with something
19       or nothing.  Is that fair?
20    A. Yes.
21    Q. And do you know who the driver was that drove
22       from Syracuse to the Buffalo area?
23    A. Yeah, but I don't remember his name.
```

RICHARD RYDZA

1    Q. Was it Mr. Walter, the individual who was

2       injured?

3            MS. BAUMEISTER:  Objection.

4    A. That's who I assume was driving it.

5    Q. You assume that or learned that through your

6       investigation?

7    A. I was told that.

8    Q. So your recollection is -- and you understand

9       the person who claims he was injured in this

10      lawsuit was Mr. Walter, correct?  Do you

11      understand that?

12   A. Yes.  Now you're telling me that.

13   Q. And it's your understanding he drove it from

14      Syracuse to Buffalo?

15   A. Told.  Advised.

16   Q. Do you have any other information that leads

17      you to believe that's not true?

18   A. No.  I don't recall.

19   Q. Do you have any -- did your investigation

20      yield any prior complaints or problems with

21      this particular trailer?

22   A. Not the particular trailer, but other trailers

23      had similar issues.

RICHARD RYDZA

1    Q. Okay.  When you say similar issues, did your

2       investigation reveal that there were other

3       trailers that may have had some missing planks

4       on them?

5    A. Yes.  There was one where some product came

6       onto the highway and I got a complaint from a

7       driver requesting payment for damage to his

8       vehicle because the stones came off our truck.

9    Q. Any other instances?

10   A. Not that I recall.

11   Q. When you responded to the scene of this

12      incident at CSX, you talked to Mr. Walter and

13      he told you that he stepped in the area where

14      the plank was missing, correct?

15   A. Yes.

16   Q. All right.  Do you, as you sit here, have any

17      knowledge as to how that plank came off?

18   A. No, I do not.

19   Q. Do you, as you sit here, have any acknowledge

20      as to how long the plank was missing?

21   A. No, I do not.

22   Q. So you don't know if it came off in

23      transportation a long time ago or not.  Is

RICHARD RYDZA

1        that fair?

2    A.  That's fair, yes.

3    Q.  You indicated that you may have sent some

4        e-mails or memos.  Did you do that before this

5        particular incident of July 21st, 2017?

6    A.  Yes.

7    Q.  And what was the -- what was the substance of

8        those communications?

9    A.  From that incident, I took a picture of that

10       vehicle, a flatbed lowboy, that had a missing

11       plank and sent out a hazard alert, the DOT

12       standard, the New York State standard

13       requiring -- and the OSHA standard requiring

14       that there be no holes in the decking and they

15       shouldn't be transported until they're

16       repaired.

17   Q.  So do you believe that that notice went out at

18       some point before Mr. Walter's accident?

19   A.  Yes.  Definitely.

20   Q.  Did you send the notice out as a result of Mr.

21       Walter's accident?

22   A.  On top of that, I do send another hazard ID

23       alert out because I let everybody know about

RICHARD RYDZA

1      the injury and what happened and how it

2      happened.

3   Q. Do you recall doing it in this occasion?

4   A. Yes.

5   Q. Are drivers responsible to conduct an

6      inspection of their tractor and trailer before

7      operating it?

8   A. Yes.

9   Q. Would you have expected Mr. Walter to conduct

10     an inspection of his tractor and trailer prior

11     to operating it?

12  A. Yes.

13  Q. Would that include carefully examining the

14     trailer to make sure there are no known

15     problems or defects with it?

16  A. Yes.  Sometimes that can be difficult with

17     lowboys, the beds, because if there's a crane

18     on it, you're not going to see what's on the

19     decking under it sometimes.

20  Q. All right.  But you don't know what was on it

21     when he first got the trailer, correct?

22  A. Correct.

23  Q. Have you ever put out a hazard bulletin

RICHARD RYDZA

1      stating "do not use trailer decks as walking

2      surfaces"?

3   A. I don't recall.

4   Q. Do you agree with that statement, that you

5      should not use trailer decks as walking

6      surfaces?

7   A. No.

8   Q. You don't agree with that?

9   A. They are considered a walking-working surface.

10     You cannot physically do the work without

11     walking onto the deck to unbolt some of the

12     equipment when it's chained down, so then it

13     becomes a walking-working surface.

14  Q. So then the people should use them as

15     walking-working surfaces.  Is that what you're

16     saying?

17  A. They can be used as walking-working surface.

18  Q. Would you agree that in this particular case a

19     root cause was the driver's failure to inspect

20     the trailer using the pre-trip form?

21  A. I would say yes.

22  Q. Would you agree that a root cause or secondary

23     cause of this incident was the failure of Mr.

RICHARD RYDZA

1       Walter to watch where he was walking?

2            MS. BAUMEISTER:  Objection.

3    A. Secondary causes -- or the first one, if I may

4       elaborate on that first one.  As far as a root

5       cause, it would go down to the actual

6       procedure or the policy of the manager or the

7       owner who initiates a policy that from that --

8       that root cause is the procedure that that

9       individual is the secondary.

10           He should be doing the inspection, so

11      the inspection would be the secondary cause,

12      not the root cause.  The root cause of the

13      procedure is the maintenance mechanic did not

14      repair the item.

15   Q. That's fine.

16   A. I don't know if that matters.

17   Q. I'm not sure it matters or not, but let's just

18      answer my questions, if you can.  And if you

19      can't, just tell me you can't.  Question:  Do

20      you agree that a root cause was the driver's

21      failure to inspect the trailer using a

22      pre-trip form?

23   A. No.

RICHARD RYDZA

1    Q. You don't agree with that?

2    A. Not as the root cause.

3    Q. Do you believe that it's any cause?

4    A. It's a secondary.

5    Q. You believe that's the secondary cause?

6    A. Yes.

7    Q. What about the driver's failure to watch where

8       he is walking?  Do you believe that's any

9       cause in this accident?

10   A. Yes.

11   Q. What kind of cause do you believe that is?

12   A. Secondary.

13   Q. Do you believe this is a true statement:  The

14      best prevention to getting hurt is yourself?

15   A. It's a common statement, yes.

16   Q. Do you agree with that?

17   A. Yes.

18   Q. Do you agree that workers should plan their

19      steps?

20   A. Yes.

21   Q. Okay.  And they should look ahead and plan

22      their steps by watching for hazards such as

23      protruding screws, nails, stones, or anything

RICHARD RYDZA

1          that could create a slip, trip, or fall?

2     A. Yes.

3     Q. Do you agree with that?  And that includes Mr.

4          Walter in this particular incident, correct?

5     A. As being a what?

6     Q. That would apply to him as being an employee.

7     A. Yes.

8     Q. That he should do those things.

9     A. Yes.

10    Q. Do you know why Mr. Walter was walking on the

11         surface of the lowboy trailer?

12    A. Yes.

13    Q. Why is that?

14    A. He said that he was actually not only

15         performing his duties as a driver, but they

16         wanted him to perform duties as a rigger,

17         which he's not certified to do, but the cause

18         -- they will ask drivers to do rigging work,

19         so what he was doing was actually holding onto

20         a tagline as a piece of equipment was in the

21         air and walking backwards on the lowboy, and

22         that's when he fell.

23    Q. So that's what he told you?

RICHARD RYDZA

1   A. That's how he said it happened.

2   Q. He told you he was walking backwards and then

3      he said he was not watching in the direction

4      he was traveling?

5   A. No.  He was focusing on the piece of equipment

6      because it had to be guided properly.

7   Q. Let me just ask the question, because it

8      wasn't responsive.  Did he tell you that he

9      was walking backwards and he was not looking

10     in the direction he was moving?

11  A. I don't recall exactly what he said.

12  Q. You don't?

13  A. No.

14  Q. Well, if he was looking up at the load, was he

15     also watching where he was walking behind him?

16         MS. BAUMEISTER:  Objection.

17  A. No.

18  Q. All right.  So he wasn't watching where was

19     going.  Is that a fair statement?

20         MS. BAUMEISTER:  Objection.

21  A. Yes.

22         MR. GULISANO:  That's all the questions

23     I have.

RICHARD RYDZA

1          MS. BAUMEISTER:  Quick followup.

2

3      **BY MS. BAUMEISTER:**

4   Q. Do you know how the planks are affixed to a

5      trailer?

6   A. They're bolted down.

7   Q. They're bolted down.  Okay.  How do they come

8      off?  How do you find yourself in a situation

9      where a trailer is missing a plank?

10          MR. GULISANO:  Objection.

11  A. That would ask for assumption, so I don't

12     know.  Are you asking me why this one was

13     removed?

14  Q. Not this one.  You said in the past trailers

15     have had similar issues with missing planks.

16  A. It may have had a bad plank and they just

17     didn't finish repairing it.

18  Q. If it is a bad plank, how does that affect

19     the --

20  A. It could affect -- I know where you're going.

21     It could affect the stability of the load.  It

22     could cause somebody to actually go through

23     it.

RICHARD RYDZA

1     Q.  Is it fair to say if there is a -- I'm sorry.

2         I forget the term you used for it.  The

3         plate -- the plank.  If it's not properly on,

4         it's --

5     A.  Plank.

6     Q.  Yes.  Is it fair to say that if a piece of

7         equipment was placed on this area, the plank

8         could come off and no one would know if it's

9         not fully, like, on?

10    A.  So you're asking if it could?

11    Q.  If it could.

12    A.  It possibly could, but I can't assume, you

13        know?  There's been trailers I've seen that

14        have damaged floorboards and they've never

15        come off.

16    Q.  But it's possible, if there was a damaged

17        floorboard and upon inspection everything

18        looks up to code --

19    A.  Mm-hm.

20    Q.  -- and then a piece of equipment's put on,

21        that floorboard could go and no one would

22        know?

23    A.  That's a possibility.  Yes.

**RICHARD RYDZA**

1    Q. Possibility.  Okay.  And do you know if it's

2        standard procedure for employees to do

3        multiple tasks on a job site?  For example,

4        would it be standard procedure for a driver to

5        help unload equipment off of the trailer?

6    A. I think our policy dictated no, and they're

7        also not supposed to do rigger jobs, so he was

8        doing a job of not only a driver, but of the

9        rigger, and that's something I was all over

10       Clark about, too, that they had un-certified

11       riggers doing rigging work.  It was a concern.

12           MS. BAUMEISTER:  That's all I have.

13           MR. GULISANO:  Okay.  Thank you.

14           THE WITNESS:  Thank you very much.

15

16       (Deposition concluded at 1:24 p.m.)

17                   *  *  *  *  *  *

18

19

20

21

22

23

1    STATE OF NEW YORK)

2                  )  ss.

3    COUNTY OF ERIE   )

4

5

6    I, Jennifer A. Drakulich, Notary Public, in
     and for the County of Erie, State of New York,

7    do hereby certify:

8    That the witness whose testimony appears
     hereinbefore was, before the commencement of

9    their testimony, duly sworn to testify the
     truth, the whole truth and nothing but the

10   truth; that said testimony was taken pursuant
     to notice at the time and place as herein set

11   forth; that said testimony was taken down by
     me and thereafter transcribed into

12   typewriting, and I hereby certify the
     foregoing testimony is a full, true and

13   correct transcription of my shorthand notes so
     taken.

14

15   I further certify that I am neither counsel
     for nor related to any party to said action,

16   nor in anyway interested in the outcome
     thereof.

17

18   IN WITNESS WHEREOF, I have hereunto
     subscribed my name and affixed my seal this

19   30th day of October, 2020.

20

                    _____
22                  Jennifer A. Drakulich

23

## 1

**110** [1] - 4:2
**12:50** [1] - 1:15
**135** [1] - 1:13
**14202** [2] - 2:4, 2:9
**14219** [1] - 4:2
**181** [1] - 2:4
**19** [1] - 3:4
**19-CV-01583-WMS-JJM** [1] - 1:6
**1961** [1] - 5:8
**1:24** [1] - 32:16

## 2

**20** [1] - 6:8
**2014** [2] - 6:13, 6:15
**2015** [1] - 6:13
**2016** [4] - 6:9, 7:7, 7:13, 7:14
**2017** [6] - 4:10, 7:9, 7:17, 7:22, 13:1, 23:5
**2020** [3] - 1:15, 6:1, 33:19
**21st** [6] - 1:15, 4:10, 7:9, 7:22, 13:1, 23:5
**23rd** [1] - 6:1

## 3

**30** [1] - 3:3
**301** [1] - 1:14
**30th** [1] - 33:19
**344** [1] - 2:8
**393** [1] - 13:10

## 4

**4** [1] - 3:3
**400** [1] - 2:8

## 7

**716** [2] - 2:5, 2:9
**7th** [1] - 5:8

## 8

**842-4121** [1] - 2:9
**855-3761** [1] - 2:5

## A

**access** [1] - 10:6
**accident** [11] - 4:9, 13:2, 15:12, 15:14, 15:15, 15:21, 19:13, 20:8, 23:18, 23:21,

27:9
**accurate** [2] - 10:22, 11:5
**acknowledge** [1] - 22:19
**action** [1] - 33:15
**actual** [1] - 26:5
**advised** [4] - 19:22, 20:1, 20:2, 21:15
**affect** [1] - 30:18, 30:20, 30:21
**affixed** [2] - 30:4, 33:18
**afternoon** [1] - 10:2
**ago** [3] - 11:22, 12:14, 22:23
**agree** [6] - 25:4, 25:8, 25:18, 25:22, 26:20, 27:1, 27:16, 27:18, 28:3
**ahead** [1] - 27:21
**air** [1] - 28:21
**Al** [1] - 10:8
**ALAN** [1] - 1:4
**Alan** [3] - 4:8, 8:3, 16:4
**alert** [3] - 14:18, 23:11, 23:23
**almost** [1] - 12:20
**ambulating** [1] - 11:16
**ancillary** [1] - 9:13
**answer** [4] - 4:20, 9:6, 14:1, 26:18
**anyway** [1] - 33:16
**APPEARING** [2] - 2:2, 2:6
**apply** [1] - 28:6
**appointment** [1] - 19:1
**approaching** [1] - 10:12
**approximate** [1] - 6:12
**area** [6] - 12:4, 14:7, 17:6, 20:22, 22:13, 31:7
**arrived** [1] - 11:7
**associated** [1] - 18:2
**assume** [3] - 21:4, 21:5, 31:12
**assumption** [1] - 30:11
**attention** [1] - 19:13
**audit** [1] - 14:15
**Aurubis** [1] - 6:5
**Avenue** [3] - 1:13, 2:8, 4:2

## B

**backwards** [3] -

28:21, 29:2, 29:9
**bad** [3] - 11:15, 30:16, 30:18
**BAUMEISTER** [11] - 2:3, 4:6, 7:18, 18:19, 21:3, 26:2, 29:16, 29:20, 30:1, 30:3, 32:12
**Baumeister** [2] - 3:3, 4:7
**becomes** [1] - 25:13
**bed** [2] - 10:21, 12:2
**beds** [1] - 24:17
**behind** [1] - 29:15
**best** [3] - 4:20, 19:2, 27:14
**better** [1] - 16:12
**birth** [1] - 5:7
**bit** [2] - 5:9, 16:19
**Blasdell** [1] - 4:2
**board** [1] - 12:11
**bolted** [2] - 30:6, 30:7
**brought** [3] - 18:14, 19:13, 19:21
**Buffalo** [8] - 1:14, 2:4, 2:9, 17:9, 17:20, 18:2, 20:22, 21:14
**building** [1] - 5:17
**bulletin** [1] - 24:23
**business** [1] - 5:19
**BY** [5] - 2:3, 2:7, 4:6, 19:5, 30:3

## C

**cannot** [1] - 25:10
**carefully** [1] - 24:13
**case** [1] - 25:18
**causes** [1] - 26:3
**central** [1] - 20:2
**certifications** [1] - 5:18
**certified** [3] - 5:17, 28:17, 32:10
**certify** [3] - 33:6, 33:12, 33:15
**chained** [1] - 25:12
**citation** [1] - 14:8
**claims** [1] - 21:9
**clarify** [1] - 7:12
**Clark** [13] - 6:10, 6:11, 6:20, 7:4, 7:20, 7:22, 8:2, 8:9, 8:14, 16:14, 18:8, 18:9, 32:10
**Clark's** [1] - 6:9
**code** [2] - 13:19, 31:18
**combination** [1] - 16:23
**coming** [3] - 14:6, 14:23, 17:15

**commencement** [1] - 33:8
**common** [1] - 27:15
**communications** [1] - 23:8
**complaint** [1] - 22:6
**complaints** [1] - 21:20
**complete** [1] - 12:15
**compliance** [2] - 14:14, 14:17
**concern** [1] - 32:11
**concluded** [1] - 32:16
**conduct** [2] - 24:5, 24:9
**CONNORS** [1] - 2:7
**considered** [2] - 13:14, 25:9
**construction** [1] - 14:20
**continue** [1] - 8:22
**contract** [1] - 8:14
**Correct** [10] - 4:23, 9:18, 9:21, 17:17, 18:6, 18:11, 19:9, 19:15, 20:11, 24:22
**correct** [11] - 9:17, 16:17, 18:17, 19:8, 19:15, 20:10, 21:10, 22:14, 24:21, 28:4, 33:13
**counsel** [1] - 33:15
**COUNTY** [1] - 33:3
**County** [1] - 33:6
**couple** [4] - 4:11, 12:14, 12:23, 13:1
**COURT** [1] - 1:1
**court** [1] - 4:16
**crane** [8] - 8:17, 9:9, 9:10, 10:10, 11:8, 15:9, 15:11, 24:17
**create** [1] - 28:1
**criminal** [1] - 5:11
**Crosby** [1] - 1:12
**CSX** [7] - 1:7, 8:11, 8:13, 8:15, 9:2, 18:14, 22:12
**CSX's** [1] - 8:19

## D

**damage** [1] - 14:9, 22:7
**damaged** [2] - 31:14, 31:16
**date** [4] - 5:7, 6:7, 13:2, 15:18
**dates** [1] - 8:1
**debris** [1] - 12:18
**deck** [1] - 25:11
**decking** [3] - 12:16,

23:14, 24:19
**decks** [2] - 25:1, 25:5
**defects** [1] - 24:15
**DEFENDANT** [1] - 2:6
**Defendant** [1] - 1:8
**definitely** [1] - 23:19
**degree** [4] - 5:11, 5:12, 5:14
**Delaware** [2] - 1:13, 2:8
**demanding** [1] - 14:5
**DePaolo** [1] - 1:12
**Deposition** [1] - 32:16
**deposition** [1] - 4:12
**DESCRIPTION** [1] - 3:6
**determine** [1] - 20:6
**diameter** [1] - 13:17
**dictated** [1] - 32:6
**difficult** [1] - 24:16
**difficulty** [1] - 11:15
**direction** [2] - 29:3, 29:10
**directly** [2] - 18:14, 18:17
**director** [3] - 6:22, 16:15
**dispatch** [2] - 20:7, 20:8
**dispatches** [1] - 20:3
**DISTRICT** [2] - 1:1, 1:2
**done** [2] - 7:10, 9:5
**DOT** [1] - 23:11
**down** [8] - 4:17, 4:18, 4:21, 25:12, 26:5, 30:6, 30:7, 33:11
**Drakulich** [3] - 1:12, 33:5, 33:22
**drive** [1] - 14:13
**driven** [1] - 15:5
**driver** [9] - 14:3, 15:5, 19:22, 20:4, 20:21, 22:7, 28:15, 32:4, 32:8
**driver's** [4] - 14:13, 25:19, 26:20, 27:7
**drivers** [2] - 24:5, 28:18
**driving** [1] - 21:4
**drove** [5] - 10:6, 15:11, 20:4, 20:21, 21:13
**dual** [1] - 5:14
**duly** [2] - 4:3, 33:9
**duties** [2] - 28:15, 28:16

## E

**e-mail** [1] - 14:5, 14:18

**e-mails** [1] - 23:4
**edge** [1] - 10:9
**education** [1] - 5:9
**either** [1] - 6:15
**elaborate** [1] - 26:4
**emergency** [3] - 9:22, 11:17, 11:18
**employed** [4] - 5:20, 7:20, 7:22, 8:2
**employee** [1] - 28:6
**employees** [1] - 32:2
**end** [1] - 7:14
**engineering** [2] - 5:15, 5:16
**entire** [1] - 7:4
**environmental** [4] - 5:14, 6:3, 6:21, 16:21
**equipment** [12] - 9:7, 9:10, 9:13, 14:10, 14:23, 17:14, 18:5, 25:12, 28:20, 29:5, 31:7, 32:5
**equipment's** [1] - 31:20
**ERIE** [1] - 33:3
**Erie** [1] - 33:6
**ESQ** [2] - 2:3, 2:7
**exact** [2] - 7:1, 8:1
**exactly** [3] - 6:13, 15:6, 29:11
**Examination** [1] - 1:10
**EXAMINATION** [3] - 3:1, 4:6, 19:5
**examined** [1] - 4:3
**examining** [1] - 24:13
**example** [1] - 32:3
**Exhibit** [2] - 10:17, 11:2
**EXHIBIT** [1] - 3:6
**exhibits** [1] - 3:7
**existing** [1] - 8:15
**expected** [1] - 24:9
**explain** [1] - 17:23

**F**

**facilities** [1] - 14:16
**failure** [4] - 25:19, 25:23, 26:21, 27:7
**fair** [8] - 17:19, 19:14, 20:19, 23:1, 23:2, 29:19, 31:1, 31:6
**fall** [4] - 12:18, 13:15, 14:10, 28:1
**far** [3] - 9:3, 16:4, 26:4
**fell** [3] - 12:5, 12:20, 28:22
**fill** [1] - 15:23
**filled** [1] - 15:13

**fine** [1] - 26:15
**finish** [1] - 4:19, 30:17
**finished** [2] - 12:17, 13:6
**fire** [1] - 5:17
**first** [5] - 4:3, 7:13, 24:21, 26:3, 26:4
**Fisher** [2] - 5:21, 5:22
**fit** [1] - 16:22
**flat** [1] - 10:21
**flatbed** [5] - 9:11, 10:7, 11:4, 12:14, 23:10
**flatbeds** [2] - 13:5, 14:6
**floorboard** [2] - 31:17, 31:21
**floorboards** [1] - 31:14
**fly** [1] - 13:7
**focusing** [1] - 29:5
**follows** [1] - 4:4
**followup** [1] - 30:1
**FOR** [2] - 2:2, 2:6
**foregoing** [1] - 33:12
**forget** [2] - 15:6, 31:2
**form** [2] - 25:20, 26:22
**forth** [1] - 33:11
**four** [1] - 5:13
**four-year** [1] - 5:13
**Franklin** [1] - 2:4
**full** [1] - 33:12
**fully** [1] - 31:9

**G**

**generated** [1] - 15:14
**given** [1] - 4:12
**Grand** [1] - 5:21
**greater** [2] - 13:12, 13:16
**ground** [1] - 4:15
**GROUP** [1] - 2:3
**guess** [2] - 9:23, 18:2
**guessing** [1] - 15:10
**guided** [1] - 29:6
**GULISANO** [12] - 2:7, 7:12, 7:15, 7:19, 13:21, 13:23, 18:21, 19:2, 19:5, 29:22, 30:10, 32:13
**Gulisano** [1] - 3:4
**guy** [1] - 20:7

**H**

**hands** [1] - 16:22
**hands-on** [1] - 16:22
**hazard** [4] - 14:18, 23:11, 23:22, 24:23

**hazards** [1] - 27:22
**head** [1] - 4:21
**health** [4] - 5:12, 6:3, 6:21, 16:21
**Heather** [1] - 4:7
**HEATHER** [1] - 2:3
**held** [1] - 1:11
**help** [1] - 32:5
**hereby** [2] - 33:6, 33:12
**herein** [1] - 33:10
**hereinbefore** [1] - 33:8
**hereunto** [1] - 33:18
**highway** [1] - 22:6
**hired** [1] - 16:20
**history** [1] - 5:10
**hit** [1] - 13:7
**hm** [1] - 31:19
**hold** [1] - 7:3
**holding** [1] - 28:19
**holes** [1] - 23:14
**hurt** [1] - 27:14
**hurts** [1] - 11:15
**hygiene** [1] - 5:13

**I**

**ID** [1] - 23:22
**idea** [3] - 8:21, 12:13, 19:11
**identified** [1] - 12:4
**identify** [1] - 10:17
**IN** [1] - 33:18
**INC** [1] - 1:7
**inch** [2] - 13:13, 13:16
**incident** [8] - 8:10, 19:8, 19:11, 22:12, 23:5, 23:9, 25:23, 28:4
**incidents** [1] - 13:4
**include** [1] - 24:13
**includes** [1] - 28:3
**indicate** [2] - 9:2, 11:12
**indicated** [1] - 23:3
**individual** [2] - 21:1, 26:9
**industrial** [1] - 5:13
**information** [1] - 21:16
**initiates** [1] - 26:7
**injured** [7] - 8:3, 9:16, 9:20, 11:12, 12:21, 21:2, 21:9
**injuries** [1] - 4:9
**injury** [3] - 15:19, 24:1
**inspect** [2] - 25:19, 26:21

**inspection** [5] - 24:6, 24:10, 26:10, 26:11, 31:17
**inspector** [1] - 5:17
**instances** [1] - 22:9
**interested** [1] - 33:16
**investigate** [1] - 19:14
**investigation** [3] - 21:6, 21:19, 22:2
**involvement** [1] - 19:6
**Island** [1] - 5:21
**issues** [4] - 14:17, 21:23, 22:1, 30:15
**item** [1] - 26:14
**items** [1] - 9:13

**J**

**Jennifer** [3] - 1:11, 33:5, 33:22
**job** [16] - 8:5, 8:8, 8:10, 8:11, 8:13, 9:4, 9:15, 9:20, 10:23, 11:23, 13:18, 17:8, 17:11, 18:14, 32:3, 32:8
**jobs** [1] - 32:7
**July** [5] - 4:10, 7:9, 7:22, 13:1, 23:5
**June** [1] - 5:8
**justice** [1] - 5:11

**K**

**kind** [2] - 10:11, 27:11
**knowledge** [2] - 19:10, 22:17
**known** [1] - 24:14

**L**

**Labelle** [1] - 4:2
**LAW** [1] - 2:3
**lawsuit** [1] - 21:10
**leads** [1] - 21:16
**learn** [1] - 19:20
**learned** [1] - 21:5
**left** [3] - 6:8, 7:6, 7:13
**lengthy** [1] - 15:17
**lift** [1] - 9:13
**likely** [1] - 15:10
**load** [2] - 29:14, 30:21
**loaded** [2] - 18:4, 20:18
**loading** [2] - 17:18, 17:21
**location** [4] - 17:7, 18:6, 20:3, 20:5
**locations** [2] - 8:16, 17:3

**look** [2] - 14:16, 27:21
**looked** [1] - 11:6
**looking** [2] - 29:9, 29:14
**looks** [1] - 31:18
**LOTEMPIO** [1] - 2:3
**lowboy** [6] - 19:17, 19:20, 20:13, 23:10, 28:11, 28:21
**lowboys** [1] - 24:17

**M**

**mail** [2] - 14:5, 14:18
**mails** [1] - 23:4
**main** [1] - 8:9
**maintenance** [1] - 26:13
**manager** [2] - 7:2, 26:6
**Manager** [1] - 16:17
**manner** [1] - 15:1
**March** [1] - 6:1
**marked** [3] - 3:7, 10:16, 11:2
**matters** [2] - 26:16, 26:17
**mean** [2] - 13:1, 20:1
**mechanic** [2] - 18:7, 26:13
**memo** [1] - 14:4
**memos** [1] - 23:4
**might** [6] - 17:5, 17:8, 17:9, 17:10, 17:11
**minimize** [1] - 19:10
**miss** [2] - 12:20, 19:11
**missing** [8] - 12:2, 12:11, 22:3, 22:14, 22:20, 23:10, 30:9, 30:15
**mm-hm** [1] - 31:19
**month** [1] - 13:3
**most** [1] - 15:10
**move** [1] - 17:9
**moving** [2] - 11:16, 29:10
**MR** [11] - 7:12, 7:15, 7:19, 13:21, 13:23, 18:21, 19:2, 19:5, 29:22, 30:10, 32:13
**MS** [10] - 4:6, 7:18, 18:19, 21:3, 26:2, 29:16, 29:20, 30:1, 30:3, 32:12
**multiple** [2] - 15:2, 32:3

**N**

**nails** [1] - 27:23

**name** [5] - 4:7, 15:6, 15:18, 20:23, 33:18
**NASH** [1] - 2:7
**near** [1] - 12:19
**need** [3] - 5:19, 17:4, 17:6
**needed** [2] - 12:15, 12:16
**needs** [1] - 13:9
**never** [1] - 31:14
**NEW** [2] - 1:2, 33:1
**New** [8] - 1:14, 2:4, 2:9, 4:2, 5:16, 17:6, 23:12, 33:6
**non** [1] - 14:17
**non-compliance** [1] - 14:17
**Notary** [2] - 1:12, 33:5
**notes** [1] - 33:13
**nothing** [3] - 12:9, 20:19, 33:9
**notice** [4] - 1:15, 23:17, 23:20, 33:10

## O

**objected** [1] - 13:23
**objection** [6] - 13:21, 21:3, 26:2, 29:16, 29:20, 30:10
**objects** [1] - 13:8
**observed** [1] - 10:11
**occasion** [1] - 24:3
**occupational** [1] - 5:12
**October** [2] - 1:14, 33:19
**OF** [3] - 1:2, 33:1, 33:3
**office** [3] - 8:9, 17:22, 18:2
**offloaded** [1] - 9:10
**old** [1] - 8:15
**one** [16] - 4:18, 6:19, 8:16, 8:18, 12:20, 13:13, 13:16, 16:4, 17:20, 22:5, 26:3, 26:4, 30:12, 30:14, 31:8, 31:21
**openings** [2] - 13:12, 13:15
**operating** [2] - 24:7, 24:11
**operators** [1] - 16:5
**opportunities** [1] - 12:17
**opportunity** [1] - 13:6
**OSHA** [2] - 13:12, 23:13
**outcome** [1] - 33:16
**own** [1] - 18:6

**owner** [1] - 26:7
**owner's** [1] - 14:19

## P

**P.C** [2] - 2:3, 2:7
**p.m** [2] - 1:15, 32:16
**PAGE** [2] - 3:1, 3:6
**page** [2] - 4:16, 5:5
**part** [1] - 17:21
**particular** [5] - 21:21, 21:22, 23:5, 25:18, 28:4
**party** [1] - 33:15
**past** [1] - 30:14
**payment** [1] - 22:7
**pebbles** [1] - 12:18
**penetrations** [1] - 14:11
**people** [3] - 12:18, 15:2, 25:14
**people's** [1] - 14:9
**perform** [1] - 28:16
**performed** [1] - 19:7
**performing** [2] - 28:15
**period** [1] - 17:11
**person** [5] - 4:19, 14:22, 15:18, 21:9
**PHILIP** [1] - 2:7
**physically** [1] - 25:10
**picture** [2] - 10:18, 11:3, 23:9
**pictures** [3] - 15:20, 18:13
**piece** [6] - 17:14, 18:5, 28:20, 29:5, 31:6, 31:20
**pinpoint** [1] - 10:2
**place** [3] - 9:14, 19:12, 33:10
**placed** [1] - 31:7
**Plaintiff** [1] - 1:5
**PLAINTIFF** [1] - 2:2
**plan** [2] - 27:18, 27:21
**plank** [13] - 12:1, 12:11, 22:14, 22:17, 22:20, 23:11, 30:9, 30:16, 30:18, 31:3, 31:5, 31:7
**planks** [3] - 22:3, 30:4, 30:15
**plate** [1] - 31:3
**point** [3] - 15:8, 16:16, 23:18
**policy** [3] - 26:6, 26:7, 32:6
**position** [4] - 6:2, 7:3, 9:14, 16:20
**positioned** [1] - 10:10
**positions** [1] - 6:17

**possibility** [3] - 17:14, 31:23, 32:1
**possible** [1] - 31:16
**possibly** [4] - 14:9, 15:11, 31:12
**potentially** [1] - 18:4
**pre** [2] - 25:20, 26:22
**pre-trip** [2] - 25:20, 26:22
**prevention** [1] - 27:14
**problems** [2] - 21:20, 24:15
**procedure** [5] - 26:6, 26:8, 26:13, 32:2, 32:4
**product** [1] - 22:5
**project** [3] - 7:10, 8:12, 9:4
**properly** [3] - 14:7, 29:6, 31:3
**property** [6] - 8:19, 8:21, 9:3, 9:5, 14:9, 15:1
**protruding** [1] - 27:23
**Public** [2] - 1:12, 33:5
**pursuant** [2] - 1:15, 33:10
**put** [8] - 12:13, 12:21, 14:4, 14:18, 15:16, 15:20, 24:23, 31:20

## Q

**questioning** [1] - 7:16
**questions** [3] - 4:11, 26:18, 29:22
**Quick** [1] - 30:1
**quite** [1] - 15:17

## R

**rail** [2] - 10:6, 10:7
**really** [2] - 11:15, 19:12
**recollection** [1] - 21:8
**recount** [1] - 10:5
**referred** [1] - 19:17
**refreshed** [1] - 11:8
**refreshing** [1] - 11:1
**related** [1] - 33:15
**remember** [13] - 6:14, 6:17, 7:10, 8:1, 8:7, 10:1, 10:5, 10:7, 10:10, 11:14, 11:20, 11:23, 20:23
**remove** [2] - 8:14, 8:18
**removed** [1] - 30:13
**repair** [1] - 26:14
**repaired** [3] - 14:7,

16:10, 23:16
**repairing** [1] - 30:17
**rephrase** [1] - 5:4
**replaced** [1] - 12:10
**report** [4] - 15:13, 15:14, 15:16, 15:21
**reporter** [1] - 4:17
**Reporting** [1] - 1:13
**represent** [1] - 4:8
**representation** [2] - 10:22, 11:5
**requested** [1] - 8:9
**requesting** [1] - 22:7
**requirement** [1] - 13:5
**requiring** [1] - 23:13
**respect** [3] - 4:8, 17:1, 19:16
**respond** [2] - 8:9, 9:23
**responded** [1] - 22:11
**responses** [1] - 5:2
**responsibility** [5] - 13:20, 14:2, 14:15, 14:19, 14:22
**responsible** [3] - 14:13, 15:2, 24:5
**responsive** [1] - 29:8
**result** [1] - 23:20
**returned** [1] - 11:19
**reveal** [1] - 22:2
**RICHARD** [2] - 1:11, 3:2
**rigger** [2] - 28:16, 32:7, 32:9
**riggers** [1] - 32:11
**Rigging** [4] - 6:11, 8:2, 16:14, 18:10
**rigging** [2] - 28:18, 32:11
**risk** [1] - 7:1
**roadway** [2] - 9:1, 10:6
**Rochester** [1] - 17:10
**rocks** [1] - 12:18
**role** [1] - 16:14
**root** [8] - 25:19, 25:22, 26:4, 26:8, 26:12, 26:20, 27:2
**rules** [1] - 4:15
**run** [1] - 5:19
**RYDZA** [2] - 1:11, 3:2
**Rydza** [1] - 4:7

## S

**safe** [1] - 15:1
**safety** [7] - 5:13, 5:15, 6:3, 6:21, 7:1, 14:22, 16:21
**scene** [1] - 22:11
**screws** [1] - 27:23

**seal** [1] - 33:18
**secondary** [7] - 25:22, 26:3, 26:9, 26:11, 27:4, 27:5, 27:12
**Section** [1] - 13:10
**section** [1] - 13:11
**sector** [1] - 18:3
**secure** [1] - 13:9
**see** [4] - 7:18, 10:13, 14:6, 24:18
**seeing** [1] - 10:7
**semitrailer** [5] - 9:12, 10:8, 10:19, 10:21, 11:4
**send** [2] - 23:20, 23:22
**sent** [2] - 23:3, 23:11
**Services** [1] - 1:13
**set** [1] - 33:10
**setting** [1] - 8:17
**shorthand** [1] - 33:13
**shoulder** [1] - 5:1
**show** [2] - 10:16, 11:2
**showed** [1] - 18:13
**shrugs** [1] - 5:1
**side** [1] - 11:11
**sign** [1] - 9:1
**signed** [1] - 16:3
**similar** [3] - 21:23, 22:1, 30:15
**sit** [3] - 20:12, 22:16, 22:19
**site** [17] - 8:5, 8:8, 8:11, 8:13, 9:16, 9:20, 10:23, 11:23, 14:20, 16:1, 17:8, 17:11, 17:20, 18:14, 18:17, 32:3
**sitting** [2] - 10:8, 11:11
**situation** [1] - 30:8
**slip** [1] - 28:1
**someone** [3] - 12:20, 18:1, 18:3
**sometime** [3] - 6:8, 6:9, 7:14
**sometimes** [2] - 24:16, 24:19
**sorry** [4] - 6:20, 11:21, 16:9, 31:1
**sort** [1] - 15:12
**sorts** [1] - 5:18
**specialist** [1] - 6:3
**ss** [1] - 33:2
**stability** [1] - 30:21
**standard** [6] - 13:12, 23:12, 23:13, 32:2, 32:4
**start** [2] - 5:23, 6:6, 6:12
**STATE** [1] - 33:1

**State** [3] - 5:17, 23:12, 33:6
**statement** [6] - 16:3, 25:4, 27:13, 27:15, 29:19
**statements** [1] - 16:2
**states** [1] - 13:11
**STATES** [1] - 1:1
**stating** [1] - 25:1
**stationing** [1] - 8:17
**stay** [2] - 17:9, 17:11
**stepped** [1] - 22:13
**steps** [2] - 27:19, 27:22
**still** [2] - 9:21, 9:22
**stones** [4] - 13:4, 13:6, 22:8, 27:23
**Street** [1] - 2:4
**strike** [1] - 9:6
**subscribed** [1] - 33:18
**substance** [1] - 23:7
**Suite** [2] - 1:13, 2:8
**supervisor** [2] - 15:23, 16:6
**supposed** [1] - 32:7
**surface** [5] - 13:14, 25:9, 25:13, 25:17, 28:11
**surfaces** [3] - 25:2, 25:6, 25:15
**sustained** [1] - 4:9
**sworn** [2] - 4:3, 33:9
**Syracuse** [17] - 14:3, 14:12, 15:3, 15:5, 17:10, 17:16, 17:21, 18:1, 18:4, 18:17, 19:21, 19:22, 20:4, 20:10, 20:13, 20:22, 21:14

**T**

**tagline** [1] - 28:20
**tasks** [1] - 32:3
**technically** [2] - 7:19, 14:2
**technology** [2] - 5:15, 5:16
**term** [2] - 19:18, 31:2
**terminal** [1] - 20:2
**testified** [1] - 4:4
**testify** [1] - 33:9
**testimony** [6] - 7:20, 33:8, 33:9, 33:10, 33:11, 33:12
**testing** [1] - 16:22
**THE** [6] - 2:2, 2:6, 7:14, 13:22, 18:23, 32:14
**thereafter** [1] - 33:11

**thereof** [1] - 33:16
**Thermo** [2] - 5:21, 5:22
**they've** [1] - 31:14
**three** [2] - 6:7, 11:22
**throughout** [3] - 7:4, 12:15, 12:16
**title** [1] - 7:1
**today** [1] - 4:11
**took** [2] - 16:3, 23:9
**top** [1] - 23:22
**towers** [3] - 8:15, 8:18
**tracks** [3] - 9:3, 9:5, 10:7
**tractor** [3] - 9:12, 24:6, 24:10
**trailer** [34] - 9:11, 10:9, 10:13, 10:23, 11:11, 12:2, 12:6, 12:8, 12:12, 14:12, 15:3, 16:10, 17:15, 18:5, 18:12, 19:16, 19:17, 19:21, 20:9, 20:14, 21:21, 21:22, 24:6, 24:10, 24:14, 24:21, 25:1, 25:5, 25:20, 26:21, 28:11, 30:5, 30:9, 32:5
**trailers** [10] - 12:15, 13:18, 17:1, 17:5, 17:8, 18:7, 21:22, 22:3, 30:14, 31:13
**transcribed** [1] - 33:11
**transcription** [1] - 33:13
**transport** [1] - 17:7
**TRANSPORTATION** [1] - 1:7
**transportation** [1] - 22:23
**transported** [1] - 23:15
**traveling** [1] - 29:4
**Trial** [1] - 1:10
**trip** [3] - 25:20, 26:22, 28:1
**truck** [3] - 14:13, 16:5, 22:8
**trucks** [1] - 12:14
**true** [4] - 11:5, 21:17, 27:13, 33:12
**truth** [3] - 33:9, 33:10
**two** [3] - 5:11, 5:12, 13:3
**two-year** [2] - 5:11, 5:12
**typewriting** [1] - 33:12
**typically** [1] - 15:15

**U**

**un-certified** [1] - 32:10
**unbolt** [1] - 25:11
**under** [1] - 24:19
**UNITED** [1] - 1:1
**unload** [1] - 32:5
**unloading** [1] - 17:18
**up** [6] - 8:17, 9:14, 10:6, 13:19, 29:14, 31:18

**V**

**various** [2] - 17:2, 17:3
**vehicle** [6] - 9:23, 11:17, 11:18, 12:5, 22:8, 23:10
**vehicles** [1] - 13:7
**verbal** [1] - 5:2
**version** [1] - 16:1
**vs** [1] - 1:6

**W**

**wait** [1] - 11:16
**waiting** [1] - 9:22
**walking** [14] - 25:1, 25:5, 25:9, 25:11, 25:13, 25:15, 25:17, 26:1, 27:8, 28:10, 28:21, 29:2, 29:9, 29:15
**walking-working** [4] - 25:9, 25:13, 25:15, 25:17
**WALTER** [1] - 1:4
**Walter** [11] - 4:8, 8:3, 9:16, 11:10, 21:1, 21:10, 22:12, 24:9, 26:1, 28:4, 28:10
**Walter's** [2] - 23:18, 23:21
**warehouse** [3] - 14:4, 15:4, 17:16
**warehouses** [1] - 17:2
**warning** [1] - 12:13
**watch** [2] - 26:1, 27:7
**watching** [4] - 27:22, 29:3, 29:15, 29:18
**Wednesday** [1] - 1:14
**weeks** [3] - 12:14, 12:23, 13:1
**WESTERN** [1] - 1:2
**Western** [1] - 17:5
**WHEREOF** [1] - 33:18
**whole** [1] - 33:9
**witness** [1] - 33:8

**WITNESS** [6] - 3:1, 7:14, 13:22, 18:23, 32:14, 33:18
**woods** [1] - 18:22
**workers** [1] - 27:18

**Y**

**yard** [1] - 10:6
**year** [4] - 5:11, 5:12, 5:13, 6:1
**years** [2] - 6:8, 11:22
**yield** [1] - 21:20
**YORK** [2] - 1:2, 33:1
**York** [8] - 1:14, 2:4, 2:9, 4:2, 5:16, 17:6, 23:12, 33:6
**yourself** [2] - 27:14, 30:8